**PROSKAUER ROSE LLP**
Counsel for the Debtors
and Debtors-in-Possession
Jeffrey W. Levitan (JL-6155)
Adam T. Berkowitz (AB-3714)
1585 Broadway
New York, New York 10036-8299
Tel: (212) 969-3000
Fax: (212) 929-2900

**UNITED STATES BANKRUPTCY COURT,
EASTERN DISTRICT OF NEW YORK**

```
-------------------------------------------------- x
In re:                                     :
                                           :          Chapter 11
                                           :
CARITAS HEALTH CARE, INC., et al.,         :          Case Nos. 09-40901 (CEC)
                                           :          through 09-40909 (CEC)
                                           :
                      Debtors.             :          (Jointly Administered)
-------------------------------------------------- x
```

**MOTION OF DEBTORS FOR ORDERS: (I) APPROVING AUCTION PROCEDURES RESPECTING AN AGREEMENT FOR THE SALE OF MEDICAL EQUIPMENT AND RELATED ASSETS AND ENGAGEMENT OF A DISPOSITION AGENT WITH RESPECT TO MEDICAL SUPPLIES; AND (II) AUTHORIZING THE SALE OF THOSE ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS**

  Caritas Health Care, Inc. and the other above-captioned debtors and debtors-in-

possession (each, a "Debtor," and collectively, the "Debtors"), hereby submit this motion (the

"Motion") and respectfully represent:

**SUMMARY OF RELIEF REQUESTED**

  1. The Debtors entered into an agreement, subject to court approval, with

Centurion Service Group, LLC ("Centurion") and Perfection Plant Liquidations, LLC ("PPL,"

and together with Centurion, the "Stalking Horse Bidder"), dated April 30, 2009, a copy of

which is annexed hereto as Exhibit B (the "Agreement") in order to monetize certain of the

Debtors' assets consisting of medical equipment (the "Equipment") and supplies ("Supplies").

The Equipment consists of various medical equipment including, among other things, hospital

beds, exam tables, lights, wheelchairs, diagnostic equipment, respiratory equipment, and surgical

equipment as well as the other furniture and fixtures at the Debtors' facilities.  The Supplies

consist of various items utilized in the day to day treatment of patients including, among other

things, wound dressings, hot and cold therapy supplies, various types of wraps, surgical and

medical kits, needles and syringes along with the Debtors' general office supplies.

2.      In furtherance of the Debtors efforts to monetize the Equipment and

Supplies, the Debtors, in the exercise of their sound business judgment, have determined that it is

in the best interests of the Debtors, their estates and creditors to seek entry of two orders of this

court.  The Debtors first seek entry of an order, substantially in the form of Exhibit A annexed

hereto (the "Bidding Procedures Order"), to:

> (a)      approve the auction procedures annexed hereto as Exhibit C (the
> "Auction Procedures") in connection with an auction (the
> "Auction") to solicit alternative proposals regarding the disposition
> of the Equipment and Supplies.  The sales of the Equipment and
> Supplies are herein referred to as the "Sales;"

> (b)      approve bid protections for the Stalking Horse Bidder in the form
> of a break-up fee of $68,000 pursuant to the Agreement in the
> event that the Stalking Horse Bidder is not selected as the
> Successful Bidder (as defined in the Auction Procedures) at the
> Auction (the "Break-Up Fee") and a minimum overbid
> requirement of 3% of the Equipment Purchase Price (as defined in
> paragraph 17 below);

> (c)      approve the manner and form of the notice of auction procedures,
> auction date and sale hearing (the "Auction and Sale Hearing
> Notice"), substantially in the form annexed hereto as Exhibit D;
> and

> (d)      grant certain ancillary and other relief related thereto.

3.　　　After the Auction is conducted, the Debtors will seek entry of a second order (the "Sale Order") to approve the Agreement, or another similar agreement or agreements, and authorize Caritas to implement such agreement or agreements in order to sell the Equipment and the Supplies free and clear of all liens, claims and encumbrances and to establish procedures in connection with the abandonment of property of inconsequential value (such approval hearing to be known as the "Sale Hearing").

## JURISDICTION

4.　　　The Court has jurisdiction over this Motion under 28 U.S.C. § 1334, which is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of these proceedings is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

5.　　　On February 6, 2009 (the "Petition Date"), the Debtors filed with this Court voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, the Debtors are continuing to operate their businesses and manage their affairs as debtors-in-possession.  On February 13, 2009, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee") in the Debtors' Chapter 11 cases.

6.　　　The factual background relating to the Debtors' commencement of these Chapter 11 cases is set forth in detail in the Affidavit of John Lavan, the Chief Restructuring Officer of Caritas, in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 10] (the "Lavan Affidavit") filed on the Petition Date and incorporated herein by reference.

7.     Since the Petition Date, the Debtors have completed the shut down of all medical operations, ceased providing health care services, terminated all health-care-related operations and are in the process of liquidating their assets and winding up their affairs.

**The Debtors Efforts to Market and Sell Their Equipment and Supplies**

8.     The Debtors, in consultation with their secured lenders and the Committee, have determined in their sound business judgment that a sale of the Equipment and Supplies will maximize the value of their estates.  To that end, the Debtors began to solicit bids regarding the Sales in February, 2009 through their financial advisor, Montclair Partners, LLC ("Montclair").  Montclair contacted several well-known liquidation firms as well as several other entities which initiated unsolicited contact with the Debtors.  These initial discussions resulted in four firms interested in pursuing a potential transaction, each of which were invited to tour the Debtors' facilities in order to examine the Equipment and Supplies.  Three proposals were then submitted in respect of the Sales by these parties.  The Debtors engaged each of these three potential purchasers in further discussions resulting in a significantly better proposal than originally submitted.  Ultimately, the Debtors determined that the joint proposal submitted by the Stalking Horse Bidder provided the Debtors with the best opportunity to maximize the value received for the Equipment and the Supplies.  Accordingly, the Debtors negotiated the Agreement with the Stalking Horse Bidder on the terms and conditions set forth in their proposal.

**RELIEF REQUESTED AND BASIS THEREFOR**

9.     By this Motion, the Debtors seek entry of two orders of this Court: (I) approving procedures for the solicitation of alternate proposals for the disposition and

monetization of the Equipment and Supplies; and (II) authorizing (x) sales of the Equipment to the Stalking Horse Bidder and (y) sales of the Supplies through the Agent Sale, as defined below, all free and clear of liens, claims, encumbrances and interests, pursuant to the Agreement or approval of such other proposal or proposals that the Debtors determine, after the Auction, to be a higher or better offers for the disposition and monetization of the Debtors' Equipment and Supplies.

10.     Accordingly, the Debtors request authority to conduct the Auction on June 1, 2009 at 10:00 a.m. (New York City time), with bids to be received by no later than 4:00 p.m. (New York City time) on May 27, 2009, and request a sale hearing on June 3, 2009, subject to the Court's availability. The Debtors also request that the Court set May 28, 2009 at 4:00 p.m. (New York City time) as the deadline for serving objections to the proposed sale.

## A.     The Auction Procedures

11.     The Debtors are proposing Auction Procedures in an attempt to maximize the realizable value of the Equipment and Supplies for the benefit of the Debtors' estates, creditors and other interested parties. The Auction Procedures contemplate an auction process pursuant to which alternative proposals regarding the disposition of the Equipment and Supplies will be solicited. The following is a brief summary of certain of the key provisions of the Auction Procedures; the Court, however, is respectfully referred to Exhibit C for a full recitation of the Auction Procedures:[1]

> (a)     Bids will be accepted for (i) the purchase of all or a portion of the Equipment and/or Supplies and/or (ii) service as a disposition

---

[1]     The dates and times included in this description of the Auction Procedures assume that the dates proposed by the Debtors in paragraph 10 are acceptable to and approved by the Court.

agent for all or a portion of the Equipment and/or Supplies. Bidders may submit either type of Bid for either category of assets, and are free to combine types of bids or to bid for any of the assets.

(b)     All Bids must be unconditional and not contingent upon any event, including, without limitation, any additional due diligence investigation, inventory evaluation, or financing.

(c)     All Bids must be in writing and include an executed Agreement (marked to show changes from the form annexed hereto as Exhibit B unless otherwise agreed by a potential bidder and the Debtors in advance) and must be submitted so that they are actually received by the Debtors, counsel for the Debtors, counsel for the Debtors' Secured Lenders (as defined below) and counsel for the Committee by no later than 4:00 p.m. (New York City time), on May 27, 2009.

(d)     All Bids shall be accompanied by a deposit equal to 10% of the value of the Bid, and shall provide appropriate evidence, reasonably satisfactory to the Debtors, of the bidder's financial ability to consummate a transaction.

(e)     The Auction shall commence at 10:00 a.m. (New York City time), on June 1, 2009 at the offices of Proskauer Rose LLP, 1585 Broadway, New York, New York 10036.

(f)     If the Debtors determine to accept a combination of Bids, each for less than 100% of the Equipment, the aggregate monetary value of such Bids must be greater than the Equipment Purchase Price plus 3%.

(g)     The Debtors reserve the right, after consultation with the Secured Lenders and the Committee, to (i) impose additional terms and conditions at or prior to the Auction, (ii) extend the deadlines set forth in the Auction Procedures and/or adjourn the Auction at the Auction and/or the Sale Hearing without further notice and (iii) reject any or all bids if, in the Debtors' reasonable business judgment, no bid is for a fair and adequate price.

12.     The Debtors believe that these Auction Procedures provide an appropriate framework for selecting a Bid in a uniform fashion and, at the same time, provide the Debtors with the flexibility to consider any and all proposed transactions and will enable the Debtors to review, analyze and compare all bids received to determine which bid is in the best interests of the Debtors' estates and creditors. Therefore, the Debtors respectfully request that this Court

approve the Auction Procedures. At the Auction, after consultation with the Committee and the Secured Lenders, the Debtors will determine which transaction or transactions will maximize the value of the Debtors' estates and the recovery for their creditors.

13. Similar relief to that requested herein has been granted in cases in this District. See, e.g., Victory Memorial Hospital, et al., Case No. 06-44387 (CEC) (Bankr. E.D.N.Y. March 10, 2008) (approving auction procedures in connection with sale of certain assets free and clear of liens); The Brooklyn Hospital Center, et al., Case No. 05-26990 (CEC) (Bankr. E.D.N.Y. June 6, 2007) (approving auction procedures in connection with sale of real estate and related assets free and clear of liens).

**B.     Notice of Auction and Sale Hearing**

14. The Debtors propose to serve the Auction and Sale Hearing Notice, no later than two business days following the entry of the Bidding Procedures Order upon (a) the U.S. Trustee; (b) the Dormitory Authority of the State of New York ("DASNY"); (c) Healthcare Finance Group, Inc. ("HFG"); (d) St. Vincents Catholic Medical Centers of New York ("SVCMC"); (e) the Committee; (f) all those who have entered an appearance in these cases pursuant to Bankruptcy Rule 2002; (g) all parties who have expressed interest in making a Bid or identified by the Debtors as a potential purchaser; (h) all known entities holding or asserting a lien on the Equipment or Supplies; (i) the Office of the Attorney General of the State of New York; and (j) any taxing authorities having jurisdiction over the Debtors. DASNY, HFG and SVCMC shall herein be referred to as the "Secured Lenders."

15. The Debtors submit that the notice to be provided by notice of this Motion and the Auction and Sale Hearing Notice and the method of service proposed herein constitutes

good and adequate notice of the Auction and the proceedings to be had with respect thereto. Therefore, the Debtors respectfully request that this Court approve the foregoing notice procedures.

## C.   The "Stalking Horse" Agreement

16.   The Debtors' proposed auction procedures request that, where practical, offers be submitted in the form of a markup of the Agreement, a copy of which is annexed hereto as <u>Exhibit B</u>.  The Debtors will seek approval of the agreement(s) executed with the Successful Bidder(s) at the Sale Hearing held subsequent to the Auction.  Set forth below is a description of the Agreement which will be utilized in connection with the Auction.

17.   The Agreement contemplates the disposition of Equipment and Supplies in two separate ways:  the Equipment will be sold to the Stalking Horse Bidder free and clear of liens, claims and encumbrances, while the Supplies will be sold by the Stalking Horse Bidder as disposition agent for the Debtors in an auction process.  The following is a brief summary of certain of these and other key provisions of the Agreement; the Court, however, is respectfully referred to the Agreement for a full recitation of the terms and conditions thereof:[2]

The Equipment Sale:

(a)   <u>Purchase Price</u>:  Stalking Horse Bidder will pay Caritas $3,400,000 for the Equipment (the "<u>Equipment Purchase Price</u>").

(b)   <u>Good Faith Deposit</u>: Within two business days after execution of the Agreement, ten percent (10%) of the Equipment Purchase Price, which amount is equal to $340,000, will be deposited with Proskauer Rose LLP in its capacity as escrow agent.

---

[2]   Capitalized terms used in this Section C, but not otherwise defined, shall have the meanings given to them in the Agreement.

(c)     <u>Bid Protections</u>: In the event that the Debtors consummate a transaction with a party other than the Stalking Horse Bidder, the Debtors have agreed to provide the Stalking Horse Bidder with a Break-Up Fee equal to 2% of the Equipment Purchase Price.

(d)     <u>Closing</u>: The balance of the purchaser price, $3,060,000, shall be paid to Caritas on the Closing Date, which date shall be no later than five (5) days after entry of a Sale Order approving the Agreement.

<u>Sales by Disposition Agent</u>:

(a)     <u>Agent Sale</u>: For a period of 90 days from the Closing Date, the Stalking Horse Bidder will conduct auctions at the Debtors' facilities and online in order to sell the Equipment and Supplies (the "<u>Agent Sale</u>"). The Agent will retain all proceeds from sale of the Equipment and will remit net proceeds of the sale of Supplies as set forth below.

(b)     <u>Sales of Supplies</u>: The Stalking Horse Bidder will lot, catalog and sell the Supplies as part of the Agent Sale, charging a buyer's premium of 10% in respect of sales occurring at the Debtors' facilities and 17% in respect of sales occurring online (as applicable, the "<u>Buyer's Premium</u>"), but charging no additional commission to the Debtors. The net proceeds, after subtraction of the Buyer's Premium and any sales and similar taxes, will be remitted to Caritas on the next business day following any such sales.

<u>Obligations Respecting Facilities and Conclusion of Agent Sale</u>:

(a)     The Debtors will pay for all expenses related to the Hospital Facilities, and are required to maintain general liability insurance for the Hospital Facilities through the conclusion of the Agent Sale term. The Stalking Horse Bidder shall be required to obtain comprehensive general liability insurance respecting its use of the Hospital Facilities, property hazard insurance covering the Supplies, and must name the Debtors as additional insured parties under such policies.

(b)     At the conclusion of the 90 day Agent Sale term, the Stalking Horse Bidder shall consolidate all unsold Equipment and Supplies, leave all sales areas free of papers and trash, and vacate the Hospital Facilities, leaving them in broom clean condition.

(c)     In addition, the Stalking Horse Bidder shall be permitted to abandon any unsold Equipment and shall leave all unsold Supplies at the Hospital Premises.

18.     The Agreement contains other provisions customary to Agreements of this nature including, without limitation, indemnification provisions.

## D.     Approval of the Sales

19.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, the Second Circuit has required that the decision to sell assets outside the ordinary course of business be based upon a sound business justification. See In re Chateaugay Corp., 973 F.2d 141 (2nd Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2nd Cir. 1983). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. Lionel, 722 F.2d at 1071.

20.     Additionally, Section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its Section 105(a) power is

proper.  In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002); In re United States Lines, 199 B.R. 476, 481 (Bankr. S.D.N.Y. 1996).  Pursuant to Section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets.  See, e.g., Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

21.     The Debtors believe that Sales to the Successful Bidder (or the Next Highest Bidder, as defined in the Auction Procedures) pursuant to the Auction Procedures represent prudent and proper exercises of their business judgment and are supported by articulated business reasons.  The Sales reduce the Debtors' carrying and maintenance costs, will help prevent any shrinkage and will allow the Debtors to substantially clear out the Hospital Facilities in preparation for any opportunities to sell such facilities and the underlying real estate. The realization of fair value for the Equipment and Supplies as quickly as possible is in the best interests of the Debtors' estates and their creditors.  Accordingly, the Debtors believe that they are exercising sound business judgment and request that the Court approve the Sales to the Highest Bidder (or Next Highest Bidder) pursuant to the Auction Procedures.

**E.     Approval to Sell the Equipment and Supplies
          Free and Clear of Liens, Claims and Encumbrances**

22.     The Debtors request approval to sell the Equipment and/or the Supplies to the Highest Bidder (or Next Highest Bidder), and/or to sell the Supplies through Purchaser-Run Sales, free and clear of any and all liens, claims or encumbrances in accordance with Section 363(f) of the Bankruptcy Code.  Pursuant to Sections 363(b) and 363(f) of the Bankruptcy Code, a debtor-in-possession may sell property "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions is satisfied:

(a)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

23.     The Debtors believe that they will be able to establish one or more of such requirements.  More specifically, the Debtors propose that any liens, claims or encumbrances asserted against the assets be transferred to and attach to the proceeds of the sale of the assets and such other amounts payable to the Debtors under the Agreement, subject to the rights, claims, defenses, and objections, if any, of all interested parties with respect thereto.

**F.     Retention of the Stalking Horse Bidder as Liquidation Agents**

24.     Section 327(a) of the Bankruptcy Code provides, in pertinent part, that "... the trustee, with the court's approval, may employ one or more attorneys, accountants,

appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons... ." 11 U.S.C. § 327(a). Section 101(14)(C) of the Bankruptcy Code provides, in pertinent part, that a "disinterested person" is a person, among other things, "that does not have an interest materially adverse to the interest of the estate ... by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C. § 101(14)(C).

      25.     The Debtors submit that the Stalking Horse Bidder meet the criteria for such retention and the Stalking Horse Bidder should be retained in accordance with the terms of the Agreement, subject to the Debtors right to select another party as the Successful Bidder in the event such party submits a higher and better bid. Any Successful Bidder proposing to act as the Debtors' disposition agent will be required to submit a declaration of disinterestedness at or prior to the Sale Hearing stating that the Successful Bidder neither holds nor represents any interest adverse to the Debtors or their estates, that the Successful Bidder is a "disinterested person" within the meaning of 11 U.S.C. § 101(14)(C), and that the employment of the Successful Bidder would be in the best interests of the Debtors' estates.

      26.     Section 328(a) of the Bankruptcy Code provides, in pertinent part, that "[t]he trustee …, with the court's approval, may employ or authorize the employment of a professional person under section 327 … of this title … on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis. 11 U.S.C. § 328(a). The Debtors request that the Successful Bidder (or Next Highest Bidder) be compensated in accordance with the Agreement, or such similar agreement or agreements entered into by and between the Debtors and the Successful Bidder (or

Next Highest Bidder), pursuant to the standards set forth in Section 328(a) of the Bankruptcy Code.

27.     In the event the Stalking Horse Bidder is the Successful Bidder, the Debtors submit that the Agreement is the result of arms' length negotiations between the Stalking Horse Bidder and the Debtors, and the Debtors believe that the Agreement is fair and reasonable.  In light of the percentage fee-based nature of the compensation proposed to be paid to the Stalking Horse Bidder in connection with the sale of Supplies under the Agreement, the Stalking Horse Bidder will not keep time records.  Accordingly, it is proposed that the Stalking Horse Bidder be compensated, in accordance with the terms of the Agreement, without further order of the Court.

28.     Similar relief has been granted in cases in this Circuit.  <u>See</u>, <u>e.g.</u>, <u>In re Dreier LLP</u>, Case No. 08-15051 (SMB) (Bankr. S.D.N.Y. March 20, 2009) (approving compensation of broker with a 12% buyer's premium for brokered sales).

**G.      Approval of the Stalking Horse Bidder Bid Protections**

29.     There are three considerations for courts assessing break-up fees: (1) whether the relationship of the parties who negotiated the break-up fee is tainted by self-dealing or manipulation; (2) whether the fee hampers, rather than encourages, bidding; and (3) whether the amount of the fee is unreasonable relative to the proposed purchase price.  <u>In re Integrated Resources</u>, 147 B.R. 650, 657 (S.D.N.Y. 1992).

30.     In order to facilitate the auction process, Caritas agreed to include the Break-Up Fee provision in the Agreement.  In addition, the Break-Up Fee is intended to reimburse the Stalking Horse Bidder for certain of the expenses they have incurred and will

continue to incur in connection with the proposed transaction, and to compensate the Stalking Horse Bidder for the substantial time and effort they have expended to date and will continue to expend as a stalking horse for competing bids.  In the event that the Stalking Horse Bidder are not the successful bidders at the Auction, the Agreement provides for the Caritas to pay a Break-Up Fee of  2% of the purchase price for the Equipment, which amount is equal to $68,000.  The Debtors submit that notwithstanding the Break-Up Fee, use of the Agreement will facilitate discussions with other interested parties and will establish a floor with respect to the proposed Auction.  The Debtors believe that without a stalking horse agreement, which the Debtors were unable to attain without the inclusion of a Break-Up Fee, the ultimate proceeds for the Auction may not be maximized.  Thus, the amount of the Break-Up Fee is fair and reasonable, and use of the stalking horse Agreement will ensure that competing bids will be higher and better than the Asset Purchase Agreement, providing a significant benefit to the Debtor's estates and creditors. See, e.g., In re The Brooklyn Hospital Center, et al., Case No. 05-26990 (CEC) (Bankr. E.D.N.Y. June 6, 2007) (approving a break-up fee of 3%); In re Our Lady of Mercy Medical Center, et al., Case No. 07-10609 (REG) (Bankr. S.D.N.Y. March 29, 2007) (approving a break-up fee of 1.8%); Integrated Resources, 147 B.R. at 662 (approving a breakup fee that ranged as high as 3.2% of the purchase price of the non-cash assets).  Moreover, there are no facts regarding the relationships between the Debtors and the Stalking Horse Bidder which would indicate any manipulation or self-dealing in the negotiation of the Break-Up Fee.  Accordingly, the Debtors believe that the proposed Break-Up Fee satisfies the standards provided for in Integrated Resources.

**H.      The Court Should Authorize the Abandonment of Inconsequential Property**

31.      In addition to the Sales, the Debtors may determine that the costs associated with holding and/or selling certain property exceed the likely proceeds that may be realized upon sale.  As such, the property is of inconsequential value and benefit to the Debtors' estates and may, in certain instances, be burdensome to the Debtors' estates.  To maximize the value of the Debtors' estates, the Debtors request authority under Section 554(a) of the Bankruptcy Code to abandon such property which the Debtors, in the exercise of their business judgment, determine to be burdensome, or of inconsequential value and benefit to the Debtors' estate.  See S. Chicago Disposal, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.), 130 B.R. 162, 166 (Bankr. S.D.N.Y. 1991) (stating in dicta that the debtor "may abandon burdensome property . . . to further the best interests of the estate") (quotation omitted); In re St. Lawrence Corp., 239 B.R. 720, 726-27 (Bankr. D. N.J. 1999) (permitting abandonment where property was burdensome or of inconsequential value and benefit to the estate); In re Boogaard, 89 B.R. 397, 399 (Bankr. D. Del. 1988) (permitting abandonment of truck found to be of inconsequential value or of no value to the estate).

**I.      Relief from the Ten-Day Waiting Period
          Under Bankruptcy Rule 6004(h) is Appropriate**

32.      Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property … is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." The Debtors request that Court order that the Sale Order be effective immediately upon entry thereof.

33.      The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee

Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten-day stay period, Collier on Bankruptcy suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10-6004 Collier on Bankruptcy, 15th Edition Rev. P 6004.10. Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

34. Accordingly, the Debtors hereby request that the Court order that the ten-day stay period under Bankruptcy Rule 6004(h) shall not be in effect.

## NOTICE

35. Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the U.S. Trustee; (b) DASNY; (c) HFG; (d) SVCMC; (e) the Committee; (f) all those who have entered an appearance in these cases pursuant to Bankruptcy Rule 2002; (g) all parties who have expressed interest in making a Bid and for which the Debtors were provided contact information; (h) all known entities holding or asserting a lien on the Equipment or Supplies; (i) the Office of the Attorney General of the State of New York; and (j) any taxing authorities having jurisdiction over the Debtors. The Debtors respectfully submit that such notice is sufficient, and request that, except as provided herein, the Court find that no further notice of the relief requested herein is required.

## NO PRIOR REQUEST

36.     No prior Application for the relief requested herein has been made to this or any other Court.

**WHEREFORE**, the Debtors respectfully request that the Court enter the proposed order, annexed hereto as <u>Exhibit A</u> approving auction procedures respecting the Agreement for the sale of medical equipment and related assets and engagement of a disposition agent with respect to medical supplies; and, subsequent to the Auction, enter a sale order, which will be submitted prior to the Sale Hearing, authorizing the Sales free and clear of liens, claims, encumbrances and interests, and approving such agreement related thereto and such other and further relief as the Court deems just and proper.

Dated:  April 30, 2009
        New York, New York

                    **PROSKAUER ROSE LLP**

                    By:  /s/ Jeffrey W. Levitan
                         Jeffrey W. Levitan (JL-6155)
                         Adam T. Berkowitz (AB-3714)
                         1585 Broadway
                         New York, NY  10036-8299
                         Tel:  (212) 969-3000
                         Fax:  (212) 969-2900

                    Counsel for the Debtors and
                    Debtors In-Possession

**Exhibit A**

**Bidding Procedures Order**

**UNITED STATES BANKRUPTCY COURT,**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------- x
In re:                              :
                                    :          Chapter 11
                                    :
**CARITAS HEALTH CARE, INC., et al.,**   :      Case Nos. 09-40901 (CEC)
                                    :          through 09-40909 (CEC)
                                    :
                      **Debtors.**   :          (Jointly Administered)
------------------------------------------------------- x

### ORDER APPROVING AUCTION PROCEDURES RESPECTING AN AGREEMENT FOR THE SALE OF MEDICAL EQUIPMENT AND RELATED ASSETS AND ENGAGEMENT OF A DISPOSITION AGENT WITH RESPECT TO MEDICAL SUPPLIES

Upon consideration of the motion (the "Motion")[1] of Caritas Health Care, Inc. and

the other above-captioned debtors and debtors-in-possession (each, a "Debtor," and collectively,

the "Debtors"), for entry of two orders of this Court: (I) approving sale procedures for the sale of

medical equipment and related assets and engagement of a disposition agent with respect to

medical supplies; and (II) authorizing the Sales free and clear of liens, claims, encumbrances and

interests, and approving such agreement related thereto; and notice of the Motion being sufficient

and no further notice needing to be given; and the Debtors having articulated good and sufficient

reasons for granting the Motion; and after due deliberation, and sufficient cause appearing

therefor, it is hereby

**ORDERED**, that the Motion is hereby granted to the extent set forth herein; and

it is further

**ORDERED**, that the Auction Procedures are hereby approved in their entirety;

and it is further

---

[1]       Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

**ORDERED**, that the Debtors shall hold the Auction in accordance with the Auction Procedures; and it is further

**ORDERED,** if Stalking Horse Bidder is not the successful bidder pursuant to the Auction Procedures, Caritas is authorized to pay the Stalking Horse Bidder the Break-Up Fee from the proceeds of a sale to or conducted by a competing bidder; and it is further

**ORDERED**, that the Sale Hearing shall be held on _____, 2009 at _____m.; and it is further

**ORDERED**, that objections, if any, to the Motion, other than with respect to relief granted herein, shall be set forth in writing and state with particularity the grounds for such objections or other statements of position and shall be electronically filed with the Bankruptcy Court and served upon (1) counsel for the Debtors, Proskauer Rose LLP, 1585 Broadway, New York, NY 10036, (Attn: Jeffrey W. Levitan, E-mail: jlevitan@proskauer.com, and Adam T. Berkowitz, E-mail aberkowitz@proskauer.com), Fax: 212-969-2900; (2) the Office of the United States Trustee, 271 Cadman Plaza East, Suite 4529, Brooklyn, New York 11201 (Attn: William E. Curtin, E-mail william.e.curtin@usdoj.gov, and Valerie Millman, E-mail valerie.millman@usdoj.gov), (3) counsel to DASNY, Winston & Strawn LLP, 200 Park Avenue, New York, New York 10166-4193 (Attn: David Neier, E-mail dneier@winston.com); (4) counsel for HFG, Kaye Scholer LLP, 425 Park Avenue, New York, New York 10022-3598 (Attn: Benjamin Mintz, E-mail bmintz@kayescholer.com); (5) counsel to SVCMC, Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New York 10281 (Attn: Andrew M. Troop, E-mail andrew.troop@cwt.com, and Christopher R. Mirick, E-Mail christopher.mirick@cwt.com); (6) counsel to the Committee, Alston & Bird LLP, 90 Park Avenue, New York, New York 10016 (Attn: Craig E. Freeman, Esq., E-mail

craig.freeman@alston.com); and (7) any other party entitled to service under applicable rules, to be actually received by _____m. (New York City time), on _____, 2009, in accordance with the Notice of Auction and Sale Hearing; and it is further

ORDERED, that the Debtors shall serve the Auction and Sale Hearing Notice upon (a) the U.S. Trustee; (b) the Dormitory Authority of the State of New York; (c) Healthcare Finance Group, Inc.; (d) St. Vincents Catholic Medical Centers of New York; (e) the Committee; (f) all those who have entered an appearance in these cases pursuant to Bankruptcy Rule 2002; (g) all parties who have expressed interest in making a Bid or identified by the Debtors as a potential purchaser for which the Debtors were provided contact information; (h) all known entities holding or asserting a lien on the Equipment or Supplies; (i) the Office of the Attorney General of the State of New York; and (j) any taxing authorities having jurisdiction over the Debtors in the manner specified in the Auction Procedures. Such service shall be deemed due, timely, good and sufficient notice of the entry of this Order, the Motion and all proceedings to be held thereon; and it is further

ORDERED, that the Debtors are authorized to execute and deliver all instruments and documents, and take such other action as may be necessary or appropriate to implement and effectuate the transactions contemplated by this Order; and it is further

ORDERED, that the Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order; and it is further

Dated: _____, 2009
        Brooklyn, New York

                                _____
                                UNITED STATES BANKRUPTCY JUDGE

**Exhibit B**

**Asset Purchase Agreement**

ASSET PURCHASE AND AUCTION AGREEMENT

THIS ASSET PURCHASE AND AUCTION AGREEMENT (this "<u>Agreement</u>") is made on this 30th day of April, 2009, by and between Caritas Health Care, Inc., a New York not-for-profit corporation ("<u>Seller</u>") and a joint venture partnership by and between Centurion Service Group LLC., an Illinois Limited Liability Corporation and Perfection Plant Liquidations an Illinois Limited Liability Corporation (collectively, "<u>Purchaser</u>").

W I T N E S S E T H :

WHEREAS, Seller is a debtor-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "<u>Bankruptcy Code</u>"), and filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on February 6, 2009 (the "<u>Petition Date</u>"), in the United States Bankruptcy Court for the Eastern District of New York (the "<u>Bankruptcy Court</u>") (Case No. 09-4091 (CEC)) (the "<u>Bankruptcy Case</u>"); and

WHEREAS, Seller owns certain tangible personal property, inventory and supplies located at St. John's Queens Hospital, 90-02 Queens Boulevard, Elmhurst, NY, and Mary Immaculate Hospital 152-11 89th Ave, Jamaica, NY (collectively, the "<u>Premises</u>"), which will include tangible personal property, inventory and supplies that had been located at Seller's outpatient clinic at 95-25 Queens Boulevard, Rego Park, NY; and

WHEREAS, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller, pursuant to Section 363 of the Bankruptcy Code, all of the tangible personal property located at the Premises, as well as the vehicles (including ambulances) shown to and inspected by Purchaser, other than the property described in <u>Exhibit A</u> annexed hereto (the "<u>Equipment</u>"), which Purchaser will then sell at an auction and keep the proceeds therefrom, on the terms and conditions set forth below; and

WHEREAS, Seller desires to retain Purchaser to sell on Seller's behalf at an auction, the perishable medical supplies located in the materials management areas of the Premises (the "<u>Supplies</u>"), on the terms and conditions set forth below; and

WHEREAS, Purchaser desires to be so retained.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements as hereafter set forth, the parties agree as follows:

ARTICLE I
DEFINITIONS

1.1     <u>Certain Definitions.</u>

For purposes of this Agreement, the following terms shall have the meanings specified in this <u>Section 1.1</u>:

"Auction" has the meaning set forth in Section 4.1(a).

"Auction Period" has the meaning set forth in Section 4.1(c).

"Bidding Procedures Order" means an order of the Bankruptcy Court setting forth the procedures by which Competing Bids may be made.

"Break-Up Fee" has the meaning set forth in Section 8.1.

"Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"Buyer's Premium" has the meaning set forth in Section 3.4.

"Closing" has the meaning set forth in Section 5.1.

"Closing Date" has the meaning set forth in Section 5.1.

"Competing Bid" has the meaning set forth in Section 8.2.

"Contemplated Transactions" means the transactions contemplated by this Agreement.

"Environmental Law" means any federal, state or local statute, law, regulation, code, ordinance, or rule of common law currently in effect relating to the protection of human health and safety or the environment or natural resources, including the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.) the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.), and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), and the regulations promulgated pursuant thereto.

"Equipment Purchase Price" has the meaning set forth in Section 3.1.

"Escrow Agent" has the meaning set forth in Section 3.2.

"Escrow Agreement" has the meaning set forth in Section 3.2.

"Escrowed Funds" has the meaning set forth in Section 3.2.

"Hazardous Material" means any substance, material or waste which is regulated by any government body including petroleum and its by-products, asbestos, biomedical waste, medical waste and any chemical, material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste,"

2

"solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" under any provision of Environmental Law.

"Laws" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement and transfer restriction under any agreement.

"Losses" has the meaning set forth in Section 4.3.

"Patient Records" shall mean any documents containing information concerning medical, health care or behavioral health services provided to, or the medical, health care or behavioral health of any individual, or that are otherwise subject to regulation under applicable Law, including the Health Insurance Portability and Accountability Act of 1996 and all regulations promulgated pursuant thereto, including the Transaction Code Set Standards, the Privacy Rules and the Security Rules set forth at 45 C.F.R. Parts 160 and 164.

"Permits" means any approvals, authorizations, consents, licenses, permits, certificates of exemption, franchises, accreditations, registrations or certificates of a governmental body or other regulatory entity.

"Permitted Exceptions" means (i) statutory liens for current Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings, provided the same could not reasonably be expected to result in a loss of the property and an appropriate reserve is established therefor; (ii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the ordinary course of business for sums not yet due and payable; (iii) title of a lessor under a capital or operating lease; and in the case of all of the foregoing, solely to the extent that such Liens cannot be removed by operation of Sections 105 and/or 363(f) of the Bankruptcy Code.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, association, estate, governmental body or other entity.

"Purchaser Documents" has the meaning set forth in Section 7.2.

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, or leaching of Hazardous Material into the indoor or outdoor environment, or into or out of any property.

"Remedial Action" means any and all actions as required by a governmental body to (i) investigate, monitor, clean up, remove, remediate, treat or in any other way address any Hazardous Material; (ii) prevent any Release so it does not endanger or threaten to endanger public health or welfare or the indoor or outdoor environment or any natural resources;

(iii) perform pre-remedial studies and investigations or post-remedial monitoring and care concerning Hazardous Material; or (iv) to correct a condition of noncompliance with, or in violation of, Environmental Law.

"Representatives" means with respect to any Person, any of its affiliates, directors, trustees, officers, members, employees, consultants, agents, advisors, and other representatives.

"Sale and Approval Order" means an order or orders of the Bankruptcy Court, (a) authorizing Seller to transfer and assign to Purchaser, and authorizing Purchaser to purchase, acquire and assume from Seller, pursuant to Section 363 of the Bankruptcy Code, the Equipment, (b) authorizing Purchaser to conduct an auction sale of the Supplies pursuant to the auction procedures described in this Agreement, (c) authorizing Seller to abandon any Supplies not sold at such auction, and (d) authorizing the parties to effectuate the transactions contemplated herein.

"Sale Motion" means the motion or motions of Seller seeking approval and entry of the Bidding Procedures Order and the Sale and Approval Order.

"Seller Documents" has the meaning set forth in Section 6.2.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, excise taxes under Section 4358 of the Internal Revenue Code, unrelated business income taxes, and estimated taxes, whether disputed or not, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

1.2     Other Definitional and Interpretive Matters.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Periods.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars.  Any reference in this Agreement to $ shall mean U.S. dollars.

Exhibits.  All Exhibits annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

4

Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

Survival of Certain Covenants. Any covenant which by its terms is to be performed after the Closing shall survive the Closing, notwithstanding the fact that the provision does not explicitly provide that the covenant shall survive the Closing.

(b) The parties hereto have been advised by experienced counsel, and have participated jointly, in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted in its entirety by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF EQUIPMENT

2.1 Purchase and Sale of Equipment. On the terms and subject to the conditions set forth in this Agreement, at the Closing (defined below) Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser, all of Seller's right, title and interest in and to the Equipment, free and clear of any and all Liens or adverse claims other than the Permitted Exceptions.

5

3.1     Consideration for the Equipment.  The consideration for the Equipment shall be Three Million Four Hundred Thousand Dollars ($3,400,000.00) (the "Equipment Purchase Price").

3.2     Equipment Purchase Price Deposit.  As promptly as possible, but in any event within two Business Days, after the execution of this Agreement, Purchaser shall deposit with Proskauer Rose LLP, in its capacity as escrow agent (the "Escrow Agent"), pursuant to that certain Escrow Agreement, dated as of the date hereof, by and among Purchaser, Seller and the Escrow Agent (the "Escrow Agreement"), by good check or wire transfer of immediately available funds, an amount equal to Ten Percent (10%) of the Equipment Purchase Price (the "Escrowed Funds"), such deposit to be released by the Escrow Agent and delivered to either Purchaser or Seller, in accordance with the provisions of the Escrow Agreement.  Pursuant to the Escrow Agreement, the Escrowed Funds shall be deposited into an interest bearing account and (together with all accrued investment income thereon) distributed as follows:

          (a)     if the Closing shall occur, the Escrowed Funds shall be delivered to Seller as partial consideration for the Equipment, and all accrued investment income on the Escrowed Funds shall be delivered to Purchaser at the Closing;

          (b)     if this Agreement is terminated by Seller pursuant to Section 5.4(c), the Escrowed Funds, together with all accrued investment income thereon, shall be delivered to Seller; or

          (c)     if this Agreement is terminated pursuant to the terms hereof, other than by Seller pursuant to Section 5.4(c), the Escrowed Funds, together with all accrued investment income thereon, shall be returned to Purchaser.

3.3     Payment of the Equipment Purchase Price.  On the Closing Date, Purchaser shall pay to Seller, by wire transfer of immediately available funds into an account designated by Seller, an amount equal to the Equipment Purchase Price, less the amount of the Escrowed Funds (which shall be delivered to Seller by the Escrow Agent).

3.4     Compensation for Auction.  The price to be charged by Purchaser to buyers of the Supplies at the Auction will include a surcharge on each sale price (a "Buyer's Premium") in the amount of 10% for purchases made at the Premises and 17% for purchases made over the internet.  Purchaser shall be compensated for its services in brokering the sales of the Supplies in the amount of the aggregate Buyer's Premium.

3.5     Payment of the Buyer's Premium.  All buyers of the Supplies shall be required to submit payment to Purchaser for all Supplies purchased at the Auction.  Each such payment will include the sale price, the Buyer's Premium and all applicable sales and similar taxes.  On the next Business Day following the date on which the sale of any Supplies occurs, Purchaser will (a) provide Purchaser with a written report detailing the Supplies sold and the prices therefor;

6

and (b) deposit into an account designated by Seller the aggregate amount of the sales prices paid for the Supplies, less the Buyer's Premium and all applicable sales and similar taxes (which taxes Purchaser will remit to appropriate governmental authorities).

ARTICLE IV
AUCTION

4.1     Auction

(a)     Date.  Purchaser will conduct an auction of the Equipment and the Supplies (the "Auction") on such dates and times as mutually agreed to by Seller, but in no event later than 60 days following the Closing Date.

(b)     Cataloguing of Supplies.  As part of the Auction, Purchaser will, for no commission and at its expense, lot, catalog and sell all of the Supplies located in the materials management areas at the Premises.  The lots will be determined by item type, model and value.  Some lots may contain multiple items, while others may have individual items.  Some lots may contain like models and others may consist of groups of multiple models with of lesser value.  Purchaser will have photographs for viewing on the internet.

(c)     Use of the Premises.  The Auction will be conducted by Purchaser at the Premises.  Seller will provide Purchaser with free, non-exclusive license to use the Premises starting from the Closing Date and ending ninety (90) days thereafter (the "Auction Period"), to allow Purchaser to prepare for and complete the Auction.  Purchaser acknowledges that the license granted herein for the use of the Premises shall be further subject to the following general terms and conditions:

(i)     Purchaser will use the Premises solely for the purposes of storing, exhibiting and selling the Equipment and Supplies at the Auction, and for any other legal purpose proximately and materially related thereto including, without limitation, photographing the Equipment and Supplies, compiling information pertaining thereto and inviting to the Premises prospective purchasers and their agents for inspection and purchase.  Purchaser will close off to its invitees all areas that are not being used to exhibit the Equipment and Supplies.

(ii)     Purchaser shall not alter the Premises or in any way assign its rights to the use of the Premises.  Purchaser will take commercially reasonable efforts to avoid any damage to the Premises.  Unless Purchaser breaches its obligation hereunder, Purchaser will not be responsible for any damages, repair or restoration of any portion of the Premises from which the Equipment and Supplies are sold or removed, except as may result from the gross negligence or willful misconduct of Purchaser, its employees, agents or invitees.

(iii)     By no later than the last day of the Auction Period, Purchaser shall (A) consolidate at locations at the Premises reasonably specified by Seller all

7

Equipment and Supplies not sold to buyers at the Auction, it being understood that Purchaser will be abandoning any unsold Equipment; (B) consolidate all papers belonging to Seller in well marked rooms specified by Seller; (C) leave all sales areas free of papers and trash; and (D) vacate the Premises, leaving it broom clean of any debris and trash brought to the Premises by Purchaser and its invitees, it being understood that Purchaser shall not be required to remove or take any Remedial Action with respect to any Hazardous Material nor to remove from the Premises any trash or debris not brought to the Premises by Purchaser or its invitees. Purchaser shall not remove from the Premises any Patient Records, documents, or other assets belonging to Seller.

(d)  _Removal of Supplies_.  Purchaser shall neither remove, nor permit to be removed, from the Premises any Supplies, except to buyers of such Supplies at the Auction who have paid Purchaser the full purchase price therefor.

(e)  _Obligations of Seller_.  During the Auction Period Seller will supply electricity, heat, and/or air conditioning, and elevator service to the Premises. Seller will also maintain property, casualty and liability insurance covering the Premises for the benefit and protection of the Equipment, the Supplies, Purchaser, and Purchaser's invitees and employees.

(f)  _Condition of the Equipment and Supplies_.  All of the Equipment is being sold by Seller to Buyer "as is" and "where is" irrespective the condition, wear and tear, or damage of any item and without guarantee or warranty express or implied of any kind, nature or description. Purchaser will similarly auction the Equipment "as is" and "where is" irrespective the condition, wear and tear, or damage of any item and without guarantee or warranty express or implied of any kind, nature or description. All sales of the Supplies will be "as is" and "where is" irrespective the condition, wear and tear, or damage of any item and without guarantee or warranty express or implied of any kind, nature or description.

4.2  _Compliance with Law_.  In conducting the Auction, Purchaser shall obtain all necessary Permits and comply with all Laws. In conducting the auction of the Supplies, Purchaser shall also comply with the Bankruptcy Court Rules and Procedures and local Bankruptcy rules.

4.3  _Indemnification_.  Purchaser shall defend, indemnify and hold harmless Seller from and against any and all losses, costs, expenses (including, without limitation, reasonable attorneys' fees and disbursements), claims, liabilities and proceedings (collectively, "_Losses_") in connection with or related to or arising out of Purchaser's negligence, gross negligence, willful misconduct or unlawful conduct in connection with the Auction, or any breach by Purchaser of its obligations or representations/warranties hereunder. Notwithstanding the foregoing or any other provision of this Agreement, Purchaser will have no liability to Seller, and no indemnification obligations hereunder, to the extent relating to or arising out of (a) Hazardous Materials claims, except to the extent caused by the negligence, gross negligence, willful misconduct or unlawful conduct of Purchaser or any third party engaged by Purchaser, or (b)

8

prior liabilities and proceedings relating to the Equipment, the Supplies or the Premises. The obligations contained in this section shall survive the Closing and the auctions. Seller shall defend, indemnify and hold harmless Purchaser from and against any and all Losses arising from or related to the existence, removal or disposal, or the failure to remove or dispose, of any Hazardous Materials. Notwithstanding the foregoing or any other provision of this Agreement, Seller will have no liability to Purchaser, and no indemnification obligations hereunder, to the extent relating to or arising out of the gross negligence, willful misconduct or unlawful conduct of Purchaser or any third party engaged by Purchaser.

ARTICLE V
CLOSING AND TERMINATION

5.1 <u>Closing Date</u>. Subject to the satisfaction of the conditions set forth in Section 10.1 (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Equipment (the "<u>Closing</u>") shall take place at the offices of Proskauer Rose LLP, located at 1585 Broadway, New York, New York 10036 (or at such other place as Seller and Purchaser may designate in writing) at 10:00 a.m. (New York time) on a date agreed upon by Seller and Purchaser that is not more than five Business Days following the entry of the Sale and Approval Order, unless another time or date, or both, are agreed to in writing by Seller and Purchaser. The date on which the Closing shall be held is referred to in this Agreement as the "<u>Closing Date</u>." Unless otherwise agreed by Seller and Purchaser in writing, regardless of the time at which the Closing is completed, the Closing shall be deemed effective and all right, title and interest of Seller in the Equipment to be acquired by Purchaser hereunder, shall be considered to have passed to Purchaser as of 12:01 a.m. (New York time) on the Closing Date.

5.2 <u>Deliveries by Seller</u>. At the Closing, Seller shall deliver to Purchaser:

(a) a duly executed Bill of Sale with respect to the Equipment, which will have annexed to it a list of the Equipment;

(b) title to the motor vehicles included among the Equipment;

(c) all other instruments of conveyance and transfer executed by Seller, as may be necessary to convey the Equipment to Purchaser free and clear of all Liens (except Permitted Exceptions); and

(d) such other documents, instruments and certificates as Purchaser may reasonably request.

5.3 <u>Deliveries by Purchaser</u>. At the Closing, Purchaser shall deliver to Seller:

(a) the Equipment Purchase Price, in immediately available funds, as set forth in Section 3.3; and

9

(b)     such other documents, instruments and certificates as Seller may reasonably request.

5.4     Termination of the Agreement.  In respect of the Contemplated Transactions, this Agreement may be terminated prior to the Closing as follows:

(a)     Termination Due to Events in Bankruptcy Case.  This Agreement shall terminate immediately if the Bankruptcy Case is dismissed.

(b)     Termination by Purchaser.  Purchaser may terminate this Agreement if there shall be a material breach by Seller of any material representation or warranty, or any material covenant or agreement contained in this Agreement which breach cannot be cured or has not been cured within 20 Business Days after the giving of written notice by Purchaser to Seller of such breach.

(c)     Termination by Seller.  Seller may terminate this Agreement if there shall be a material breach by Purchaser of any material representation or warranty, or by Purchaser of any material covenant or agreement contained in this Agreement, which breach cannot be cured or has not been cured within 20 Business Days after the giving of written notice by Seller to Purchaser of such breach.

(d)     Termination by Purchaser or Seller.  Either Purchaser or Seller may terminate this Agreement upon the occurrence of any of the following:

(i)     by mutual written consent of Seller and Purchaser;

(ii)     if the Bankruptcy Court shall deny Seller's motion to enter the Bidding Procedures Order; or

(iii)     if the Bankruptcy Court shall enter an order approving a Competing Bid, subject to the limitations set forth in the Bidding Procedures Order and subject to Purchaser's right to payment of the Break-Up Fee in accordance with the provisions of this Agreement and the Bidding Procedures Order.

(e)     Extension of Time Periods. The time periods for termination of this Agreement set forth in this Section 5.4 may be extended upon the written agreement of the parties without the further consent of the Bankruptcy Court.

5.5     Procedure For Termination. If this Agreement is terminated by Purchaser or Seller, or both, pursuant to Section 5.4, written notice thereof shall forthwith be given to the other party, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 5.4) the Contemplated Transactions shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by Section 5.6, without further action by the parties.

CURRENT 14094780v5

5.6     Effect of Termination.

(a)     If this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to any party; *provided, however,* that the obligations of the parties set forth in the Escrow Agreement, ARTICLE XI, and to the extent necessary to effectuate the foregoing, ARTICLE I, shall survive any such termination and shall be enforceable in accordance with their terms.

(b)     Nothing in this Section 5.6 shall relieve the parties of any liability for a breach of this Agreement prior to the date of termination.

ARTICLE VI
REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser that:

6.1     Organization and Good Standing.  Seller is a not-for-profit corporation duly organized, validly existing and in good standing under the laws of the State of New York and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Seller is in good standing under the laws of the State of New York.

6.2     Authorization of Agreement.  Except for such authorization as is required by the Bankruptcy Court (as hereinafter provided for), Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action necessary for it to validly execute and deliver, this Agreement and each other agreement or document contemplated by this Agreement to be executed and delivered by Seller in connection with Seller entering into this Agreement (the "Seller Documents") and to perform its obligations hereunder and thereunder and to consummate the Contemplated Transactions. This Agreement has been, and each other Seller Document will be at or prior to the Closing, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, the entry of the Sale and Approval Order, and the entry of the Bidding Procedures Order) this Agreement constitutes, and each of Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3     Title.  Seller owns all of the Equipment and the Supplies, and Purchaser will be vested with good title to the Equipment, free and clear of all Liens, other than Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

11

6.4     Acknowledgement Regarding Representations and Warranties by Purchaser. Notwithstanding anything contained in this Agreement to the contrary, Seller acknowledges and agrees that neither Purchaser nor its affiliates are making any representations or warranties whatsoever, express or implied, beyond those expressly given by Purchaser in ARTICLE VII. Any claims Seller may have for breach of representation or warranty shall be based solely on the representations and warranties of Purchaser set forth in ARTICLE VII. Seller further represents that neither Purchaser nor any of its affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Purchaser or the Contemplated Transactions not expressly set forth in this Agreement, and none of Purchaser, any of its affiliates or any other Person will have or be subject to any liability to Seller or any other Person resulting from the distribution to Seller or its Representatives or Seller's use of, any such information. Seller acknowledges that it has conducted to its satisfaction, its own independent investigation of Purchaser, and, in making the determination to proceed with the Contemplated Transactions, Seller has relied on the results of its own independent investigation.

6.5     No Other Representations or Warranties. Except for the representations and warranties contained in this ARTICLE VI, neither Seller nor any other Person makes any other express or implied representation or warranty with respect to Seller, the Equipment, the Supplies or the Contemplated Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, its affiliates or any of their respective officers, directors, employees, agents or other Representatives. Seller expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Equipment and Supplies (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials).

ARTICLE VII
REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

7.1     Organization and Good Standing. Purchaser is a partnership by and between Centurion Service Group LLC, an Illinois Limited Liability Corporation and Perfection Plant Liquidations, an Illinois Limited Liability Corporation, each of which is validly existing and in good standing under the laws of its state of formation, is authorized to conduct business in the State of New York and has all requisite limited liability company power and authority to effectuate the Contemplated Transactions.

7.2     Authorization of Agreement. Purchaser has all requisite power and authority to execute and deliver this Agreement and each other agreement or document contemplated by this Agreement or to be executed by it in connection with the consummation of the Contemplated Transactions (the "Purchaser Documents"), and to consummate the Contemplated Transactions. The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all partnership action on behalf of Purchaser. This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly

12

executed and delivered by Purchaser, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

7.3    Acknowledgement Regarding Condition of the Purchased Assets. Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller to Purchaser in ARTICLE VI, and Purchaser acknowledges and agrees that the Equipment and Supplies are being transferred on a "WHERE IS" and, as to condition, "AS IS" basis.   Any claims Purchaser may have for breach of representation or warranty shall be based solely on the representations and warranties of Seller set forth in ARTICLE VI hereof.  Purchaser further represents that neither Seller nor any of its affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Seller, the Equipment, the Supplies or the Contemplated Transactions not expressly set forth in this Agreement, and neither Seller, any of its affiliates or any other Person will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives or the use by Purchaser or any of its affiliates of, any such information.  Purchaser acknowledges that it, along with its Representatives, has conducted or, as of the Closing Date, will have conducted, to its satisfaction, its own independent investigation of the Equipment and Supplies and, in making the determination to proceed with the Contemplated Transactions, Purchaser has, or will have, relied on the results of its own independent investigation. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PURCHASER ACKNOWLEDGES THAT SELLER HAS NOT MADE ANY REPRESENTATION RELATING TO THE EQUIPMENT OR SUPPLIES.   PURCHASER ALSO ACKNOWLEDGES AND AGREES THAT THE INSPECTION AND INVESTIGATION OF THE EQUIPMENT AND SUPPLIES BY PURCHASER AND ITS REPRESENTATIVES HAS BEEN ADEQUATE TO ENABLE PURCHASER TO MAKE ITS OWN DETERMINATION WITH RESPECT TO THE THEIR CONDITION, SUITABILITY AND FITNESS.  PURCHASER ACKNOWLEDGES THAT THE DISCLAIMERS, AGREEMENTS AND OTHER STATEMENTS SET FORTH IN THIS PARAGRAPH ARE AN INTEGRAL PORTION OF THIS AGREEMENT.

7.4    Financial Ability To Close.   Purchaser has the financial ability to close the Contemplated Transactions as outlined in this Agreement.

7.5    No Other Representations or Warranties. Except for the representations and warranties contained in this ARTICLE VII, neither Purchaser nor any other Person makes any other express or implied representation or warranty with respect to Purchaser or the Contemplated Transactions, and Purchaser disclaims any other representations or warranties, whether made by Purchaser, any affiliate of Purchaser or any of its officers, directors,

13

employees, agents or other Representatives. Except for the representations and warranties contained in this ARTICLE VII, Purchaser disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Seller or its Representatives .

## ARTICLE VIII
## BANKRUPTCY COURT MATTERS

8.1     Approval of Break-Up Fee.  In consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of the Equipment and Supplies, Seller shall pay to Purchaser a break-up fee (the "Break-Up Fee") in an amount equal to Two Percent (2%) of the amount of the Equipment Purchase Price on the first Business Day following the date of the consummation of a transaction that is a Competing Bid (as hereinafter defined).

8.2     Competing Transaction.   This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each a "Competing Bid").

8.3     Bankruptcy Court Filings.  As promptly as practicable following the execution of this Agreement, Seller shall file with and seek the approval of the Bankruptcy Court of the Sale Motion, including the Break-Up Fee, and the entry by the Bankruptcy Court of the Bidding Procedures Order.  Seller will request that the Bidding Procedures Order provide that any Competing Bid contain a purchase price for the Equipment in an amount greater than 3% of the Equipment Purchase Price, and that subsequent bids for the Equipment be in increments of at least $25,000.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale and Approval Order and the Bidding Procedures Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court.  In the event the entry of the Sale and Approval Order or the Bidding Procedures Order shall be appealed, each party shall use their respective commercially reasonable efforts to defend against such appeal.  In the event that an appeal is taken, or a stay pending appeal is requested from the Sale and Approval Order or the Bidding Procedures Order, Seller shall promptly notify Purchaser of such appeal or stay request and shall provide Purchaser within three (3) Business Days a copy of the relevant notice of appeal or order of stay.  Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders.

## ARTICLE IX
## COVENANTS

9.1     Further Assurances.  Each party shall use its commercially reasonable efforts to (a) take all actions necessary or appropriate to consummate the Contemplated Transactions and (b) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Contemplated Transactions.

9.2     Cooperation.  Each party agrees to reasonably cooperate with the other, from the date hereof up through and following the Auction Period, in good faith, in an effort to satisfy all further conditions, undertakings and agreements contained in this Agreement.

9.3     Risk of Loss.  All risk of loss with respect to the Equipment and Supplies shall pass to Purchaser on the Closing Date.  Purchaser shall be solely responsible for any damage to or loss of the Equipment or Supplies, for whatever reason, occurring after the Closing Date.

9.4     Conduct by Purchaser.  Purchaser will provide adequate personnel to supervise and conduct the Auction, remove and transfer the Equipment, and perform its other duties pursuant hereto, will take commercially reasonable efforts to insure the safety of its employees, agents and invitees while on the Premises, and will use commercially reasonable efforts to insure the minimum amount of damage and wear and tear to the Premises resulting from the Auction and the removal and any disconnection of the Equipment and Supplies.

9.5     Insurance.

(a)     By Seller.  Between the date hereof and the Closing Date, Seller will maintain the insurance coverage currently in place with respect to the Equipment and Supplies.  Between the date hereof and through the end of the Auction Period, Seller will maintain its general liability insurance coverage with respect to the Premises.

(b)     By Purchaser.  Prior to occupying the Premises pursuant to the license granted hereunder, Purchaser shall provide to Seller evidence of (i) comprehensive general liability insurance covering Purchaser's use of the Premises, (ii) property hazard insurance covering the Supplies in an amount equal to 100% of the full replacement value thereof, and (iii) Seller being named as an additional insured under such policies.

(c)     By Invitees of Purchaser.  Purchaser will ensure that before a buyer of Equipment at the Auction is allowed to remove any Equipment needing to be de-installed, such buyer provides Purchaser with evidence of comprehensive general liability insurance in the amount of at least $1 million per occurrence, naming Seller as an additional insured thereunder.

ARTICLE X
CONDITIONS TO CLOSING; TAXES

10.1     Conditions Precedent to Obligations of Purchaser and Seller.  The respective obligations of the parties to consummate the Contemplated Transactions as provided by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any order by a governmental body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Contemplated Transactions; and

15

(b)     the Bankruptcy Court shall have entered the Sale and Approval Order and the Sale and Approval Order shall have become a final order.

10.2    <u>Transfer Taxes</u>.  Purchaser shall pay any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the Contemplated Transactions, if any.

ARTICLE XI
MISCELLANEOUS

11.1    <u>Survival</u>.  No representations, warranties or covenants (other than covenants that contemplate performance following the Closing) in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing.

11.2    <u>Expenses</u>. Except as otherwise provided in this Agreement, each party shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions.  Purchaser shall be responsible for all expenses associated with the conducting of the Auction, including, advertising, web expenses, employee expenses.

11.3    <u>Submission to Jurisdiction; Consent to Service of Process</u>.  Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Contemplated Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 11.7 hereof; *provided, however*, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Eastern District of New York sitting in Kings County or the Supreme Court of the State of New York sitting in Kings County and any appellate court from any thereof, for the resolution of any such claim or dispute.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 11.7.

11.4    <u>Waiver of Right to Trial By Jury</u>.  Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

16

11.5    <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement and the Escrow Agreement represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

11.6    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State.

11.7    <u>Notices</u>. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) three Business Days after being sent by certified or registered mail or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

If to Seller, to:  Caritas Health Care, Inc., c/o Mary Immaculate Hospital, 152-11 89th Avenue, Jamaica, NY  11432, Attention:  Chief Executive Officer, with a copy to Richard J. Zall, Esq., Proskauer Rose LLP, 1585 Broadway, New York, NY 10036.

If to Purchaser, to:  Erik Tivin, 1400 N 25th Avenue, Melrose Park, IL 60160.

11.8    <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any court order law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Contemplated Transactions are not affected in any manner materially adverse to any party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the Contemplated Transactions are consummated as originally contemplated to the greatest extent possible.

11.9    <u>Binding Effect; Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.  Nothing in this

Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below.  No assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of law or otherwise) without the prior written consent of Purchaser and Seller and any attempted assignment without the required consents shall be void.  No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations.

11.10   No Personal Liability.  In entering into this Agreement, the parties understand, agree and acknowledge that no director, trustee, officer, manager, member, employee, shareholder, attorney, accountant, advisor or agent of any party hereto shall be personally liable or responsible to any other party or its affiliates, directors, trustees, officers, managers, members, employees, shareholders, attorneys, accountants, advisors or agents for the performance of any obligation under this Agreement of any party to this Agreement or the truth, completeness or accuracy of any representation or warranty contained in, or statement made in, this Agreement or any document prepared pursuant hereto and that all obligations hereunder are those of the named parties only (but nothing contained herein shall limit the liability of any person for his or her fraudulent acts).

11.11   Counterparts.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and both of which, when taken together, will be deemed to constitute one and the same agreement.  The exchange of copies of this Agreement and of signature pages by facsimile or other electronic transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

CARITAS HEALTH CARE, INC.


By:_____
Name:
Title:

PURCHASER

By:

CENTURION SERVICE GROUP, LLC


By:_____
Name:
Title:

and

PERFECTION PLANT LIQUIDATIONS, LLC


By:_____
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

CARITAS HEALTH CARE, INC.

By:_____
Name:
Title:

PURCHASER

By:

CENTURION SERVICE GROUP, LLC

By:_____
Name: ERIK  TIVIN
Title: President

and

PERFECTION PLANT LIQUIDATIONS, LLC

By:_____
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

CARITAS HEALTH CARE, INC.

By:_____
Name:
Title:

PURCHASER

By:

CENTURION SERVICE GROUP, LLC

By:_____
Name:
Title:

and

PERFECTION PLANT LIQUIDATIONS, LLC

By:_____
Name: DAVID A. MVSLIN
Title: CEO/PRES.

EXHIBIT A


See attached.

| Department | Acct # | Vendor | Description | Date | Ref # |
|---|---|---|---|---|---|
| RESPIRATORY THERAPY | 6070 | Med One Capital Funding LLC | Lease For 18 Puritan Bennet 840 Ventilators/3 Year Extended Warranty/5 Year Preventative Maintenance Coverage | 12/31/2009 | 11893 |
| CATH LAB | 6101 | Creekridge Capital LLC | 38 Month Equipment Lease for EP Med systems 2-Channel Stimulator Model EP-4i-1-110 | 4/12/2010 | 9009 |
| RADIOLOGY | 6210 | Siemens Medical Solutions | 60 Month Operating Lease Agreement/ Software & Related Documentation | 10/19/2012 | 17636 |
| RADIOLOGY | 6210 | Siemens Medical Solutions | Arcadis Avantic 60 Month Lease | 9/25/2012 | 16374 |
| RADIOLOGY | 6210 | Siemens Medical Systems Inc. | 60 Month Lease/Arieadis Varic Mobile C-Arm | 6/7/2012 | 11640 |
| RADIOLOGY CAT SCAN | 6214 | Siemens Financial Services Inc. | Acuson Antares System - 5.0 Premium Edition 60 Month Lease | 1/4/2013 | 21223 |
| OPERATING ROOM | 6305 | Datascope Corp. | Lease For 10 Spectrum O.R. Monitors & 10 Gas Modules II SE Along With All Software & Hardware To Support Equipment & Installation | 1/18/2009 | 21958 |
| OPERATING ROOM | 6305 | Pentax Medical Company | Pentax Partnership Program Agreement (includes scopes) | 3/31/2008 | 26899 |
| TUMOR REGISTRY | 7055 | Pitney Bowes Inc. | Equipment Rental Agreement DM 550 WOW With 10LB Scale/Meter Rental | 10/22/2011 | 17664 |
| AUDIOVISUAL | 7303 | Xerox Corp. AA Truck Renting | Service Contract/lease for a 60 Month Lease for 2 Multifunctional Use Machines. Model #- WCM201/ Contract #- 072131501 | 4/18/2013 | 27520 |
| MATERIAL MANAGEMENT | 8075 | Xerox Corp. Corp. | Fixed Lease Agreement For Truck Rental | 2/1/2009 | 22583 |
| INFORMATION TECHNOLOGY | 9120 | Xerox Corp. | Lease Agreement for 29 Xerox Copiers/Printers for 60 Months | 5/1/2012 | 20992 |
| OPERATING ROOM | 6305 | MSI Surgical Solutions LLC | Contract for Medical Instruments Sterilation Equipment At Both Mary Immaculate & St. Johns Hospital | 7/31/2008 | 5427 |
| RADIOLOGY | 6210 | Nuance Communications Inc. | Powerscrope Voice Recognition. This System is Interfaced w/ The Vodka Veriphy System (Refer PO# 030294) | 6/30/2013 | 30295 |
| NURSING | 5005 | Huntleigh Healthcare Inc. | AC 550 Flowtron Excel Pump Intermittent Pneumatic Compression Pump for Use with Calf & Thigh Garments | Time Frame Dependant On Scope of Work | 26963 |
| OPERATING ROOM | 6305 | Pentax Medical Company | Five (5) Year Lease & Service Agreement of Endoscopy Equipment | 8/31/2013 | 33316 |
| NURSING ADMIN | 5005 | HOSPIRA | I.V. AND PCA PUMPS | 9/30/2013 | 34200 |
| PHARMACY | 8020 | CARDINAL-PYXIS | BLANKET PO TO ALLOW PAYMENTS FOR MEDICATION DELIVERY SYSTEM.- YEAR TO YEAR | 7/1/2013 | 29847 |
| AUDIOVISUAL | 7303 | Xerox Corp. | CONTRACT SIGNED WHILE UNDER ST. VINCENTS-2005 RADIOLOGY DEPT AT SYQ | 7/1/2013 | 39983 |
| AUDIOVISUAL | 7303 | Xerox Corp. | OB/GYN AT SYQ | 10/31/2012 | 39982 |
| 7TH FL LAB | 6122 | SIEMENS | TWO*(2) advia centaur cp immunoassay system | 10/31/2012 | wire transfer |
| 7TH FL LAB | 6122 | SIEMENS | two*(2) advia 1800 chemistry systems | 10/31/2012 | wire transfer |
| RADIOLOGY | 6208 | SIEMENS MEDICAL IMAGING SOLUTIONS GROUP INC. | MONTHLY LEASE FOR MRI MOBILE SR#24067 | 9/1/2008 | 31385 |
| ELECTROPHYSIOLOGY | 6547 | Siemens Financial Services Inc. | ONE*(1) SEQUOIA PLUS | 6/1/2013 | 30671 |
| ELECTROPHYSIOLOGY | 6547 | Siemens Financial Services Inc. | ONE*(1) ACUSON SEQUOIA C512 ECHO SYSTEM | 3/31/2013 | 25677 |
| ELECTROPHYSIOLOGY | 6547 | Siemens Financial Services Inc. | SYNGO DYNAMICS XS.. V6 | 3/31/2013 | 25681 |

| Department | Vendor # | Vendor | Description | Date | Number |
|---|---|---|---|---|---|
| RADIOLOGY | 6210 | Siemens Financial Services Inc. | AXIOM LUMINOS TF 3D-TOP | 12/31/2012 | 20698 |
| RADIOLOGY | 6214 | Siemens Financial Services Inc. | TWO*(2) ACUSON X300 SYSTEMS 100V/115V/230V | 12/31/2012 | 20686 |
| RADIOLOGY | 6214 | Siemens Financial Services Inc. | ACUSON X150 SYSTEMS-ULTRASOUND | 12/31/2012 | 20683 |
| RADIOLOGY | 6210 | Siemens Services Inc. | image grid data archive for CT SCANNERS imagegrid 12.75TB Raw 9.8TB | 12/31/2012 | 20695 |
| RADIOLOGY | 6210 | Siemens Financial Services Inc. | mutlix top/vertex solitaire | 12/21/2012 | 20708 |
| FATHERS WTG ROOM, OR WAITING ROOM, CAFETERIA, ER | | PARAGON | VENDING MACHINES | NO PO - COPY OF AGREEMENT IN FILES | |
| RESPIRATORY | 6070 | WELCO | CYLINDER RENTALS | NO PO - COPY OF AGREEMENT IN FILES | |
| RESPIRATORY | 6070 | AIRGAS (FORMERLY LINDE) | RENTAL OF GAS EQUIPMENT | 12/1/2012 | 22971 |
| LABORATORY | 6122 | ABBOTT | RENTAL OF PRECISION PCX, PRECISION G, AND PRECISION QID | 12/1/2012 | 20625 |

| Department | Number | Vendor | Description | Date | ID |
|---|---|---|---|---|---|
| AMBULANCE SERVICES | 6056 | Cardinal Health | Pyxis Medication System Lease Agreement | 8/20/2007 | 8484 |
| RADIOLOGY | 6210 | Siemens Financial Services Inc. | Image Grid Dicom Archive / 60 Month Lease / Quote # 1 - ADNYAU | 12/31/2012 | 20659 |
| RADIOLOGY | 6210 | Siemens Financial Services Inc. | 1 Portable Machine - Mobilette XP Hybrid / 60 Month Lease / Quote # 1 - AA6SOD | 12/31/2012 | 20668 |
| RADIOLOGY | 6210 | Siemens Financial Services Inc. | Mobilette XP Hybrid / 60 Month Lease / Quote # 1 - AA6SDY & Quote # 1 - AA6SOD | 12/31/2012 | 20678 |
| RADIOLOGY | 6212 | Siemens Financial Services Inc. | Somatom Emotion 2007 16 Slice / 60 Month Lease / Quote # 1 - AZM3QW | 12/31/2012 | 20663 |
| ULTRASOUND | 6214 | Siemens Financial Services Inc. | Ultrasound Machine - Acuson x 300 System / 60 Month Lease / Quote # - 1 - A84EUS | 12/31/2012 | 20665 |
| RADIOLOGY CAT SCAN | 6222 | Siemens Financial Services Inc. | Digital Angiography Suite - Axiom Artis / 60 Month Lease / Quote # - 1 A2VIYO | 12/31/2012 | 20657 |
| INTERV. RADIOLOGY | 6305 | Datascope Corp. Pentax Medical Company | Lease For 6 Spectrum OR Monitors & Gas Modules II SE Including All Software & Hardware To Support Equipment & Installation | 1/17/2009 | 21884 |
| OPERATING ROOM | 6305 | Steriicycle Inc. Freedom Health Systems Inc. | Lease & Service Equipment(scopes)to Cover The Month Of March 2008 | 3/31/2008 | 26900 |
| OPERATING ROOM | 6856 | Steriicycle Inc. Freedom Health Systems Inc. | Annual Service Contract For Sharps Removal( includes all sharps containers on site) | 12/31/2007 | 11329 |
| METHADONE UNIT | 8020 | Freedom Health Systems Inc. | Sentinel Software Agreement for 340B Pharmacy for MIH & SJH | 12/31/2007 | 8308 |
| PHARMACY | 8020 | Freedom Health Systems Inc. | Sentinel Software Agreement for 340B Pharmacy for MIH & SJH | 12/31/2007 | 8308 |
| PHARMACY | 9120 | Xerox Corp. | 60 Month Lease Agreement for 27 Xerox Copiers For MIH | 8/30/2013 | 14400 |
| INFORMATION TECHNOLOGY | 7303 | Xerox Corp. UNITED MEDICAL SYSTEMS | 60 Month Operating Lease for Copier In Dept. of Surgery / Contract # -72131501 | 5/22/2013 | 28398 |
| AUDIOVISUAL | 6305 | TGI Office Automation Cisco Systems Capital Corporation | STEREOTACTIC BREAST BIOPSY This PO Cancels & Supersede PO# 021589 / For The Lease of (5) N335 Digital Copies In The MIH Methadone Clinic | 6/10/2009 | 29455 |
| OPERATING ROOM | 6856 | | Master Agreement to Lease Equipment # 6693, Schedule#- 001-000 / 36 Month Lease | 10/16/2012 | 30769 |
| METHADONE ST. DOMINIC'S NON-MD | 6816 | Siemens Medical Imaging Solutions Group Inc. | For the Monthly Lease of MRI Mobile / Siemens Volume Zoom4 / Serial # - 24067 | 7/9/2012 | 30823 |
| RADIOLOGY | 6208 | Huntleigh Healthcare Inc. | AC 550 Flowtron Excel Pump Intermittent Pneumatic Compression Pump for Use with Calf & Thigh Garments | 9/1/2008 | 31385 |
| NURSING | 5005 | | Time Frame Dependant On Scope of Work | | 26960 |

| Location | Number | Company | Description | Date | PO |
|---|---|---|---|---|---|
| OPERATING ROOM | 6305 | Pentax Medical Company | Five (5) Year Lease & Service Agreement of Endoscopy Equipment | 8/31/2013 | 33313 |
| NURSING ADMIN | 5005 | HOSPIRA | I.V. AND PCA PUMPS | 9/30/2013 | 34199 |
| OPTHAMALOGY CLINIC | 7250 | CANNON FINANCIAL | OPERATIONAL LEASE - IMAGERUNNER FAX/COPIER 60MO. @ 589.71/MO | 6/30/2013 | 35859 |
| 7TH FL LAB | 6122 | SIEMENS | TWO*(2) advia centaur cp immunoassay system | 10/31/2012 | wire transfer |
| 7TH FL LAB | 6122 | SIEMENS | tw*(2) advia 1800 chemistry systems | 10/31/2012 | wire transfer |
| AUDIOVISUAL | 7303 | Xerox Corp. | multiple copiers | 12/31/2012 | 29228 |
| HUMAN RESOURCES | 9237 | Xerox Corp. | multiple copiers | 12/31/2012 | 18585 |
| MAIN LOBBY HALLWAY, ED MAIN, CLINIC, MAIN ENTRANCE WTG ROOM, AMBULATORY SURGERY | | PARAGON | VENDING MACHINES | | NO PO - COPY OF AGREEMENT IN FILES |
| ST. DOMINIC'S | 6816 | PARAGON | VENDING MACHINES | | NO PO - COPY OF AGREEMENT IN FILES |
| RESPIRATORY | 6070 | WELCO AIRGAS (FORMERLY LINDE) | CYLINDER RENTALS | | NO PO - COPY OF AGREEMENT IN FILES |
| RESPIRATORY | 6070 | WELCO AIRGAS (FORMERLY LINDE) | RENTAL OF GAS EQUIPMENT | 12/1/2012 | 27822 |
| LABORATORY | 6122 | ABBOTT | RENTAL OF PRECISION PCX, PRECISION G, AND PRECISION QID | 12/1/2012 | 20626 |

| | |
|---|---|
| Ambulances | 2 Units owned by WYCKOFF |
| Mammo Van at MIH | Not owned by Caritas |

**Exhibit C**

**Auction Procedures**

# AUCTION PROCEDURES[1]

The following procedures (the "Auction Procedures" or these "Auction Procedures") shall govern the purchase of, or other transaction respecting, certain assets of Caritas Health Care, Inc. and the other affiliated debtors and debtors in possession (each, a "Debtor," and collectively, the "Debtors"), pursuant to the Debtors' motion (the "Motion") dated April 21, 2009 for entry of two orders of this Court: (I) approving sale procedures for the sale of medical equipment and related assets and engagement of a disposition agent with respect to medical supplies; and (II) authorizing the Sales free and clear of liens, claims, encumbrances and interests, and approving such agreement related thereto.  These Auction Procedures have been approved and authorized by order dated _____, 2009 (the "Bidding Procedures Order") of the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") in the Debtors' Chapter 11 cases.

1.      Proposed Auction

The Debtors shall consider bids (each, a "Bid") for (i) the purchase of all or a portion of the Equipment and/or Supplies and (ii) service as a disposition agent for all or a portion of the Equipment and/or Supplies.  Bidders may submit either type of bid for either category of assets, and are free to combine types of bids or to bid solely on a single category of assets.

2.      Due Diligence Requests

Upon request the Debtors will provide interested Bidders with access to the Debtors' Hospital Facilities in order to examine the Equipment and Supplies.  In addition, the Debtors will continue to cooperate and provide access to all previously contacted potential bidders who seek to conduct diligence and any other potentially interested bidder (collectively, the "Potential Bidders").

3.      Form and Content of Bids

All bids must satisfy the following requirements:

(a)      All Bids shall be accompanied by appropriate evidence, reasonably satisfactory to the Debtors as to the bidder's financial and other required abilities to consummate a transaction.

(b)      All Bids shall be unconditional and not contingent upon any event, including, without limitation, any additional due diligence investigation, inventory evaluation, or financing.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

(c) No Bid shall be shared among bidders (for example, without limitation, by way of a joint venture or a partnership) without the Debtors' prior written consent given after consultation with counsel to their secured lenders and the Committee.

(d) All Bids shall be irrevocable until seven (7) days after the selection at the Sale Hearing of a Successful Bidder (as defined below).

(e) All Bids shall include an earnest money refundable deposit equal to 10% of the value of the Bid in the form of a certified check or wire transfer payable to Caritas Health Care, Inc. (a "Deposit"). Each Deposit shall be held in an interest-bearing account. Each Deposit not given by the Successful Bidder or the Second Highest Bidder (as such terms are defined in these Auction Procedures) shall be returned promptly to the appropriate Bidder (as such term is defined in these Auction Procedures), after the expiration of the seven day period following the completion of the Sale Hearing. If a Successful Bidder fails to consummate a sale as approved at the Sale Hearing because of a breach or failure to perform on the part of such Successful Bidder, the Debtors will not have any obligation to return the Successful Bidder's Deposit, and such Deposit shall irrevocably become property of the Debtors.

(f) All Bids shall be in the form of a mark-up of the Agreement, unless otherwise agreed by the Debtors and a prospective bidder.

(g) All Bids for the all of the Equipment shall contain a minimum initial payment in immediately available funds of an amount at least $3,502,000; provided however, that if the Debtors receive multiple Bids for less than 100% of the Equipment, the aggregate monetary value of all such Bids must equal no less than $3,502,000 in order to be selected as winning Bids.

(h) All Bids shall identify the potential bidder and the officer(s) or authorized Purchasers(s) who will appear on behalf of such bidder.

4. <u>Time for Submission of Bids</u>

Any bidder ("<u>Bidder</u>") that desires to make a Bid shall deliver a copy of its proposal, in writing, including an executed Agreement, if appropriate, so that it is actually received by 4:00 p.m. (New York City time) on May 27, 2009. Bids should be submitted to: (1) counsel for the Debtors, Proskauer Rose LLP, 1585 Broadway, New York, NY 10036, (Attn: Jeffrey W. Levitan, E-mail: jlevitan@proskauer.com, and Adam T. Berkowitz, E-mail aberkowitz@proskauer.com), Fax: 212-969-2900; (2) counsel to DASNY, Winston & Strawn LLP, 200 Park Avenue, New York, New York 10166-4193 (Attn: David Neier, E-mail dneier@winston.com); (3) counsel for HFG, Kaye Scholer LLP, 425 Park Avenue, New York, New York 10022-3598 (Attn: Benjamin Mintz, E-mail bmintz@kayescholer.com); (4) counsel to SVCMC, Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New York 10281 (Attn: Andrew M. Troop, E-mail andrew.troop@cwt.com, and Christopher R. Mirick, E-Mail christopher.mirick@cwt.com); and (5) counsel to the Committee, Alston & Bird LLP, 90 Park Avenue, New York, New York 10016 (Attn: Craig E. Freeman, Esq., E-mail craig.freeman@alston.com).

By submitting a Bid, each Bidder shall be deemed to acknowledge: (i) that it is bound by these Auction Procedures; (ii) that it had an opportunity to inspect and examine the Equipment and Supplies and all other pertinent information with respect to such assets before submitting such Bid and that each such Bid is based solely on that review and upon each Bidder's own investigation and inspection; and (iii) in making its Bid, such Bidder is not relying upon any written or oral statements, representations or warranties of the Debtors, their agents or representatives.

5.    The Auction

Only persons or entities complying with the provisions above (each, a "Qualified Bidder") may participate in the Auction. The Auction shall commence at 10:00 a.m. (New York City time), on June 1, 2009 at the offices of Proskauer Rose LLP, 1585 Broadway, New York, New York 10036. Bidders who appear at the Auction in person, or through a duly authorized representative will be permitted to participate in the Auction. The Auction may be adjourned from time to time without further notice except by announcement of the adjourned date or dates at the Auction or any adjournment thereof. If there are no Qualified Bidders, the Debtors may cancel the Auction without further notice.

6.    Selection of Successful Bidder

Prior to the completion of the Auction, the Debtors shall review and consider each of the Bids. The Debtors may, after consultation with counsel to their Secured Lenders and the Committee, reject any Bid that, in the Debtors' sole discretion, is (a) inadequate or insufficient; (b) contrary to the best interests of the Debtors, their estates and their creditors, or (c) not in conformity with the requirements of these Bidding Procedures or the Bankruptcy Code. The Debtors shall determine, in the exercise of their reasonable business judgment and in consultation with counsel to their Secured Lenders and the Committee, which of the Bids constitutes the highest or best Bid and the runner-up. The Bidder making the Bid that is selected as the highest or best by the Debtors shall be considered the "Successful Bidder." Before the conclusion of the Auction, the Debtors shall inform each of the Bidders of the decision regarding who is the Successful Bidder and the Next Highest Bidder (as defined below) and the Successful Bidder shall be required to execute a definitive asset purchase agreement at such time.

7.    Auction Results

Subject to the reservation of rights set forth below, the Debtors will submit a proposed order approving the sale to the Successful Bidder, together with an agreement executed with the Successful Bidder, at or prior to the Sale Hearing (as defined below).

8.      Failure to Consummate Agreement

The Next Highest Bidder shall be obligated to keep its Bid open until the transaction with the Successful Bidder is closed.  If for any reason the Successful Bidder fails to consummate the transaction contemplated by its winning Bid, the offeror of the second highest or best Bid (the "Next Highest Bidder") will automatically be deemed to be the Successful Bidder and will be obligated to consummate the transaction proposed in its runner-up Bid, without further order of the Bankruptcy Court.

9.      Bankruptcy Court Approval of the Successful Bidder

An evidentiary hearing (the "Sale Hearing") on all of the relief requested in the Motion and to approve the transaction with the Successful Bidder shall be held before the Honorable Carla E. Craig, United States Bankruptcy Judge at 271 Cadman Plaza East, Suite 3529, Brooklyn, New York on _____, 2009 at _____m..  The execution and implementation of the Agreement or any other similar agreement is subject to approval of the Bankruptcy Court. The Sale Hearing may be adjourned from time to time without further notice except by announcement of the adjourned date or dates at the Sale Hearing or any adjournment thereof. The Debtors will be deemed to have accepted a Bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

10.      Business Judgment of the Debtors – Reservation of Rights

The Debtors reserve the right (a) to determine in the reasonable exercise of their business judgment whether the amendments and changes contained in each Bid are acceptable; (b) to determine, in the reasonable exercise of their business judgment, which Bid, or any combination of Bids, is the highest or otherwise best offer(s); (c) to reject at any time prior to entry of an order of the Bankruptcy Court approving the Successful Bidder, any bid that the Debtors, in the reasonable exercise of their business judgment, deem to be (i) inadequate or insufficient or (ii) not to conform with the requirements of the Bankruptcy Code or the Auction Procedures; (d) to withdraw some or all of the assets from the Auction or sale at any time prior to entry of an order approving such sale, or (e) to alter, amend or otherwise not comply with these Auction Procedures at any time and without notice.

**<u>Exhibit D</u>**

**Auction and Sale Hearing Notice**

**UNITED STATES BANKRUPTCY COURT,**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------- x
**In re:**                                            :
                                                      :          Chapter 11
                                                      :
**CARITAS HEALTH CARE, INC., et al.,**                :          Case Nos. 09-40901 (CEC)
                                                      :          through 09-40909 (CEC)
                                                      :
                                **Debtors.**          :          (Jointly Administered)
------------------------------------------------------- x

**NOTICE ESTABLISHING THE DATES, TIMES
AND PLACES OF THE AUCTION AND THE SALE
HEARING RESPECTING THE DISPOSITION OF
CERTAIN ASSETS OF CARITAS HEALTH CARE, INC.**

      **PLEASE TAKE NOTICE THAT**, on _____, 2009, pursuant to a motion filed by Caritas Health Care, Inc. ("Caritas") and the other above-captioned debtors and debtors-in-possession (each, a "Debtor," and collectively, the "Debtors") dated April 30, 2009 (the "Motion")[1], the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") entered an Order (the "Bidding Procedures Order") approving the Auction Procedures annexed hereto as Exhibit 1 in connection with the sale of certain assets of Caritas (the "Assets") at the Auction.

      **PLEASE TAKE FURTHER NOTICE** that the Assets are comprised of certain medical equipment and supplies owned by the Debtors as described more fully in the Motion.  Upon written request to the undersigned counsel, the Debtors will provide interested parties with access to their facilities in order to examine the Assets.  The Closing of the transactions contemplated in the Agreement relating to sale of the Assets, which is attached to the Motion as Exhibit B, shall take place at the offices of Proskauer Rose LLP, located at 1585 Broadway, New York, New York 10036 (or at such other place as Seller and Purchaser may designate in writing) at 10:00 a.m. (New York time) on a date agreed upon by Seller and Purchaser that is not more than five Business Days following the entry of the Sale and Approval Order, unless another time or date, or both, are agreed to in writing by Seller and Purchaser.

      **PLEASE TAKE FURTHER NOTICE THAT**, in accordance with the Auction Procedures (a) interested parties will have the opportunity to make competing offers to purchase all or a potion of the Assets and (b) the Debtors will select the highest or best bid and seek approval from the Bankruptcy Court of the entity submitting such bid.  **The auction procedures contain detailed requirements for the submission of all bids and should be reviewed carefully**.

---

[1]      Capitalized terms used in this Notice but not defined shall have the meanings given to them in the Motion.

**PLEASE TAKE FURTHER NOTICE THAT**, pursuant to the Auction Procedures, the Auction will be conducted at the offices of Proskauer Rose LLP, 1585 Broadway, New York, New York, on June 1, 2009 at 10:00 a.m. (New York City time). **The auction may be adjourned from time to time or may be cancelled without further notice except by announcement of the adjourned date or dates at the Auction or any adjournment thereof**.

**PLEASE TAKE FURTHER NOTICE**, that objections to any relief requested in the Motion, other than that granted in the Bidding Procedures Order, must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Eastern District of New York, and shall be filed with the Bankruptcy Court electronically, by utilizing the Court's electronic case filing system at www.nyeb.uscourts.gov, or if the same cannot be filed electronically, by manually filing the same with the Clerk of the Court together with a 3.5 inch diskette containing the same in Portable Document Format, with a hard copy provided to the Clerk's Office at the Bankruptcy Court for delivery to the Chambers of the Honorable Carla E. Craig, and shall be served upon (1) counsel for the Debtors, Proskauer Rose LLP, 1585 Broadway, New York, NY 10036, (Attn: Jeffrey W. Levitan, E-mail: jlevitan@proskauer.com, and Adam T. Berkowitz, E-mail aberkowitz@proskauer.com), Fax: 212-969-2900; (2) the Office of the United States Trustee, 271 Cadman Plaza East, Suite 4529, Brooklyn, New York 11201 (Attn: William E. Curtin, E-mail william.e.curtin@usdoj.gov, and Valerie Millman, E-mail valerie.millman@usdoj.gov), (3) counsel to DASNY, Winston & Strawn LLP, 200 Park Avenue, New York, New York 10166-4193 (Attn: David Neier, E-mail dneier@winston.com); (4) counsel for HFG, Kaye Scholer LLP, 425 Park Avenue, New York, New York 10022-3598 (Attn: Benjamin Mintz, E-mail bmintz@kayescholer.com); (5) counsel to SVCMC, Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New York 10281 (Attn: Andrew M. Troop, E-mail andrew.troop@cwt.com, and Christopher R. Mirick, E-Mail christopher.mirick@cwt.com); (6) counsel to the Committee, Alston & Bird LLP, 90 Park Avenue, New York, New York 10016 (Attn: Craig E. Freeman, Esq., E-mail craig.freeman@alston.com); and (7) any other party entitled to service under applicable rules, so as to be received by all such parties no later than _____, **2009 at _____.m.**. Only those objections which have been timely filed and served may be considered by the Court at the Hearing.

**PLEASE TAKE FURTHER NOTICE THAT**, the bankruptcy Court will hold a hearing on _____, 2009 at _____m. to consider and approve the transaction or transactions contemplated by the Bid selected by the Debtors at the Auction. **The hearing may be adjourned from time to time without further notice except by announcement of the adjourned date or dates at the hearing or any adjournment thereof**.

[SIGNATURE PAGE FOLLOWS]

Dated: May ___, 2009
New York, New York

**PROSKAUER ROSE LLP**

By: _____
    Jeffrey W. Levitan (JL-6155)
    Adam T. Berkowitz (AB-3714)
    1585 Broadway
    New York, NY 10036-8299
    Tel: (212) 969-3000
    Fax: (212) 969-2900

Counsel for the Debtors and
Debtors-In-Possession

**<u>Exhibit 1</u>**

**Auction Procedures**

**[See Exhibit C to Motion]**