**PROSKAUER ROSE LLP**
Counsel for the Debtors
and Debtors-in-Possession
Jeffrey W. Levitan (JL-6155)
Adam T. Berkowitz (AB-3714)
1585 Broadway
New York, New York 10036-8299
Tel: (212) 969-3000
Fax: (212) 969-2900

**UNITED STATES BANKRUPTCY COURT,**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| | : | |
| **CARITAS HEALTH CARE, INC., et al.,** | : | Case Nos. 09-40901 (CEC) |
| | : | through 09-40909 (CEC) |
| | : | |
| **Debtors.** | : | (Jointly Administered) |

------------------------------------------------------- x

**MOTION OF DEBTORS FOR ORDERS: (I) APPROVING PROCEDURES
FOR AN AUCTION RESPECTING SALES OF THE DEBTORS' REAL
PROPERTY AND BID PROTECTIONS IN CONNECTION THEREWITH
AND, (II) SUBSEQUENT TO ANY SUCH AUCTION, AUTHORIZING SUCH SALES
FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS**

Caritas Health Care, Inc. and the other above-captioned debtors and debtors-in-

possession (each, a "Debtor," and collectively, the "Debtors"), hereby submit this motion (the

"Motion") and respectfully represent:

**SUMMARY OF RELIEF REQUESTED**

1.       As part of the process of liquidating their assets, the Debtors and their

advisors have actively marketed and pursued sales (the "Sales") of the Debtors' real property

(the "Real Estate"), which is comprised of the Mary Immaculate and St. John's Campuses (each

as defined below), over the past months.  As a result of such efforts, the Debtors have entered

into a stalking horse agreement (the "Mary Immaculate Agreement"), subject to court approval,

with Stessa Corp. (the "Stalking Horse Bidder") for the purchase of the Mary Immaculate Campus.[1]  For the reasons set forth below, the Debtors have elected not to enter into a stalking horse agreement for the purchase of the St. John's Campus, but have attached hereto as Exhibit C a Form of Sale-Purchase Agreement for the purchase of the St. John's Campus (the "Form of St. John's Agreement," and, together with the Mary Immaculate Agreement, the "Sale Agreements") for use in connection with submission of bids therefor at the Auction (as defined below).

2.     In order to maximize the consideration received from sales of the Real Estate, the Debtors have determined in their sound business judgment that it is in the best interests of their estates and creditors to subject the Real Estate to competitive bidding at an auction (the "Auction") to be conducted in accordance with the Auction Procedures attached hereto as Exhibit D (the "Auction Procedures").  Moreover, the Debtors will ultimately seek Court approval of sales of the Real Estate to the Successful Bidders (as defined in the Auction Procedures).  Thus, the Debtors first seek entry of an order, substantially in the form of Exhibit A annexed hereto (the "Bidding Procedures Order"), to:

(a)     approve the Auction Procedures;

(b)     approve requirements that (i) a Bid (as defined in the Auction Procedures) on the St. John's Campus provide for a purchase price of at least $13,500,000 and (ii) subsequent Bids therefor exceed previous Bids by at least $50,000 (the requirements set forth in this subparagraph (b) are referred to as the "SJQ Bid Requirements");

(c)     approve requirements that (i) a Bid on the Mary Immaculate Campus provide for a purchase price of at least $4,351,000 and (ii) subsequent Bids therefor exceed previous Bids by at least $25,000

---

[1]     A copy of the Mary Immaculate Agreement is attached hereto as Exhibit B.

(the requirements set forth in this subparagraph (c) are referred to as the "<u>MIH Bid Requirements</u>," and together with the SJQ Bid Requirements, the "<u>Bid Requirements</u>");

(d) approve a break-up fee of $126,000 (the "<u>Break-Up Fee</u>"), which is paid to the Stalking Horse Bidder upon closing of an alternate transaction in the event that the Stalking Horse Bidder is not selected as the Successful Bidder at the Auction with respect to the Mary Immaculate Campus;

(e) approve the manner and form of the notice of auction procedures, auction date and sale hearing (the "<u>Auction and Sale Hearing Notice</u>"), substantially in the form annexed hereto as <u>Exhibit E</u>; and

(f) grant certain ancillary and other relief related thereto.

3. In addition, the Debtors request that this Court schedule a hearing (the "<u>Sale Hearing</u>") to take place after the Auction is conducted, at which to consider entry of further orders (each, a "<u>Sale Order</u>"), each in substantially the form attached hereto as <u>Exhibit F</u>, to approve agreements for the sale of the Real Estate and authorize Caritas to implement such agreements in order to sell the Real Estate free and clear of all liens, claims and encumbrances.

## <u>JURISDICTION</u>

4. The Court has jurisdiction over this Motion under 28 U.S.C. § 1334, which is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these proceedings is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## <u>BACKGROUND</u>

5. On February 6, 2009 (the "<u>Petition Date</u>"), the Debtors filed with this Court voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, the Debtors are continuing to operate their businesses and manage their affairs as debtors-in-possession. On February 13, 2009, the Office

of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee") in the Debtors' Chapter 11 cases.

6.      The factual background relating to the Debtors' commencement of these Chapter 11 cases is set forth in detail in the Affidavit of John Lavan, the Chief Restructuring Officer of Caritas, in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 10] (the "Lavan Affidavit") filed on the Petition Date and incorporated herein by reference.

7.      Since the Petition Date, the Debtors have terminated all health-care-related operations and are in the process of liquidating their assets and winding up their affairs.  A critical part of this process is the Debtors' efforts to dispose of and monetize their real property, which is comprised of the following parcels:

> (a)     Mary Immaculate Hospital Campus and the attached on-site parking facility, located at 152-01 89th Avenue (aka 152-11 89th Avenue), Jamaica, New York, Block 9695, Lot 14;
>
> (b)     St. John's Queens Hospital Campus, located at 90-02 Queens Boulevard, Elmhurst, New York, Block 2857, Lot 36;
>
> (c)     St. John's Queens Hospital Parking Facility, located at 87-28 58th Avenue, Elmhurst, New York, Block 2860, Lot 16;
>
> (d)     three contiguous unimproved parcels located at 57-28, 57-30 and 57-32 Hoffman Drive, Elmhurst, New York, Block 2858, Lots 20, 21 and 22;
>
> (e)     a vacant lot located on 88th Avenue in Jamaica, New York, Block 9695, Lot 6; and
>
> (f)     a parking lot located at 152-09 88th Avenue (aka 152-03 88th Avenue), Jamaica, New York, Block 9697, Lot 52.

Each of these parcels is part of one or the other of the Debtors' main hospital facilities.  Thus, these parcels can be grouped into two bundles:  the group of parcels

referred to in (a), (e) and (f) of this paragraph 7 comprise the Mary Immaculate Hospital Campus (the "Mary Immaculate Campus"), and the group of parcels referred to in (b), (c) and (d) of this paragraph 7 comprise the St. John's Queens Hospital Campus (the "St. John's Campus").

8.      Further, in connection with their efforts to sell the Real Estate, the Debtors have used the services of CB Richard Ellis, Inc. (the "Broker") as real estate broker. The Broker was retained pursuant to an order of the court dated May 11, 2009 (the "Broker Retention Order").

## A.      The Debtors' Efforts to Market and Sell The Real Estate

9.      The Debtors have determined in their sound business judgment that sales of the Real Estate will maximize the value of their estates. To that end, the Debtors began to solicit bids regarding the sale of the Real Estate in May, 2009 through the Broker. The Broker emailed a solicitation package to a database of approximately 1,400 recipients which included real estate investors, real estate developers, brokers, colleges, health care providers and holders of office space. In addition, the solicitation was emailed to approximately 1,700 Tri-State commercial real estate brokers. The solicitation package generally described the properties for sale and directed interested parties to execute a confidentiality agreement. Upon execution of a confidentiality agreement, interested parties were granted access to a comprehensive electronic data room maintained by the Broker, which allowed them to conduct due diligence review of the Real Estate. Approximately 98 parties executed confidentiality agreements and reviewed the materials posted in the data room, of which approximately 22 parties conducted site visits for further review.

10. Furthermore, the solicitation package requested that parties interested in serving as a stalking horse bidder submit proposals by remitting a marked copy of a form of stalking horse agreement by June 15, 2009. Approximately five bids were received by such deadline for various parcels of the Real Estate, but these were determined by the Debtors, in the exercise of their sound business judgment, to be insufficient. At this point, the Debtors and their advisors considered various alternatives to the Sales, including transfer of the Real Estate into a trust for the benefit of the Debtors' creditors. At the same time, the Debtors redoubled their efforts to pursue a sale of the Real Estate. Accordingly, they reached out to a number of other parties through various contacts and entered into further discussions and pursued possible sales with a number of interested parties, some of whom submitted formal bids. The Debtors actively negotiated potential stalking horse contracts with approximately four potential purchasers, two of whom requested additional time and materials to conduct their due diligence review. Of these, the Stalking Horse Bidder's bid for the Mary Immaculate Campus provided the best value therefor and the greatest degree of certainty to the Debtors' estates regarding sale thereof, and Caritas therefore entered into the Mary Immaculate Agreement.

11. In addition, the Debtors recently received another firm offer from a potential purchaser to serve as a stalking horse bidder for the St. John's Campus. After reviewing this bid, the Debtors determined that it was not high enough to justify the Debtors' agreeing to stalking horse protections, including a break-up fee. Thus, in their sound business judgment, the Debtors determined that the Auction described herein, employing a stalking horse bidder for the Mary Immaculate Campus, but holding an auction for the St. John's Campus with a minimum required bid, presents the best opportunity to maximize the value received for the Real Estate.

## RELIEF REQUESTED AND BASIS THEREFOR

12. As stated above, by this Motion, the Debtors seek entry of orders of this Court: (I) approving procedures for the Auction, and approving the Bid Requirements and the Break-Up Fee and, (II) subsequent to any such Auction, authorizing sales of the Real Estate free and clear of liens, claims, encumbrances and interests.

13. Accordingly, the Debtors request authority to conduct the Auction on October 9, 2009 at 10:00 a.m. (New York City time), with bids to be received by no later than 12:00 p.m. (New York City time) on October 6, 2009, and request a sale hearing on October 14, 2009, subject to the Court's availability. The Debtors also request that the Court set October 9, 2009 at 4:00 p.m. (New York City time) as the deadline for serving objections to the proposed sale.

**B.** **The Auction Procedures[2]**

14. The Debtors are proposing the Auction Procedures in an attempt to maximize the realizable value of the Real Estate for the benefit of the Debtors' estates, creditors and other interested parties. The Auction Procedures contemplate an auction process pursuant to which bids for purchase of the Real Estate will be solicited. The following is a brief summary of certain of the key provisions of the Auction Procedures; the Court, however, is respectfully referred to <u>Exhibit D</u> for a full recitation thereof:[3]

   (a) All Bids shall be accompanied by appropriate evidence, satisfactory to the Debtors in their sole discretion, as to the

---

[2] Capitalized terms used but not defined in this Section B shall have the meanings given to them in the Auction Procedures.

[3] The dates and times included in this description of the Auction Procedures assume that the dates proposed by the Debtors in Paragraph 13 of this motion are acceptable to and approved by the Court.

Bidder's financial and other required abilities to consummate a transaction.

(b)  All Bids shall be unconditional and not contingent upon any event, including, without limitation, any additional due diligence investigation or financing contingency of any kind.

(c)  All Bids shall be irrevocable until a Closing has occurred with respect to the Real Estate which was bid upon and all Bidders shall be deemed to have agreed to serve as a Next Highest Bidder (as defined herein) and shall be obligated to close the Sales in such capacity if so elected by the Debtors.

(d)  All Bids shall include an earnest money refundable deposit equal to 10% of the value of the Bid (a "<u>Deposit</u>") in the form of a certified check or wire transfer payable to Proskauer Rose LLP, as escrow agent. Each Deposit shall be held in an interest-bearing account. Deposits shall be returned promptly to the appropriate Bidder after the Closing of the sale of the related Real Estate, except for Deposits given by the purchaser(s) with respect to such Real Estate. If a Successful Bidder fails to consummate a sale as approved at the Sale Hearing because of a breach or failure to perform on the part of such Successful Bidder, the Debtors will not have any obligation to return the Successful Bidder's Deposit, and such Deposit shall irrevocably become property of the Debtors.

(e)  All Bids shall state that such Bidder is prepared to enter into a legally binding Sale Agreement and shall be in the form of a mark-up of (i) the Sale Agreement(s) (each such mark-up, a "<u>Modified Sale Agreement</u>") and (ii) the Form of Sale Order annexed to this Motion as <u>Exhibit F</u>, in each case unless otherwise agreed by the Debtors and a Bidder, and shall not request or entitle the Bidder to any transaction or break-up fee, expense reimbursement or similar type of payment. Moreover, all Bids shall be accompanied by a clean and duly executed Modified Sale Agreement.

(f)  A Bid for the purchase of the St. John's Campus shall provide for a purchase price of no less than $13,500,000, and a Bid for the purchase of the Mary Immaculate Campus shall provide for a purchase price of no less than $4,351,000.

(g)  Bids for both the St. John's and Mary Immaculate Campuses as a package shall allocate a value to each Campus individually, and such allocation shall provide consideration equal to or greater than the minimum required purchase price with respect to each such Campus.

(h)    The Auction shall commence at 10:00 a.m. (New York City time), on October 9, 2009 at the offices of Proskauer Rose LLP, 1585 Broadway, New York, New York 10036.

(i)    The Debtors reserve the right (a) to determine in the reasonable exercise of their business judgment whether the amendments and changes contained in each Bid are acceptable; (b) to determine, in the reasonable exercise of their business judgment, which Bid, or any combination of Bids, is/are the highest or otherwise best offer(s), and to seek court approval of separate purchase agreements with separate purchasers with respect to such Bids; (c) to reject at any time prior to entry of an of the Bankruptcy Court approving a Successful Bidder, any bid that the Debtors, in the reasonable exercise of their business judgment, deem to be (i) inadequate or insufficient or (ii) not to conform with the requirements of the Bankruptcy Code or the Auction Procedures; (d) to withdraw some or all of the assets from the Auction or sale at any time prior to entry of an order approving such sale, or (e) to alter, amend or otherwise not comply with these Auction Procedures at any time and without notice.

15.    The Debtors believe that these Auction Procedures provide an appropriate framework for selecting Bids in a uniform fashion and, at the same time, provide the Debtors with the flexibility to consider any and all proposed transactions and will enable the Debtors to review, analyze and compare all Bids received to determine which Bids are in the best interests of the Debtors' estates and creditors. Therefore, the Debtors respectfully request that this Court approve the Auction Procedures. At the Auction, the Debtors will determine which transaction or transactions will maximize the value of the Debtors' estates and the recovery for their creditors.

16.    Similar relief to that requested herein has been granted in cases in this District. See, e.g., Victory Memorial Hospital, et al., Case No. 06-44387 (CEC) (Bankr. E.D.N.Y. March 10, 2008) (approving auction procedures in connection with sale of certain assets free and clear of liens); The Brooklyn Hospital Center, et al., Case No. 05-26990 (CEC)

(Bankr. E.D.N.Y. June 6, 2007) (approving auction procedures in connection with sale of real estate and related assets free and clear of liens).

## C.    Notice of Auction and Sale Hearing

17.    The Debtors propose to serve the Auction and Sale Hearing Notice, no later than two business days following the entry of the Bidding Procedures Order upon (a) the U.S. Trustee; (b) the Dormitory Authority of the State of New York ("DASNY"); (c) Healthcare Finance Group, Inc. ("HFG"); (d) St. Vincents Catholic Medical Centers of New York ("SVCMC"); (e) the Committee; (f) all those who have entered an appearance in these cases pursuant to Bankruptcy Rule 2002; (g) all parties who have expressed interest in making a Bid or identified by the Debtors as a potential purchaser; (h) all known entities holding or asserting a lien on the Real Estate; (i) the Office of the Attorney General of the State of New York; and (j) any taxing authorities having jurisdiction over the Debtors.  DASNY, HFG and SVCMC shall herein be referred to as the "Secured Lenders."

18.    The Debtors submit that the notice to be provided by notice of this Motion and the Auction and Sale Hearing Notice constitutes good and adequate notice of the Auction and the proceedings to be had with respect thereto.  Therefore, the Debtors respectfully request that this Court approve the foregoing notice procedures.

## D.    The Sale Agreements[4]

19.    The Auction Procedures request that, unless it is impractical, Bids be submitted in the form of a markup of the applicable Sale Agreement.  The Debtors will seek

---

[4]    Capitalized terms used in this Section D, but not otherwise defined, shall have the meanings given to them in the applicable Sale Agreement.

approval of the agreements executed with the Successful Bidders at the Sale Hearing held subsequent to the Auction.  The following is a brief summary of certain key provisions of the Mary Immaculate Agreement; the Court, however, is respectfully referred to the agreement itself for a full recitation of the terms and conditions thereof:

(a)      <u>Purchase Price and Closing Amounts</u>:  The purchase price for the Mary Immaculate Campus is $4,200,000 (the "<u>Stalking Horse Purchase Price</u>").  On the Closing Date, the Stalking Horse Bidder will pay Caritas, in immediately available funds, the Stalking Horse Purchase Price, less the MIH Deposit (as defined below) and subject to apportionment of certain expenses.  In addition, the Stalking Horse Bidder has agreed to pay to third parties certain other amounts in respect of insurance premiums and other fees related to transfer of the real estate.

(b)      <u>Exclusions</u>:  Notwithstanding anything to the contrary contained in the Mary Immaculate Agreement, any movable fixtures, furniture, furnishings, equipment or other personal property (including, without limitation, trade fixtures and equipment, medical or otherwise, in, on, around or affixed to the Real Estate) owned by Caritas or any affiliate of Caritas are excluded from the sale, <u>provided however</u>, that certain items listed on Exhibit D to the Mary Immaculate Agreement are carved out from this general exclusion and shall be sold.

(c)      <u>Good Faith Deposit</u>:  On the date of the Mary Immaculate Agreement, the Stalking Horse Bidder wired a deposit (the "<u>MIH Deposit</u>") of $420,000, equal to 10% of the Stalking Horse Purchase Price, to Proskauer Rose LLP, counsel to the Debtors, to hold in trust in its capacity as escrow agent pursuant to the Escrow Agreement attached to the Mary Immaculate Agreement as Exhibit B.

(d)      <u>Bid Protections</u>:  The Debtors have agreed to the MIH Bid Requirements, as well as the Break-Up Fee.

(e)      <u>Closings</u>:  The Closing shall take place on the 10th business day after notice of entry of a Sale Order approving the Mary Immaculate Agreement, subject to Caritas' right to adjourn the Closing for a period not to exceed ten (10) business days, which extension shall be without prejudice to further extensions at Caritas' sole discretion, and time shall be of the essence as to the

Stalking Horse Bidder's obligations to consummate the Closing on such adjourned date.

20.     The following is a brief summary of certain key provisions of the Form of St. John's Agreement; the Court, however, is respectfully referred to the agreement itself for a full recitation of the terms and conditions thereof:

(a)     Purchase Price and Closing Amounts:  The purchase price for the St. John's Campus (the "SJQ Purchase Price") shall be no less than $13,500,000.  On the Closing Date, the Successful Bidder will pay Caritas, in immediately available funds, the SJQ Purchase Price that is the highest and best Bid at the Auction and approved by the Court at the Sale Hearing, less the SJQ Deposit (as defined below) and subject to apportionment of certain expenses.  In addition, the Successful Bidder shall pay to third parties certain other amounts in respect of insurance premiums and other fees related to transfer of the real estate.

(b)     Exclusions:  Notwithstanding anything to the contrary contained in the Form of St. John's Agreement, any movable fixtures, furniture, furnishings, equipment or other personal property (including, without limitation, trade fixtures and equipment, medical or otherwise, in, on, around or affixed to the Real Estate) owned by Caritas or any affiliate of Caritas are excluded from the sale.

(c)     Good Faith Deposit:  A party making a Bid on the St. John's Campus must either wire funds or deliver a certified check for 10% of their Bid (the "SJQ Deposit") to Proskauer Rose LLP, counsel to the Debtors, to hold in trust in its capacity as escrow agent pursuant to the Escrow Agreement attached to the Form of St. John's Agreement as Exhibit B.

(d)     Closings:  The Closing shall take place on the 10th business day after notice of entry of a Sale Order approving an agreement for purchase of the St. John's Campus, subject to Caritas' right to adjourn the Closing for a period not to exceed ten (10) business days, which extension shall be without prejudice to further extensions at Caritas' sole discretion, and time shall be of the essence as to the Successful Bidder's obligations to consummate the Closing on such adjourned date.

21.     In addition, the Sale Agreements each contain other provisions customary to agreements of this nature.

**E.     Approval of the Sales**

22.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan.  However, the Second Circuit has required that the decision to sell assets outside the ordinary course of business be based upon a sound business justification.  See In re Chateaugay Corp., 973 F.2d 141 (2nd Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2nd Cir. 1983).  Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case.  Lionel, 722 F.2d at 1071.

23.     Additionally, Section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its Section 105(a) power is proper.  In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002); In re United States Lines, 199

B.R. 476, 481 (Bankr. S.D.N.Y. 1996). Pursuant to Section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. See, e.g., Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

24. The Debtors believe that sales to the Successful Bidders (or the Next Highest Bidder(s)) pursuant to the Auction Procedures represent prudent and proper exercises of their business judgment and are supported by articulated business reasons. As stated above, the Debtors are no longer conducting health care operations at any of their locations, and are generally seeking now to liquidate their assets in an orderly fashion. Moreover, once the Real Estate is sold, the Debtors will no longer incur any of the upkeep, security, insurance or maintenance expenses related thereto. Thus, the Sales will allow the Debtors to minimize the costs of administering their estates. In addition, the value contained in Real Estate is a significant percentage of the total value of the Debtors' assets, and thus the expeditious realization of fair value therefor is a critical step toward concluding these Chapter 11 cases and is in the best interests of the Debtors' estates, creditors and other parties in interest. Accordingly, the Debtors believe that they are exercising sound business judgment and request that the Court approve sales to the Successful Bidders (or Next Highest Bidder(s)) pursuant to the Auction Procedures.

**F.  Approval to Sell the Real Estate
Free and Clear of Liens, Claims and Encumbrances**

25.     The Debtors request approval to sell the Real Estate to the Successful Bidders (or Next Highest Bidder(s)) free and clear of any and all liens, claims or encumbrances in accordance with Section 363(f) of the Bankruptcy Code.  Pursuant to Sections 363(b) and 363(f) of the Bankruptcy Code, a debtor-in-possession may sell property "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions is satisfied:

(a)     applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

26.     The Debtors believe that they will be able to establish one or more of such requirements.  More specifically, the Debtors propose that any liens, claims or encumbrances asserted against the Real Estate be transferred to and attach to the proceeds of the sale of the assets and such other amounts payable to the Debtors under the Sale Agreements, subject to the rights, claims, defenses, and objections, if any, of all interested parties with respect thereto.

**G.     Approval of the Stalking Horse Protections**

27.     In order to facilitate the auction process, Caritas agreed to include the MIH Bid Requirements in the Mary Immaculate Agreement, as well as the Break-Up Fee.  There

are three considerations for courts assessing break-up fees: (1) whether the relationship of the parties who negotiated the break-up fee is tainted by self-dealing or manipulation; (2) whether the fee hampers, rather than encourages, bidding; and (3) whether the amount of the fee is unreasonable relative to the proposed purchase price. In re Integrated Resources, 147 B.R. 650, 657 (S.D.N.Y. 1992).

28. As stated above, the Break-Up Fee is intended to facilitate the Auction, reimburse the Stalking Horse Bidder for certain of the expenses it has incurred and will continue to incur in connection with the proposed transaction and to compensate the Stalking Horse Bidder for the substantial time and effort it has expended to date and will continue to expend as a stalking horse for competing bids. In the event that the Stalking Horse Bidder is not the successful bidder at the Auction with respect to the Mary Immaculate Campus, the Mary Immaculate Agreement provides for Caritas to pay a Break-Up Fee of $126,000, which amount is equal to 3% of the Stalking Horse Purchase Price. The Debtors submit that notwithstanding the Break-Up Fee, use of the Mary Immaculate Agreement will facilitate discussions with other interested parties and will establish a floor with respect to the proposed auction of the Mary Immaculate Campus. The Debtors believe that without the Mary Immaculate Agreement, which the Debtors were unable to attain without the inclusion of a Break-Up Fee, the ultimate proceeds obtained for the Mary Immaculate Campus would not be maximized. Thus, the amount of the Break-Up Fee is fair and reasonable, and use of the Mary Immaculate Agreement will ensure that competing bids will be higher and better, providing a significant benefit to the Debtors' estates and creditors. See, e.g., In re The Brooklyn Hospital Center, et al., Case No. 05-26990 (CEC) (Bankr. E.D.N.Y. June 6, 2007) (approving a break-up fee of 3%); In re Our Lady of Mercy Medical Center, et al., Case No. 07-10609 (REG) (Bankr. S.D.N.Y. March 29, 2007) (approving

a break-up fee of 1.8%); Integrated Resources, 147 B.R. at 662 (approving a breakup fee that ranged as high as 3.2% of the purchase price of the non-cash assets). Moreover, there are no facts regarding the relationships between the Debtors and the Stalking Horse Bidder which would indicate any manipulation or self-dealing in the negotiation of the Break-Up Fee. Accordingly, the Debtors believe that the proposed Break-Up Fee satisfies the standards provided for in Integrated Resources.

29. In addition, the Debtors submit that the Bid Requirements are fair and reasonable and will facilitate the conduct of a competitive Auction to the benefit of the Debtors' estates.

## H.  Brokerage Commission

30. Pursuant to the Broker Retention Order, the Broker is entitled to a commission equal to 1.5% of the final aggregate purchase price with respect to the Real Estate, as calculated in accordance with the Broker's retention letter agreement dated April 24, 2009. The Debtors seek authority from the Court to pay the Broker its commission, out of the proceeds of the Sales, upon approval of the Broker's final fee application.

## I.  Relief from the Ten-Day Waiting Period
## Under Bankruptcy Rule 6004(h) is Appropriate

31. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property … is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." The Debtors request that Court order that a Sale Order be effective immediately upon entry thereof.

32.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  <u>See</u> Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten-day stay period, Collier on Bankruptcy suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10-6004 <u>Collier on Bankruptcy</u>, 15th Edition Rev. P 6004.10. Furthermore, <u>Collier</u> provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  <u>Id.</u>

33.     Accordingly, the Debtors hereby request that the Court order that the ten-day stay period under Bankruptcy Rule 6004(h) shall not be in effect with respect to any Sale Order that is entered.

## <u>NOTICE</u>

34.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the U.S. Trustee; (b) DASNY; (c) HFG; (d) SVCMC; (e) the Committee; (f) all those who have entered an appearance in these cases pursuant to Bankruptcy Rule 2002; (g) all parties who have expressed interest in making a Bid and for which the Debtors were provided contact information; (h) all known entities holding or asserting a lien on the Real Estate; (i) the Office of the Attorney General of the State of New York; and (j) any taxing authorities having jurisdiction over the Debtors.  The Debtors respectfully submit that such notice is sufficient, and request that, except as provided herein, the Court find that no further notice of the relief requested herein is required.

## NO PRIOR REQUEST

35.    No prior motion for the relief requested herein has been made to this or any other Court.

**WHEREFORE**, the Debtors respectfully request that the Court enter the proposed order, annexed hereto as <u>Exhibit A</u> approving the Auction Procedures, the Bid Requirements and the Break-Up Fee, and, subsequent to the Auction, enter the Sale Orders, which will be submitted prior to the Sale Hearing, authorizing the Sales free and clear of liens, claims, encumbrances and interests, and approving such agreements(s) related thereto and such other and further relief as the Court deems just and proper.

Dated: August 28, 2009
      New York, New York

                                   **PROSKAUER ROSE LLP**

                                   By:  /s/ Jeffrey W. Levitan
                                     Jeffrey W. Levitan (JL-6155)
                                     Adam T. Berkowitz (AB-3714)
                                     1585 Broadway
                                     New York, NY  10036-8299
                                     Tel:  (212) 969-3000
                                     Fax:  (212) 969-2900

                                   Counsel for the Debtors and
                                     Debtors In-Possession

**<u>Exhibit A</u>**

**Bidding Procedures Order**

**UNITED STATES BANKRUPTCY COURT,**
**EASTERN DISTRICT OF NEW YORK**

```
------------------------------------------------------- x
```
In re:                                             :
                                                   :                    Chapter 11
                                                   :
**CARITAS HEALTH CARE, INC., et al.,**             :                    Case Nos. 09-40901 (CEC)
                                                   :                    through 09-40909 (CEC)
                                                   :
                              **Debtors.**         :                    (Jointly Administered)
```
------------------------------------------------------- X
```

## ORDER APPROVING AUCTION PROCEDURES AND BID PROTECTIONS RESPECTING SALES OF THE DEBTORS' REAL PROPERTY

Upon consideration of the motion (the "Motion")[1] of Caritas Health Care, Inc. and the other above-captioned debtors and debtors-in-possession (each, a "Debtor," and collectively, the "Debtors"), for entry of orders of this Court: (I) approving procedures for an auction respecting sales of the Debtors' real property and, (II) subsequent to any such auction, authorizing such sales free and clear of liens, claims, encumbrances and interests; and notice of the Motion being sufficient and no further notice needing to be given; and the Debtors having articulated good and sufficient reasons for granting the Motion; and after due deliberation, and sufficient cause appearing therefor, it is hereby

**ORDERED**, that the Motion is hereby granted to the extent set forth herein; and it is further

**ORDERED**, that the Auction Procedures are hereby approved in their entirety, and the Debtors shall hold the Auction in conformity therewith; and it is further

**ORDERED**, that if the Stalking Horse Bidder is not the Successful Bidder with respect to the Mary Immaculate Campus, then pursuant to the Mary Immaculate Agreement,

---

[1]     Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

Caritas is authorized to pay the Stalking Horse Bidder the Break-Up Fee from the proceeds of the sale to the competing bidder; and it is further

ORDERED, that the Sale Hearing shall be held on _____, 2009 at _____m.; and it is further

ORDERED, that objections, if any, to the Motion, other than with respect to relief granted herein, shall be set forth in writing and state with particularity the grounds for such objections or other statements of position and shall be electronically filed with the Bankruptcy Court and served upon (1) counsel for the Debtors, Proskauer Rose LLP, 1585 Broadway, New York, NY 10036, (Attn: Jeffrey W. Levitan, E-mail: jlevitan@proskauer.com, and Adam T. Berkowitz, E-mail aberkowitz@proskauer.com), Fax: 212-969-2900; (2) the Office of the United States Trustee, 271 Cadman Plaza East, Suite 4529, Brooklyn, New York 11201 (Attn: William E. Curtin, E-mail william.e.curtin@usdoj.gov, and Valerie Millman, E-mail valerie.millman@usdoj.gov), (3) counsel to DASNY, Winston & Strawn LLP, 200 Park Avenue, New York, New York 10166-4193 (Attn: David Neier, E-mail dneier@winston.com); (4) counsel to SVCMC, Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New York 10281 (Attn: Andrew M. Troop, E-mail andrew.troop@cwt.com, and Christopher R. Mirick, E-Mail christopher.mirick@cwt.com); (5) counsel to the Committee, Alston & Bird LLP, 90 Park Avenue, New York, New York 10016 (Attn: Craig E. Freeman, Esq., E-mail craig.freeman@alston.com); and (6) any other party entitled to service under applicable rules, to be actually received by _____m. (New York City time), on _____, 2009, in accordance with the Auction and Sale Hearing Notice; and it is further

ORDERED, that the Debtors shall serve the Auction and Sale Hearing Notice upon (a) the U.S. Trustee; (b) the Dormitory Authority of the State of New York; (c) Healthcare

Finance Group, Inc.; (d) St. Vincents Catholic Medical Centers of New York; (e) the Committee;

(f) all those who have entered an appearance in these cases pursuant to Bankruptcy Rule 2002;

(g) all parties who have expressed interest in making a Bid or identified by the Debtors as a

potential purchaser for which the Debtors were provided contact information; (h) all known

entities holding or asserting a lien on the Real Estate; (i) the Office of the Attorney General of

the State of New York; and (j) any taxing authorities having jurisdiction over the Debtors in the

manner specified in the Auction Procedures. Such service shall be deemed due, timely, good and

sufficient notice of the entry of this Order, the Motion and all proceedings to be held thereon;

and it is further

ORDERED, that the Debtors are authorized to execute and deliver all

instruments and documents, and take such other action as may be necessary or appropriate to

implement and effectuate the transactions contemplated by this Order; and it is further

ORDERED, that the Court shall retain jurisdiction over any matter or dispute

arising from or relating to the implementation of this Order.

Dated: _____, 2009
        Brooklyn, New York


_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit B

## Mary Immaculate Agreement

SALE-PURCHASE AGREEMENT

between

CARITAS HEALTH CARE, INC.

as seller,

and

STESSA CORP.

as purchaser

Premises:

152-11 89th Avenue, Jamaica, New York (Block 9695, Lot 14)
_____ 88th Avenue, Jamaica, New York (Block 9695, Lot 6)
152-09 88th Avenue (a.k.a. 152-03 88th Avenue), Jamaica, New York (Block 9697, Lot 52)

As of August 4, 2009

# TABLE OF CONTENTS

1.  Purchase and Sale. ................................................................................................... 1

2.  Purchase Price. ...................................................................................................... 2

3.  The Closing; Closing Date. ................................................................................... 3

4.  Apportionments. ................................................................................................... 3

5.  Closing Documents and Deliverables. ................................................................. 5

6.  Return of Downpayment, Payment of Break-Up Fee ......................................... 8

7.  Purchaser's Representations. ............................................................................... 8

8.  Limited Seller Representations, No Implied Representations. ............................ 9

9.  Casualty and Condemnation. ............................................................................. 12

10. Bankruptcy Court Approval and Related Matters. ............................................ 13

11. Limitation on Personal Liability. ....................................................................... 14

12. Seller's Default. .................................................................................................. 14

13. Purchaser's Default. ........................................................................................... 14

14. Conditions Precedent. ........................................................................................ 15

15. Notices. ............................................................................................................... 16

16. Assignment of Agreement. ................................................................................. 17

17. Broker. ................................................................................................................ 18

18. Entire Agreement. .............................................................................................. 18

19. Amendments. ...................................................................................................... 18

20. No Waiver. .......................................................................................................... 18

21. Successors and Assigns. ..................................................................................... 19

22. Partial Invalidity. ............................................................................................... 19

23. Section Headings. ............................................................................................... 19

24. Governing Law. .................................................................................................. 19

25. No Recording or Notice of Pendency. ............................................................... 19

26. Calculation of Time Periods; Business Days. .................................................... 20

27. Counterparts. ...................................................................................................... 20

# SALE-PURCHASE AGREEMENT

THIS SALE-PURCHASE AGREEMENT (this "Agreement") is made as of the 4th day of August 2009 (the "Effective Date"), between CARITAS HEALTH CARE, INC., a New York not-for-profit corporation, as debtor and debtor-in-possession pursuant to Case Nos. 09-40901 (CEC) through 09-40909 (CEC) in the United States Bankruptcy Court for the Eastern District of New York, having an address at 16-10 Dekalb Avenue, Brooklyn, New York 11237 ("Seller"), and STESSA CORP., a New York corporation, having an address at 55 West 37th Street, Suite 370, New York, New York 10018 ("Purchaser").

## WITNESSETH:

WHEREAS, on February 6, 2009, Seller and certain of its affiliates filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court"), which are being jointly administered under Case Nos. 09-40901 (CEC) through 09-40909 (CEC) in the Bankruptcy Court.

WHEREAS, Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, the Asset (hereinafter defined), in accordance with Section 363 and other applicable sections of the Bankruptcy Code, on the terms and subject to the conditions set forth herein, including, without limitation, that this Agreement shall be subject to higher and better offers which, subject to the terms of Section 10, shall be determined by Seller in its sole and absolute discretion.

WHEREAS, the Asset will be sold pursuant to a Sale Order (hereinafter defined) of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code and the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the mutual receipt and legal sufficiency of which the parties hereto hereby acknowledge, Seller and Purchaser hereby agree as follows:

    1.      Purchase and Sale.

    (a)      Subject to the terms and conditions set forth in this Agreement, Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase and acquire from Seller, the following (collectively, the "Asset"):

    (i)      *Land.* That certain plot, piece and parcel of land located in Queens County, State of New York, more particularly described on Exhibit "A" attached hereto and made a part hereof (the "Land"), together with all of Seller's right, title and interest, if any, in and to any land lying in the bed of any street, road or avenue, opened or proposed, public or private, in front of or adjoining the Land, to the center line thereof, and all right, title and interest, if any, of Seller in and to any award made or to be made in lieu thereof and in and to any unpaid award for damage to the Land by reason of change of grade of any street, subject, however, to the Permitted Exceptions (hereinafter defined);

(ii) *Improvements.* The buildings and other improvements built on or attached to the Land (collectively, the "Improvements"), subject, however, to the Permitted Exceptions (the Land and the Improvements being referred to herein as, collectively, the "Real Estate");

(iii) *Fixtures.* Subject to the terms of Section 1(b), all of Seller's right, title and interest in and to the fixtures built on or attached to the Real Estate (the "Fixtures"), subject, however, to the Permitted Exceptions; and

(iv) *Appurtenant Rights.* All of Seller's right, title and interest, if any, in and to all easements, rights of way, privileges, servitudes, appurtenances and other rights, if any, running with Seller's interest in the Real Estate, subject, however, to the Permitted Exceptions.

(b) Notwithstanding anything to the contrary contained herein, it is expressly agreed by the parties hereto that (i) any movable fixtures, furniture, furnishings, equipment or other personal property (including, without limitation, trade fixtures and equipment, medical or otherwise, in, on, around or affixed to the Real Estate) owned by Seller or any affiliate of Seller (collectively, "Excluded Property"), are not intended, and shall not be, included in the Asset to be sold to Purchaser hereunder; provided, however, (i) Seller shall have no obligation to remove the Excluded Property from the Real Estate at any time, (ii) the removal of the Excluded Property from the Real Estate shall not be a condition precedent to Purchaser's obligations hereunder to consummate the Closing, (iii) if and to the extent that any Excluded Property is not removed from the Real Estate prior to the Closing, such Excluded Property shall be deemed abandoned by Seller upon Closing, Seller shall have no obligation after the Closing to remove same and Purchaser shall accept the Asset with such Excluded Property in, on, around or affixed to the Real Estate without any abatement of the Purchase Price, and (iv) in no event shall the Excluded Property include those existing fixtures described on Exhibit "E" attached hereto and made a part hereof (i.e., in any event, the Asset shall include those existing fixtures described on Exhibit "E").

2. Purchase Price.

Subject to the apportionments described in Section 4 hereof, the purchase price to be paid by Purchaser to Seller for Seller's right, title and interest in the Asset is FOUR MILLION TWO HUNDRED THOUSAND AND NO/100 Dollars ($4,200,000.00), legal currency of the United States of America (the "Purchase Price"), which shall be payable as follows:

(a) *Downpayment.* On the date hereof, Purchaser shall pay to Proskauer Rose LLP, as escrow agent ("Escrow Agent"), FOUR HUNDRED TWENTY THOUSAND AND NO/100 DOLLARS ($420,000.00), legal currency of the United States of America (the "Downpayment"), by wire transfer of immediately available federal funds to the trust account designated by Escrow Agent, to be held by Escrow Agent pursuant to and in accordance with the provisions of an escrow agreement among Seller, Purchaser and Escrow Agent, dated as of the date hereof, a copy of which is attached hereto as Exhibit "B".

2

(b)    *Balance of the Purchase Price.*  The balance of the Purchase Price shall be paid by Purchaser to Seller on the Closing Date (hereinafter defined) by wire transfer of immediately available federal funds to the account or accounts designated by Seller or, at Seller's option (if requested at least three (3) business days prior to Closing (hereinafter defined)), by unendorsed certified or cashier's check(s) payable to the order of, or at the direction of, Seller and drawn on a commercial bank which is a member of the New York Clearinghouse Association (i.e., upon Closing, (i) the Downpayment (together with any interest earned thereon) shall be paid by Escrow Agent to, or as directed by, Seller and (ii) Purchaser shall receive a credit against the total Purchase Price in the amount of the Downpayment (but not any interest earned thereon)).

3.    The Closing; Closing Date.

The consummation of the purchase and sale transaction contemplated hereby (the "Closing") shall take place at 10:00 A.M. (New York City time) on the tenth (10th) business day after the notice of the entry of the Sale Order (the date on which the Closing occurs being referred to herein as the "Closing Date").  TIME SHALL BE OF THE ESSENCE as to Purchaser's obligations hereunder to consummate the Closing on such date.  Seller shall have the right to adjourn the Closing for a period not to exceed ten (10) business days by giving notice thereof to Purchaser not later than the business day on which the Closing is otherwise scheduled to occur, which extension shall be without prejudice to further extensions at Seller's sole discretion, and TIME SHALL BE OF THE ESSENCE as to Purchaser's obligations hereunder to consummate the Closing on such adjourned date.  Seller may, in its sole and absolute discretion, but is in no way required to, agree in writing to adjourn the Closing at the written request of Purchaser, in which event TIME SHALL BE OF THE ESSENCE as to Purchaser's obligations hereunder to consummate the Closing on such adjourned date.  The Closing shall take place at the offices of Proskauer Rose LLP, 1585 Broadway, New York, New York 10036, or, at Purchaser's option, at the offices of (x) the lending institution providing Purchaser's financing for Purchaser's purchase of Seller's right, title and interest in the Asset, or (y) such lending institution's attorneys, provided that in either case such offices are located in the New York metropolitan area.  Nothing contained in this Section 3 shall be construed to condition Purchaser's obligations hereunder on Purchaser arranging financing for all or any portion of the Purchase Price.

4.    Apportionments.

(a)    *Generally.*  Subject to the terms of this Section 4, the following items, without duplication, are to be apportioned between Seller and Purchaser with respect to the Asset as of 11:59 p.m., New York City time, on the date immediately prior to the Closing Date, and at the Closing the net amount thereof shall either be (x) paid by Purchaser to Seller by wire transfer to a bank account designated by Seller or, at Seller's option, by unendorsed certified or cashier's check(s) payable to the order of, or at the direction of, Seller and drawn on a commercial bank which is a member of the New York Clearinghouse Association, or (y) credited by Seller against the Purchase Price:

(i)    real property taxes and assessments;

3740/21521-011 Current/15344765v2

(ii)     water rates and charges;

(iii)    sewer taxes and rents; and

(iv)     electricity, steam, gas, fuel and all other utilities, including, without limitation, taxes thereon.

(b)     *Governmental Charges.* Apportionment of real property taxes, water rates and charges, sewer taxes and rents and other similar items shall be made on the basis of the fiscal year for which assessed. If the Closing Date occurs before the real property taxes, water rates and charges, sewer taxes and rents or similar items with respect to the Asset are finally fixed for the fiscal year in which the Closing occurs, then the apportionments thereof made at the Closing shall be made on the basis of the real property taxes, water rates and charges, sewer taxes and rents or other similar items, as the case may be, for the preceding fiscal year applied to the latest assessed valuation.

(c)     *Water Meters.* If there are any meters measuring water consumption at the Real Estate, then Seller shall attempt to obtain meter readings to a date that is no more than thirty (30) days before the Closing, and, if such readings are obtained, the unfixed water rates and charges and sewer taxes and rents, if any, based thereon for the intervening time shall be apportioned on the basis of such readings, or if such readings are not obtained, then the unfixed water rates and charges and sewer taxes and rents, if any, shall be apportioned upon the last meter readings.

(d)     *Payment of Certain Items.* The amount of any unpaid taxes, assessments, water rates and charges, sewer taxes and rents and any other similar items which Seller is obligated to pay and discharge with respect to the Real Estate, with interest and penalties thereon to the Closing Date, may, at the option of Seller, be allocated to Purchaser out of the Purchase Price, provided that official bills therefor, with interest and penalties thereon, are furnished by Seller at the Closing. Purchaser, if request is made at least two (2) business days prior to the Closing, shall provide Seller at the Closing with separate wire transfers of immediately available federal funds and/or certified and/or official bank check(s) drawn on, or by, a commercial bank that is a member of the New York Clearinghouse Association, payable as directed by Seller, in an aggregate amount not exceeding the balance of the Purchase Price due to Seller at the Closing, to facilitate the satisfaction of any of the aforesaid taxes, assessments, water rates and charges, sewer taxes and rents and other similar items and any interest and penalties thereon to the Closing Date. Without limiting the foregoing, Seller is solely obligated to pay and discharge any of the aforesaid taxes, assessments, water rates and charges, sewer taxes and rents and other similar items affecting the Real Estate and any interest or late payment charges with respect thereto that are accrued as of the Closing Date, subject to apportionment as herein provided.

(e)     *Fuel Oil; Utilities.* Fuel oil, if any, owned by Seller and located at the Real Estate on the Closing Date shall be adjusted at the cost thereof to Seller on a first in-first out basis. Seller shall arrange for the amount of fuel oil to be determined in writing by the fuel company presently supplying fuel to the Real Estate as of a date that is not more than five (5) business days prior to the Closing Date. With respect to the other utilities described in clause (iv) of Section 4(a), where possible, Seller shall secure cutoff readings for all utilities as of a date

4

that is not more than five (5) business days prior to the Closing Date. To the extent that such cutoff readings are not available, at Closing the cost of such utilities shall be apportioned between the parties on the basis of the most recent actual (not estimated) bill for such service. Purchaser shall be responsible for causing such utilities and services to be changed to its name as of the Closing Date, and shall be liable for and shall pay all utility bills for services rendered on and after the Closing Date. With respect to deposits on account with any utility company servicing the Asset, to the extent same are transferred to Purchaser at Closing, Seller shall receive an adjustment equal to (i.e., Purchaser shall be pay to Seller at Closing) the full amount of such deposits transferred to Purchaser. To the extent that any such deposits are not transferred to Purchaser, Seller shall have the right to a return of such deposits and Purchaser shall be responsible for posting any deposits required from and after the Closing.

(f)     *Assessments.* If, on the Closing Date, the Real Estate, or any part thereof, is affected by any real property tax assessments, then Seller shall pay such assessments; provided, however, that if such assessments are payable in installments, then Seller shall pay such installments due prior to the Closing Date, and Purchaser shall pay such installments due after the Closing Date.

(g)     *Violations.* Purchaser shall accept title to the Asset subject to all violations of law, rules, regulations, statutes and ordinances, orders or requirements noted in or issued by the departments of buildings, fire, labor, health or other federal, state, county, city or other departments and governmental agencies having jurisdiction against or affecting the Asset (collectively, the "Violations"), whether noted or issued prior to, on or after the date hereof, without any abatement of or adjustment to the Purchase Price, and all such Violations shall be the sole responsibility of Purchaser from and after the Closing. Seller shall not be responsible for (i) remedying any Violations that have been noted against the Real Estate or that arise prior to the Closing Date, (ii) removing the notation thereof from the public records, or (iii) making payment of any fines or penalties imposed prior to the Closing Date in connection with any such Violations.

5.     Closing Documents and Deliverables.

(a)     *Seller Deliveries.* At the Closing, Seller, at Seller's sole cost and expense, shall deliver to Purchaser the following:

(i)     possession of the Real Estate vacant and free of any tenancies and rights of occupancy (other than any tenancies or rights of occupancy created by Purchaser) and subject to the Permitted Exceptions;

(ii)     a copy of the Sale Order;

(iii)     a bargain and sale deed without covenants against grantor's acts, containing the covenant required by Section 13 of the Lien Law of the State of New York (the "Deed"), in the form of Exhibit "C" attached hereto and made a part hereof, in proper form for recording, duly executed and acknowledged by Seller, so as to convey to Purchaser all of Seller's right, title and interest in and to the Real Estate, subject only to the Permitted Exceptions;

5

(iv)     tax returns in respect of the New York State Real Estate Transfer Tax (the "TP-584") and the New York City Real Property Tax (the "NYC-RPT"), to the extent required by applicable law in connection with the consummation of the transaction contemplated hereby, both duly executed (and, to the extent required by law, notarized) by Seller;

(v)     a Real Property Transfer Tax Report (the "RP-5217NYC"), to the extent required by applicable law in connection with the consummation of the transaction contemplated hereby, duly executed by Seller;

(vi)     a "non-foreign person affidavit" that meets the requirements of Section 1445(b)(2) of the Internal Revenue Code of 1986, as amended, and the treasury regulations promulgated thereunder (the "Tax Code"), containing Seller's taxpayer identification number, duly executed by Seller;

(vii)     a direction letter to Escrow Agent authorizing and directing Escrow Agent to release the Downpayment (together with any interest earned thereon) to, or as directed, by Seller upon the Closing, duly executed by Seller (the "Escrow Agent Direction Letter");

(viii)     a closing and apportionment statement showing all adjustments in respect of the Purchase Price to be made at the Closing in accordance with Section 4 (the "Closing Statement"); and

(ix)     access to all non-privileged files in Seller's possession pertaining to the Asset.

(b)     *Purchaser Deliveries.*  At the Closing, Purchaser, at Purchaser's sole cost and expense, shall deliver to Seller the following:

(i)     in accordance with and subject to adjustment as provided in this Agreement, the balance of the Purchase Price;

(ii)     Purchaser's organizational documents, resolutions and consents, as applicable, certified by a general partner, managing member or officer, as the case may be, of Purchaser as true, correct and complete, which evidence and certify that the execution and delivery by Purchaser of this Agreement and the documents set forth herein have been duly authorized by all necessary actions of Purchaser and that this Agreement and such documents have been duly executed and delivered by Purchaser;

(iii)     The TP-584, the NYC-RPT and the RP-5217NYC, to the extent required in connection with the consummation of the transaction contemplated hereby, each duly executed (and, if required by applicable law, notarized) by Purchaser;

(iv)     a certificate, from and duly executed by Purchaser, restating on and as of the Closing Date the accuracy of the representations made by Purchaser in Section 7 hereof;

(v)     the Escrow Agent Direction Letter, duly executed by Purchaser

6

(vi)    the Closing Statement showing all adjustments in respect of the Purchase Price to be made at the Closing, duly executed by Purchaser; and

(vii)    any other documentation reasonably required to consummate the transactions contemplated by this Agreement.

(c)    *Payments at the Closing.*  At the Closing, Purchaser shall pay the following:

(i)    the Purchase Price, less the Downpayment paid pursuant to Section 2(a) hereof, subject to apportionment as provided in Section 4 hereof;

(ii)    all title insurance premiums and other costs for which Purchaser is responsible hereunder charged by the title insurance company (the "Title Company") that Purchaser designates in connection with Purchaser's acquisition of Seller's right, title and interest in and to the Asset;

(iii)    all survey fees, if any, charged in connection with Purchaser's acquisition of Seller's right, title and interest in and to the Asset; and

(iv)    all recordation fees in connection with recording any documents required to be recorded in connection with Purchaser's acquisition of Seller's right, title and interest in and to the Asset (including, without limitation, the Deed).

The terms of this Section 5(c) shall survive the Closing.

(d)    *Transfer Taxes.*  Seller and Purchaser acknowledge that the conveyance of the Asset by Seller to Purchaser may be exempt from New York State real estate transfer tax pursuant to Section 1405(b)(8) of the Real Estate Transfer Tax Law of the State of New York and from New York City real property transfer tax (due to the conveyance being made by a tax exempt organization); provided, however, in the event that any transfer, conveyance or similar tax is imposed in connection with the conveyance of the Asset by Seller to Purchaser, whether due to a change in applicable law or otherwise, then Seller shall be responsible for, and shall pay in full as and when due, any such tax imposed by law on the grantor and Purchaser shall be responsible for, and shall pay in full as and when due, any such tax imposed by law on the grantee.  The terms of this Section 5(d) shall survive the Closing.

(e)    *Condition of Title at the Closing.*  At the Closing, Seller shall convey its right, title and interest in and to the Asset free and clear of all liens, claims, interests, or encumbrances, other than Permitted Exceptions, with any such liens, interests, claims, or encumbrances attaching to the net proceeds of the transaction with the same force, effect and priority that currently exists, subject to further order of the Bankruptcy Court.  Purchaser's obligation to consummate the transaction contemplated hereby shall not be impaired by the existence of any Permitted Exceptions and Purchaser shall accept title to the Asset subject to Permitted Exceptions.  As used herein, the term "Permitted Exceptions" means, collectively, the following items:  (i) real property taxes, supplemental taxes and assessments, water rates and charges and sewer taxes and rents for the tax year in which Closing occurs (and subsequent tax years), together with any interest and penalties thereon, subject to apportionment of such items to

7

the extent provided in Section 4 of this Agreement; (ii) any state of facts an accurate, current survey of the Real Estate or a physical inspection of the Real Estate would show; (iii) all easements, rights of way, covenants, conditions and restrictions and other encumbrances (including, without limitation, any matters shown on any subdivision or parcel map affecting the Real Estate) affecting the Real Estate as shown in the public records (other than liens securing monetary debts or judgments), and all easements and rights of way that affect any land in the bed of any street, road, or avenue in front of or adjoining the Real Estate; (iv) all covenants, restrictions and utility company rights, easements and franchises relating to electricity, water, steam, gas, telephone, cable, sewer or other service or the right to use and maintain poles, lines, wires, cables, pipes, boxes and other fixtures and facilities in, over, under and upon the Real Estate; (v) any laws, rules, regulations, statutes, ordinances, orders or other legal requirements affecting the Real Estate, including, without limitation, all zoning, land use, building, development and environmental laws, rules, regulations, statutes, ordinances, orders or other legal requirements, including landmark designations and all zoning variance and special exceptions, if any, whether presently existing or enacted prior to or after the Closing; (vi) any variations between the tax diagram or tax map and the record description of the Land; (vii) the standard printed exclusions from coverage contained in the ALTA form of owner's title policy currently in use in New York; and (viii) all Violations.

      6.     Return of Downpayment, Payment of Break-Up Fee.

If Seller is unable to convey the Asset in accordance with the terms of this Agreement, for reasons other than breach of this Agreement by Purchaser, then Seller shall cause Escrow Agent to return the Downpayment (together with any interest earned thereon) to Purchaser, whereupon this Agreement shall terminate and thereupon Seller shall not have any further liability or obligation to Purchaser hereunder. If Seller shall have accepted or selected, and the Bankruptcy Court shall have approved, the bid or bids (including any credit bids) of any Qualified Bidder (hereinafter defined) other than Purchaser to purchase the Asset, and if such Qualified Bidder consummates the purchase of the Asset, then, in addition to causing the Escrow Agent to return the Downpayment, and subject to Bankruptcy Court approval, Seller shall pay to Purchaser a break-up fee in the amount of ONE HUNDRED TWENTY-SIX THOUSAND AND NO/100 DOLLARS ($126,000.00) (the "Break-Up Fee"), whereupon this Agreement shall terminate and neither party to this Agreement shall thereafter have any rights or obligations hereunder, at law or in equity for damages or otherwise (other than any such rights or such obligations which are expressly stated in this Agreement to survive the termination hereof)

      7.     Purchaser's Representations.

Purchaser hereby represents and warrants to Seller that as of the date hereof:

      (i)     Purchaser is a corporation, duly organized, validly existing and in good standing under the laws of the State of New York, was formed on April 8, 2009, and is qualified to do business in the State of New York;

      (ii)     Purchaser's tax identification number is _____;

(iii)     Purchaser has the power and authority to conduct its business and to execute and deliver, and perform Purchaser's obligations under, this Agreement;

(iv)     Purchaser's execution and delivery of this Agreement, and the performance of Purchaser's obligations hereunder, have been authorized by all necessary action on the part of Purchaser;

(v)     all necessary consents for Purchaser to enter into this Agreement and perform its obligations hereunder have been obtained and there are no pending actions or investigations the outcome of which could adversely affect Purchaser's ability to perform Purchaser's obligations hereunder;

(vi)     the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby by Purchaser do not violate any provision of, or cause a default under, or result in the acceleration of any obligation under, any agreement to which Purchaser is a party or any law, statute, rule, ordinance, regulation or requirement by which Purchaser or the properties, assets, business or operations of Purchaser may be bound or affected; do not require the consent or approval of any court, administrative or governmental authority; and do not result in the creation or imposition of any lien or equity of any kind whatsoever upon, or give to any other person any interest or right (including any right of termination or cancellation) in or with respect to, any agreement to which Purchaser is a party or the business or operations of Purchaser or any of its properties or assets;

(vii)     neither Purchaser, nor any person or entity that controls Purchaser, constitutes a person or entity that the Office of Foreign Assets Control of the United States Department of the Treasury has listed on its list of Specially Designated Nationals and Blocked Persons; and

(viii)     Purchaser, or an authorized representative of Purchaser, has made and/or Purchaser has waived the right to make personal inspection of the Asset and an investigation of all facts and circumstances in connection therewith; Purchaser is entering into this Agreement on the basis of Purchaser's own understanding and, except as expressly set forth in Section 8(a), no representations or warranties have been made by Seller or by any other person on behalf of Seller.

8.     Limited Seller Representations, No Implied Representations.

(a)     *Seller's Representations.*  Seller hereby represents and warrants to Purchaser that as of the date hereof:

(i)     there are no leases, licenses or other agreements for the present or future use or occupancy of any space at or in the Real Estate to which Seller is a party affecting the Real Estate that will survive the Closing (unless otherwise agreed by Purchaser in writing);

(ii)     there are no service, maintenance, union, employment, supply or management contracts or agreements to which Seller is a party affecting the Real Estate that will survive the Closing and for which Purchaser shall be liable (unless otherwise agreed by Purchaser in writing);

9

(iii)    there are no employees of Seller whose employment Purchaser shall be obligated to retain from and after the Closing or with respect to whom Purchaser shall be liable for severance or other payments (unless otherwise agreed by Purchaser in writing);

(iv)    no condemnation, eminent domain or similar proceeding of which Seller has received written notice is pending, threatened or contemplated with respect to all or any portion of the Real Estate;

(v)    there are no rights or options to purchase or lease all or any part of the Real Estate that have been created by Seller, except for the rights in favor of Purchaser created hereunder;

(vi)    Seller currently maintains insurance coverage with respect to the Real Estate as described on Exhibit "D" attached hereto and made a part hereof;

(vii)    Seller is not a "foreign person" as defined in Section 1445(f)(3) of the Tax Code; and

(viii)    neither Seller, nor any person or entity that controls Seller, constitutes a person or entity that the Office of Foreign Assets Control of the United States Department of the Treasury has listed on its list of Specially Designated Nationals and Blocked Persons.

(b)    *Asset "As-Is"; No Implied Representations.* Prior to the execution of this Agreement, Purchaser has either inspected and/or waived any right to inspect the Asset, and has become acquainted with the Asset's present condition. Purchaser represents, warrants and agrees that, except as specifically set forth in Section 8(a), neither Seller nor its affiliates, or any employees, agents, attorneys, partners, members, officers, directors, advisors or property manager of Seller or its affiliates have made any verbal or written representations, warranties or statements of any nature or kind whatsoever to Purchaser, whether expressed or implied, and, in particular, and without limitation, that no representations or warranties have been made with respect to (I) the physical condition or operation of the Asset (including, without limitation, (x) the absence or presence of hazardous substances at, in or adjacent to the Asset, (y) the compliance of the Asset with applicable legal or insurance requirements regarding hazardous substances or (z) the compliance of the Asset with any other applicable legal requirements), (II) the revenues and expenses of the Asset, (III) the zoning and other laws, regulations and rules applicable to the Asset or the compliance of the Asset therewith, (IV) the occupancy of the Asset or any part thereof, (V) the assignability or validity of any licenses or permits that are currently in effect for the Asset, (VI) the quantity, quality or condition of the Improvements or Fixtures (including, without limitation, regarding any latent or patent defects with respect thereto), or (VII) any other matter or thing affecting or related to the Asset or the transactions contemplated hereby. Purchaser agrees that Seller shall not be bound in any manner whatsoever by any guarantees, promises, projections, or other information pertaining to the Asset made, furnished or claimed to have been made or furnished by Seller or any affiliates, employees, agents, attorneys, partners, members, officers, directors, advisors or property manager of Seller or any broker, whether verbally or in writing. Purchaser acknowledges and agrees to take Seller's right, title and interest in and to the Asset on an "as-is, where-is" basis, with all faults as of the date hereof,

10

in substantially its present condition, subject to ordinary use, wear and tear and natural deterioration between the date hereof and the Closing and to casualty and condemnation to the extent provided in this Agreement. Purchaser hereby waives, to the extent permitted by law, any and all implied warranties. The provisions of this Section 8(b) shall survive the Closing or earlier termination of this Agreement.

(c)     *Waivers.* Notwithstanding anything to the contrary set forth in this Agreement, Seller makes no warranty with respect to the presence of Hazardous Materials (as hereinafter defined) on, above or beneath the Real Estate (or any parcel in proximity thereto) or in any water on or under the Real Estate. Purchaser's closing hereunder shall be deemed to constitute an express waiver of Purchaser's right to cause Seller to be joined in any action brought under any Environmental Laws (as hereinafter defined). Purchaser, for itself and its agents, affiliates, successors and assigns, hereby releases and forever discharges Seller and its affiliates from any and all rights, claims and demands at law or in equity, whether known or unknown at the time of this Agreement, which Purchaser has or may have in the future, arising out of the physical, environmental, economic or legal condition of the Asset, including, without limitation, any claim for indemnification or contribution arising under any Environmental Law. The term "Hazardous Materials" means (i) those substances included within the definitions of any one or more of the terms "hazardous materials," "hazardous wastes," "hazardous substances," "industrial wastes," and "toxic pollutants," as such terms are defined under the Environmental Laws, or any of them, (ii) petroleum and petroleum products, including, without limitation, crude oil and any fractions thereof, (iii) natural gas, synthetic gas and any mixtures thereof, (iv) asbestos and or any material which contains any hydrated mineral silicate, including, without limitation, chrysotile, amosite, crocidolite, tremolite, anthophylite and/or actinolite, whether friable or non-friable (collectively, "Asbestos"), (v) polychlorinated biphenyl ("PCBs") or PCB-containing materials or fluids, (vi) radon, (vii) any other hazardous or radioactive substance, material, pollutant, contaminant or waste, and (viii) any other substance with respect to which any Environmental Law or governmental authority requires environmental investigation, monitoring or remediation. The term "Environmental Laws" means all federal, state and local laws, statutes, ordinances and regulations, now or hereafter in effect, in each case as amended or supplemented from time to time, including, without limitation, all applicable judicial or administrative orders, applicable consent decrees and binding judgments relating to the regulation and protection of human health, safety, the environment and natural resources (including, without limitation, ambient air, surface, water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.), the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 1801 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S. §§ 6901 et seq.), the Toxic Substance Control Act, as amended (15 U.S.C. §§ 2601 et seq.), the Clean Air Act, as amended (42 U.S.C. §§ 7401 et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et seq.), the Occupational Safety and Health Act, as amended (29 U.S.C. §§ 651 et seq.), the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300f et seq.), Environmental Protection Agency regulations pertaining to Asbestos (including, without limitation, 40 C.F.R. Part 61, Subpart M, the United States Environmental Protection Agency Guidelines on Mold Remediation in Schools and Commercial Buildings, the United States Occupational Safety and Health Administration regulations pertaining to Asbestos including,

without limitation, 29 C.F.R. Sections 1910.1001 and 1926.58), applicable New York State and New York City statutes and the rules and regulations promulgated pursuant thereto regulating the storage, use and disposal of Hazardous Materials, the New York City Department of Health Guidelines on Assessment and Remediation of Fungi in Indoor Environments and any state or local counterpart or equivalent of any of the foregoing, and any related federal, state or local transfer of ownership notification or approval statutes.

9.      Casualty and Condemnation.

(a)      *Casualty.* If, prior to the Closing, any portion of the Asset is damaged or destroyed by fire or other casualty, then (i) Seller shall notify Purchaser of the occurrence of such fire or other casualty, and (ii) unless Purchaser terminates this Agreement pursuant to the terms of this Section 9(a), (A) Purchaser shall remain obligated under this Agreement to accept the Asset in its "as-is, where-is" condition and proceed with Closing with no abatement of the Purchase Price (it being understood that this Section 9 shall constitute a "contract that expressly provides otherwise" for purposes of Section 5-1311 of the General Obligations Law), except that at Closing Purchaser will receive a credit against the Purchase Price in the amount of the deductible for the related insurance (together with the amount of any loss which is uninsured, if any), less the portion thereof the Seller uses to pay reasonable costs incurred by Seller, in its sole and absolute discretion, to collect the same and the portion thereof that Seller, in its sole and absolute discretion, uses to make temporary or emergency repairs to the Asset, and (B) at the Closing, Seller shall assign to Purchaser, without recourse, and Purchaser shall have the right to retain, any insurance proceeds to which Seller is entitled by reason of such fire or other casualty, less reasonable costs incurred by Seller, in its sole and absolute discretion, to collect the same and the portion thereof that Seller, in its sole and absolute discretion, uses to make temporary or emergency repairs to the Asset. Notwithstanding anything herein to the contrary, if, prior to Closing, any portion of the Asset is damaged or destroyed by fire or casualty and the reasonable cost to repair such damage or destruction exceeds Five Hundred Thousand and No/100 Dollars ($500,000.00), Purchaser shall have the right to terminate this Agreement upon notice to Seller given not later than ten (10) business days after Purchaser receives notice of damage or destruction, in which event neither party shall thereafter have any further rights or obligations hereunder (other than such rights or such obligations that are expressly stated herein to survive the termination hereof), except that Seller shall cause Escrow Agent to pay the Downpayment (together with interest accrued thereon, if any) to Purchaser. Between the date hereof and the Closing Date, Seller shall maintain substantially the same insurance coverage with respect to the Asset as it maintains on the date hereof, to the extent that such insurance coverage remains available at commercially reasonable rates (and this obligation of Seller to maintain insurance coverage shall be deemed a material obligation of Seller hereunder).

(b)      *Permanent Taking.* If, prior to the Closing, any portion of the Asset is taken by eminent domain or a condemnation, other than a temporary taking (or is the subject of a pending or contemplated permanent taking which has not been consummated), then (i) if such taking materially adversely affects Purchaser's intended use of the Asset, Purchaser shall have the right to terminate this Agreement upon notice to Seller given not later than ten (10) business days after Purchaser receives notice of such taking, in which event neither party shall thereafter have any further rights or obligations hereunder (other than such rights or such obligations that are expressly stated herein to survive the termination hereof), except that Seller shall cause

12

Escrow Agent to pay the Downpayment (together with interest accrued thereon, if any) to Purchaser, or (ii) if this Agreement is not terminated by Purchaser in accordance with clause (i) of this sentence or Purchaser has no right to terminate this Agreement pursuant thereto, (A) Purchaser shall accept so much of the Asset as remains after such taking in its "as-is, where-is" condition and proceed with Closing with no abatement of the Purchase Price, and (B) at the Closing, Seller shall assign and turn over to Purchaser, without recourse, and Purchaser shall be entitled to receive and keep, all of Seller's interest in and to all awards paid or payable to Seller for such taking by eminent domain, less, in either case, reasonable costs incurred by Seller, in its sole and absolute discretion, to collect the same and the portion thereof that Seller, in its sole and absolute discretion, uses to make temporary or emergency repairs to the Asset.

(c)     *Temporary Taking.* If, prior to the Closing, all or any portion of the Asset is temporarily taken by eminent domain (or is the subject of a pending or contemplated temporary taking that has not yet been consummated), then (i) Purchaser shall accept the Asset in its "as-is" condition and proceed with Closing with no abatement of the Purchase Price, (ii) Seller shall not compromise, settle or adjust any claims to awards for the taking without the prior written consent of Purchaser, which consent shall not be unreasonably withheld, delayed or conditioned, (iii) at the Closing, Seller shall assign and turn over to Purchaser, without recourse, and Purchaser shall be entitled to receive and keep, all of Seller interest in and to any awards, if any, for the taking to the extent relating to or allocable to the period from and after the Closing Date (it being understood and agreed that Seller shall be entitled to receive and retain any such award to the extent that it relates to or is allocable to the period prior to the Closing Date, whether or not the award is received prior to, on or after Closing), in any event less an allocable share of the costs incurred by Seller, in its sole and absolute discretion, to collect same and the portion thereof that Seller, in its sole and absolute discretion, uses to make temporary or emergency repairs to the Asset.

10.     Bankruptcy Court Approval and Related Matters.

Seller, in accordance with all applicable requirements of, and procedures under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and subject in all cases to the approval of the Bankruptcy Court, shall use its reasonable efforts to file with the Bankruptcy Court, within ten (10) days following the execution of this Agreement, a motion seeking approval of an order approving certain sale and bidding procedures (the "Bidding Procedures Order"), and thereafter shall (i) take all actions as may be reasonably necessary to cause such Bidding Procedures Order to be issued, entered and become a final non-appealable order, and (ii) timely serve a copy of the notice setting forth the hearing date for approval of the Bidding Procedures Order upon any and all parties in interest entitled or required to receive notice under all applicable laws, rules and regulations and orders of the Bankruptcy Court prior to the hearing on such motion; it being understood that Seller may not consummate the contemplated transaction without such an order that is made on such notice.

Seller shall use reasonable efforts so that the Bankruptcy Court, as part of its Bidding Procedures Order, (a) fixes a date and time for an auction of the Asset at which higher or better offers may be presented to Seller (the "Auction"), (b) requires the payment of the Break-Up Fee in the event it shall become due and payable and provides that if Seller receives an offer from a third party and such offer is accepted by Seller and approved by the Bankruptcy

13

Court, the Break-Up Fee will be paid from the proceeds of sale at the closing of the transfer of title in connection with such offer, as compensation for Purchaser's good faith, due diligence, time and legal expenses in connection with the transaction contemplated herein, (c) requires an initial overbid in the aggregate consideration of at least $4,351,000.00, inclusive of the Break-Up Fee, with subsequent bids to be in increments of $25,000.00, (d) requires a deposit in the amount of the Downpayment (such deposits to be held similarly in accordance with Section 2(a) hereof), and (d) requires written evidence satisfactory to Seller in its sole discretion demonstrating that each bidder has the financial ability to consummate the transaction contemplated by this Agreement (each such bidder, at Seller's sole discretion, a "Qualified Bidder"). Notwithstanding anything herein to the contrary, Purchaser shall have the right, but not the obligation, to participate in the overbid process at the Auction and make higher or better offers, and Purchaser will receive full credit for the Break-Up Fee in the calculation of the value of any such overbid offers made by Purchaser.

11.     Limitation on Personal Liability.

Purchaser agrees that it shall look solely to the Asset, and not to any other assets of Seller to enforce Purchaser's rights hereunder, and that Seller shall not have any personal obligation or liability hereunder. The provisions of this Section 11 shall survive the Closing or the earlier termination of this Agreement.

12.     Seller's Default.

If (i) Seller defaults in the performance of Seller's material obligations hereunder, and (ii) such default continues for more than thirty (30) days after the date that Purchaser gives Seller notice thereof, then Purchaser, as Purchaser's sole remedy, except as provided in Section 6 hereof, may terminate this Agreement by giving notice thereof to Seller and upon the giving of such notice this Agreement shall terminate and thereafter neither party shall have any further rights or obligations hereunder at law or in equity, for damages or otherwise (other than any such rights or such obligations that are expressly stated herein to survive the termination hereof), except that if this Agreement is terminated pursuant to this Section 12 on or prior to the Closing Date, then Seller shall cause Escrow Agent to return the Downpayment (and the interest earned thereon) to Purchaser. The terms of this Section 12 shall survive the termination of this Agreement.

13.     Purchaser's Default.

If (i) Purchaser defaults in the performance of Purchaser's obligations hereunder, and (ii) such default continues for more than ten (10) days after the date that Seller gives Purchaser notice thereof (with the understanding, however, that this clause (ii) shall not apply in respect of Purchaser's default in respect of Purchaser's obligation to consummate the Closing on the date that is otherwise required under Section 3 hereof), then Seller's sole remedy shall be to terminate this Agreement by giving notice thereof to Purchaser, and, upon the giving of such notice, this Agreement shall terminate and neither party shall thereafter have any rights or obligations hereunder (other than any such rights or such obligations that are expressly stated in this Agreement to survive the termination thereof), except that if this Agreement is terminated pursuant to this Section 13 on or prior to the Closing Date, then Seller shall receive the

14

Downpayment (and the interest earned thereon) from Escrow Agent, as liquidated damages and as Seller's sole and exclusive remedy; it being agreed that Seller's actual damages would be difficult or impossible to ascertain. The terms of this Section 13 shall survive the termination of this Agreement.

14.    Conditions Precedent.

(a)    *Conditions Precedent to Purchaser's Obligation to Close.* Subject to the terms of this Agreement, Purchaser shall have no obligation to consummate the transaction contemplated hereby at the Closing unless:

(i)    the Bankruptcy Court shall have entered an order approving the transactions contemplated by this Agreement (the "Sale Order");

(ii)    Seller shall have complied with all of the provisions in Section 5(a);

(iii)    Seller is not in default of Seller's material obligations hereunder; and

(iv)    all of Seller's representations as set forth in Section 8(a), other than those set forth in clauses (iv) and (vi) of Section 8(a), are true and correct in all material respects on the Closing Date.

(b)    *Purchaser's Knowledge; Satisfaction of Conditions Upon Closing.* If Purchaser elects to proceed to the Closing with knowledge of (i) a default in any of the covenants, agreements or obligations to be performed by Seller under this Agreement, and/or (ii) an inaccuracy in or untruthfulness of any representation or warranty of Seller made in this Agreement, then, upon the consummation of the Closing, Purchaser shall be deemed to have waived any such default and/or inaccuracy and shall have no claim against Seller on account thereof. Purchaser's acceptance of the Deed at Closing shall be deemed to be Purchaser's acknowledgement and agreement that all conditions precedent to Purchaser's obligation to consummate the Closing have been fully satisfied by Seller, or irrevocably waived by Purchaser, and that Seller shall have no liability or obligation hereunder after the Closing, except with respect to any liability or obligation that expressly survives the Closing under the terms of this Agreement. The terms of this Section 14(b) shall survive the Closing.

(c)    *Conditions Precedent to Seller's Obligation to Close.* Subject to the terms of this Agreement, Seller shall have no obligation to consummate the transaction contemplated hereby at the Closing unless:

(i)    the Bankruptcy Court shall have entered the Sale Order;

(ii)    Purchaser shall have complied with all of the provisions in Section 5(b);

15

(iii)    Purchaser has performed in all respects the obligations on Purchaser's part to be performed hereunder on or prior to the Closing Date (and Purchaser is not in default hereunder in any respect);

(iv)    all of Purchaser's representations as set forth in Section 7 hereof are true and correct in all respects on the Closing Date; and

(v)    any other conditions precedent set forth herein to Seller's obligation to consummate the transaction contemplated hereby have been satisfied in all respects (it being understood that Seller shall have the right to waive any such conditions precedent to Seller's obligation to consummate the transaction contemplated hereby).

(d)    *Seller's Knowledge.* If Seller elects to proceed to the Closing with actual knowledge of (i) a default in any of the covenants, agreements or obligations to be performed by Purchaser under this Agreement, and/or (ii) an inaccuracy in or untruthfulness of any representation or warranty of Purchaser made in this Agreement, then, upon the consummation of the Closing, Seller shall be deemed to have waived any such default and/or inaccuracy and shall have no claim against Purchaser on account thereof. The terms of this Section 14(d) shall survive the Closing.

15.    Notices.

All notices, demands or requests made pursuant to, under or by virtue of this Agreement (in each case, a "Notice") must be in writing and sent to the party to which the Notice is being made by commercial overnight delivery service, or delivered by hand with receipt acknowledged in writing as follows:

To Seller:

        Caritas Health Care, Inc.
        16-10 Dekalb Avenue
        Brooklyn, New York  11237
        Attention:    Mr. Jerry Castoria,
                Chief Financial Officer

with a copy to:

        Proskauer Rose LLP
        1585 Broadway
        New York, New York  10036
        Attention:  Jeffrey Levitan, Esq.

To Purchaser:

> Stessa Corp.
> 55 West 37th Street, Suite 370
> New York, New York 10018
> Attention: Mr. Avi Matatov

with a copy to:

> Goldberg Weprin Finkel Goldstein LLP
> 1501 Broadway, 22nd Floor
> New York, New York 10036
> Attention: Andrew W. Albstein, Esq.

All Notices (i) shall be deemed given upon the date of delivery of such Notice or refusal to accept delivery of such Notice and (ii) may be given either by a party hereto or by such party's attorney set forth above. Either party shall have the right to change its addresses for Notices for purposes of this Section 15 by giving not less than three (3) business days of advance notice thereof to the other party in accordance with this Section 15. The provisions of this Section 15 shall survive the Closing or the earlier termination of this Agreement.

16. Assignment of Agreement.

Subject to the terms of this Section 16, Purchaser shall not assign its rights under this Agreement or delegate Purchaser's duties hereunder, without the prior written consent of Seller, which consent may be withheld, delayed and conditioned by Seller in its sole and absolute discretion. For purposes hereof, any transfer of any direct or indirect equity interest in Purchaser shall be deemed and shall constitute an assignment by Purchaser of its rights under this Agreement and shall be subject to the restrictions herein contained. Notwithstanding the foregoing, Purchaser shall have the right to assign its rights hereunder to an entity that is wholly owned by (a) Purchaser, (b) the direct or indirect owners of Purchaser on the date hereof or (c) Avi Matatov and/or Simon Alishayev or any entity in which they have a direct or indirect ownership interest or control (a "Permitted Assignee"); provided, however, that Purchaser delivers to Seller, on or before the earlier of (x) the effective date of such assignment (which shall be no later than the Closing Date) and (y) two (2) business days prior to the Closing Date, written notice thereof, together with (i) a written agreement, in form and substance satisfactory to Seller in Seller's reasonable discretion, pursuant to which such assignee assumes and agrees to be bound by the terms and conditions of this Agreement, (ii) evidence reasonably satisfactory to Seller that the proposed assignee is in fact a Permitted Assignee, and (iii) certified copies of duly adopted resolutions of Purchaser and the Permitted Assignee, in form and substance satisfactory to Seller in Seller's reasonable discretion, authorizing the execution, acknowledgment and delivery of said assignment and assumption agreement and the transactions contemplated therein and herein. Any assignment by Purchaser in contravention of this Section 16 shall be null and void for all purposes. Notwithstanding anything herein to the contrary, no assignment shall release the Purchaser herein named from any obligation or liability under this Agreement and the express terms of any assignment by Purchaser shall reaffirm Purchaser's obligations under this Agreement. Purchaser and the Permitted Assignee shall complete, execute and deliver any

17

transfer tax returns, affidavits or other documents required by applicable law to be filed in connection with such assignment and shall pay any and all transfer taxes due thereon at or prior to the Closing hereunder. Any Permitted Assignee of Purchaser shall be deemed to have made any and all representations and warranties made by Purchaser hereunder, as if the Permitted Assignee were the original signatory hereto.

17.  Broker.

(a)  *Purchaser's Representation.*  Purchaser represents and warrants to Seller that Purchaser dealt with no broker, finder or salesperson in connection with this Agreement other than CB Richard Ellis, Inc. ("Broker"). Purchaser shall indemnify Seller, and hold Seller harmless, from and against, any and all losses, damages, liabilities, costs and expenses (including without limitation, reasonable attorneys' fees and disbursements) incurred by Seller to the extent arising out of a claim for commission or other compensation made by a broker, finder or other person with whom Purchaser dealt in connection herewith (other than Broker).

(b)  *Seller's Representation.*  Broker was retained by Seller to act as its exclusive broker pursuant to an Order of the Bankruptcy Court dated May 11, 2009. Seller shall pay Broker its commission or other fee earned in connection with the transactions contemplated herein pursuant to a separate agreement between Seller and Broker.

(c)  *Survival.*  The provisions of this Section 17 shall survive the Closing or the earlier termination of this Agreement.

18.  Entire Agreement.

This Agreement contains all of the terms agreed upon between the parties with respect to the subject matter hereof, and all agreements heretofore had or made between the parties hereto are merged in this Agreement which alone fully and completely expresses the agreement of said parties. The provisions of this Section 18 shall survive the Closing or the earlier termination of this Agreement.

19.  Amendments.

This Agreement may not be changed, modified or terminated, except by an instrument executed by all of the parties hereto. The provisions of this Section 19 shall survive the Closing or the earlier termination of this Agreement.

20.  No Waiver.

No waiver by either party of any failure or refusal to comply with its obligations under this Agreement shall be deemed a waiver of any other or subsequent failure or refusal to so comply. The provisions of this Section 20 shall survive the Closing or the earlier termination of this Agreement.

3740/21521-011 Current/15344765v2

21. Successors and Assigns.

Without limiting the terms of Section 16, the stipulations aforesaid shall inure to the benefit of, and shall bind, the heirs, executors, administrators, successors and permitted assigns of the respective parties. Nothing contained herein is intended or shall be construed to confer upon or give any person or entity other than Seller or Purchaser any right, remedy or claim under or by reason of this Agreement or the transactions contemplated hereunder, and this Agreement shall be for the sole and exclusive benefit of the respective parties hereto and the heirs, executors, administrators, successors and permitted assigns of the respective parties. The provisions of this Section 21 shall survive the Closing or the earlier termination of this Agreement.

22. Partial Invalidity.

If any term or provision of this Agreement or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law. The provisions of this Section 22 shall survive the Closing or the earlier termination of this Agreement.

23. Section Headings.

The headings of the various Sections of this Agreement have been inserted only for the purposes of convenience, and are not part of this Agreement and shall not be deemed in any manner to modify, explain or restrict any of the provisions of this Agreement. The provisions of this Section 23 shall survive the Closing or the earlier termination of this Agreement.

24. Governing Law.

This Agreement shall be governed by, interpreted under and construed and enforced in accordance with, the laws of the State of New York. The Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to resolve any and all disputes relating to the interpretation and implementation of this Agreement. The provisions of this Section 24 shall survive the Closing or the earlier termination of this Agreement.

25. No Recording or Notice of Pendency.

The parties hereto agree that neither this Agreement nor any memorandum of notice hereof shall be recorded, and Purchaser agrees not to file any notice of pendency or other instrument against the Asset. The provisions of this Section 25 shall survive the termination of this Agreement.

3740/21521-011 Current/15344765v2

26.       Calculation of Time Periods; Business Days.

Notwithstanding anything herein to the contrary, all periods of time described herein shall be calculated in accordance with the Section 20 of Article 2 of the New York General Construction Law. As used herein, the term "business day" shall mean a day other than Saturday, Sunday or any day on which banks located in New York City are authorized or obligated to close. The provisions of this Section 26 shall survive the Closing or earlier termination of this Agreement.

27.       Counterparts.

This Agreement may be executed in counterparts, it being understood that all such counterparts, taken together, shall constitute one and the same agreement. The provisions of this Section 27 shall survive the termination of this Agreement.

3740/21521-011 Current/15344765v2

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the day and year first above written.

SELLER:

CARITAS HEALTH CARE, INC.

By: _____
Name: JOHN LAVAN
Title: CEO

PURCHASER:

STESSA CORP.

By: _____
Name:
Title:

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the day and year first above written.

SELLER:

CARITAS HEALTH CARE, INC.

By: _____
      Name:
      Title:

PURCHASER:

STESSA CORP.

By: _Ara Manafov_____
      Name:
      Title: _V.P.,_

21

Exhibit "A"

Description of the Land

## SCHEDULE A DESCRIPTION

152-11  89TH AVENUE, JAMAICA, NEW YORK

ALL THAT CERTAIN PLOT, PIECE, OR PARCEL OF LAND, SITUATE, LYING, AND BEING IN THE BOROUGH AND COUNTY OF QUEENS, CITY AND STATE OF NEW YORK, BEING MORE PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS::

BEGINNING AT THE CORNER FORMED BY THE INTERSECTION OF THE SOUTHERLY SIDE OF 88TH AVENUE WITH THE WESTERLY SIDE OF 153RD STREET AS SHOWN ON THE FINAL MAPS OF THE CITY OF NEW YORK;

RUNNING THENCE SOUTHERLY ALONG THE WESTERLY SIDE OF 153RD STREET, 330.25 FEET TO THE CORNER FORMED BY THE INTERSECTION OF THE WESTERLY SIDE OF 153RD STREET WITH THE NORTHERLY SIDE OF 89TH AVENUE AS SHOWN ON SAID FINAL MAPS OF THE CITY OF NEW YORK;

RUNNING THENCE WESTERLY AND ALONG THE NORTHERLY SIDE OF 89TH AVENUE AS ON SAID FINAL MAPS, THE FOLLOWING FOUR COURSES:

1) 250.04 FEET TO A POINT;

2) CONTINUING ALONG SAID NORTHERLY SIDE OF 89TH AVENUE ON A LINE DRAWN ON AN INTERIOR ANGLE OF 181 DEGREES 23 MINUTES 30.01 SECONDS WITH THE LAST MENTIONED COURSE, 50.02 FEET TO A POINT;

3) STILL ALONG THE NORTHERLY SIDE OF 89TH AVENUE ON A LINE DRAWN ON AN INTERIOR ANGLE OF 180 DEGREES 09 MINUTES 22.7 SECONDS WITH THE LAST MENTIONED COURSE, 140.12 FEET TO A POINT; AND

4) STILL ALONG THE NORTHERLY SIDE OF 89TH AVENUE ON A LINE DRAWN ON AN INTERIOR ANGLE OF 178 DEGREES 27 MINUTES 07.2 SECONDS WITH THE LAST MENTIONED COURSE, 109.98 FEET TO THE CORNER FORMED BY THE INTERSECTION OF THE NORTHERLY SIDE OF 89TH AVENUE WITH THE EASTERLY SIDE OF 150TH STREET AS SHOWN ON THE FINAL MAPS OF THE CITY OF NEW YORK;

RUNNING THENCE NORTHERLY ALONG THE EASTERLY SIDE OF 150TH STREET, 210.96 FEET TO A POINT;

RUNNING THENCE EASTERLY ON A LINE DRAWN ON AN EXTERIOR ANGLE WITH THE EASTERLY SIDE OF 150TH STREET OF 90 DEGREES 37 MINUTES 30 SECONDS, A DISTANCE OF 137.5 FEET TO A POINT;

RUNNING THENCE NORTHERLY ON A LINE DRAWN ON AN EXTERIOR ANGLE OF 89 DEGREES 22 MINUTES 30 SECONDS WITH THE LAST MENTIONED COURSE, 125 FEET TO THE SOUTHERLY SIDE OF 88TH AVENUE;

RUNNING THENCE EASTERLY ALONG THE SOUTHERLY SIDE OF 88TH AVENUE, 416.33 FEET TO THE CORNER AT THE POINT OR PLACE OF BEGINNING.

FOR INFORMATION ONLY: BLOCK 9695 LOT 14

## SCHEDULE A DESCRIPTION

152-05 88TH AVENUE, JAMAICA, NEW YORK

ALL THAT CERTAIN PLOT, PIECE, OR PARCEL OF LAND, SITUATE, LYING, AND BEING IN THE BOROUGH AND COUNTY OF QUEENS, CITY AND STATE OF NEW YORK, FORMERLY THE VILLAGE OF JAMAICA, COUNTY OF QUEENS, KNOWN AND DESIGNATED ON A CERTAIN MAP ENTITLED, "MAP NO. 2 OF THE BRONSON PROPERTY IN THE VILLAGE OF JAMAICA, QUEENS COUNTY, SURVEYED AUGUST, 1887 BY E.W. CONKLIN" AND DULY FILED IN THE OFFICE OF THE CLERK OF THE COUNTY OF QUEENS 9/28/1887 AS AND BY THE LOT # 122 AND THE WESTERLY 12 FEET 6 INCHES OF LOT # 121 AS SHOWN ON SAID MAP, WHICH SAID LOT AND PART OF LOT, TAKEN TOGETHER ACCORDING TO SAID MAP ARE MORE PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHERLY SIDE OF 88TH AVENUE, FORMERLY WILLETT AVENUE, DISTANT 100 FEET EASTERLY FROM THE CORNER FORMED BY THE INTERSECTION OF THE SAID SOUTHERLY SIDE OF 88TH AVENUE WITH THE EASTERLY SIDE OF 150TH STREET, FORMERLY ALSOP STREET, AS SHOWN ON SAID MAP;

RUNNING THENCE SOUTHERLY AND PARALLEL WITH 150TH STREET, 125 FEET;

THENCE EASTERLY AND PARALLEL WITH 88TH AVENUE, 37 FEET 6 INCHES;

THENCE NORTHERLY AND AGAIN PARALLEL WITH 150TH STREET, 125 FEET TO THE SOUTHERLY SIDE OF 88TH AVENUE;

THENCE WESTERLY ALONG THE SAID SOUTHERLY SIDE OF 88TH AVENUE, 37 FEET 6 INCHES TO THE POINT OR PLACE OF BEGINNING.

FOR INFORMATION ONLY: BLOCK 9695 LOT 6

PLEGAL

# CHICAGO TITLE INSURANCE COMPANY

## LEGAL DESCRIPTION

152-03 88TH AVENUE, JAMAICA, NEW YORK

ALL THAT CERTAIN PLOT, PIECE, OR PARCEL OF LAND, SITUATE, LYING, AND BEING IN THE FOURTH WARD OF THE BOROUGH AND COUNTY OF QUEENS, CITY AND STATE OF NEW YORK, WHICH SAID PLOT IS BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF WILLETT STREET, DISTANT 137 FEET 6 INCHES WESTERLY FROM THE NORTHWESTERLY CORNER OF RAY AND WILLETT STREET;

RUNNING THENCE NORTHERLY PARALLEL WITH RAY STREET, 120 FEET;

THENCE WESTERLY AND PARALLEL WITH WILLETT STREET, 112 FEET 6 INCHES;

THENCE SOUTHERLY AGAIN PARALLEL WITH RAY STREET, 120 FEET, TO THE NORTHERLY SIDE OF WILLETT STREET;

THENCE EASTERLY ALONG THE NORTHERLY SIDE OF WILLETT STREET 112 FEET 6 INCHES TO THE POINT OR PLACE OF BEGINNING.

FOR INFORMATION ONLY: BLOCK 9697 LOT 52

CTLGLAM

Exhibit "B"

Escrow Agreement


[see attached]

3740/21521-011 Current/15344765v2

**Escrow Agreement**

Dated: as of August 4, 2009

The parties to this agreement (this "Escrow Agreement") are CARITAS HEALTH CARE, INC., a New York not-for-profit corporation, as debtor and debtor-in-possession pursuant to Case Nos. 09-40901 (CEC) through 09-40909 (CEC) in the United States Bankruptcy Court for the Eastern District of New York ("Seller"), STESSA CORP., a New York corporation ("Purchaser"), and PROSKAUER ROSE LLP (the "Escrow Agent").

Seller and Purchaser have entered into a Sale-Purchase Agreement dated as of August 4, 2009 (the "Agreement"), which provides for the sale to Purchaser of Seller's interest in and to certain land located in New York, New York and other interests related thereto. Pursuant to Section 2 (a) of the Agreement, Purchaser is delivering to the Escrow Agent, to be held by it in escrow in accordance with the terms of this Escrow Agreement, the sum of Four Hundred Twenty Thousand and No/100 Dollars ($420,000.00), legal currency of the United States of America, which constitutes the Downpayment (as such term is defined in the Agreement) (such funds, if and to the extent deposited with the Escrow Agent, in whatever form invested and reinvested, together with all interest and other amounts from time to time held by the Escrow Agent under this Escrow Agreement, being referred to below as the "Escrow Deposit").

Accordingly, the parties agree as follows:

1.      Appointment of Escrow Agent.

Seller and Purchaser appoint Proskauer Rose LLP as the Escrow Agent, and Proskauer Rose LLP accepts that appointment and agrees to hold and dispose of the Escrow Deposit in accordance with the terms of this Escrow Agreement. The Escrow Agent acknowledges receipt, by wire transfer of immediately available funds, of the sum of $420,000.00, on account of the Escrow Deposit.

2.      Investment.

The Escrow Deposit may be deposited by the Escrow Agent with (i) J.P. Morgan Chase, (ii) Citibank, N.A., (iii) The Bank of New York Mellon or (iv) such other bank as the Escrow Agent may select. The Escrow Agent may (but shall not be required to) invest and reinvest the Escrow Deposit in any of the following forms of investment: interest bearing accounts or "money market" accounts of banks or trust companies organized in the United States having a minimum net worth of $200 million, in each case with maturity dates not later than thirty (30) days after the date of investment.

3.      Release of Escrow Deposit.

(a)      The Escrow Agent shall deliver the Escrow Deposit as follows:

(i)     If the Escrow Agent receives written instructions signed by both Seller and Purchaser (or a certified copy of a final order of a court of competent jurisdiction) directing delivery of all or part of the Escrow Deposit, the Escrow Agent shall deliver the Escrow Deposit as so directed.

(ii)     If the Escrow Agent receives a written notice signed by either Seller or Purchaser stating that the party who gave the notice is entitled to all or part of the Escrow Deposit, the Escrow Agent shall send a copy of that notice to the other party and, unless the Escrow Agent has received a written objection from the other party within seven (7) business days thereafter, the Escrow Agent shall deliver the Escrow Deposit in accordance with the notice. If the Escrow Agent receives a written objection from the other party during such 7-day period, the Escrow Agent shall send a copy of the written objection to the party who gave the notice and shall not deliver any portion of the Escrow Deposit until it shall have received written instructions signed by each of Seller and Purchaser or a certified copy of a final order of a court of competent jurisdiction directing delivery of the Escrow Deposit, and the Escrow Agent shall then deliver the Escrow Deposit as so directed.

(iii)     If the Escrow Agent receives conflicting instructions from Seller and Purchaser regarding delivery of the Escrow Deposit, it shall send a copy of the instructions from each party to the other and shall not deliver any portion of the Escrow Deposit until it shall have received written instructions signed by each of Seller and Purchaser or a certified copy of a final order of a court of competent jurisdiction directing delivery of the Escrow Deposit, and the Escrow Agent shall then deliver the Escrow Deposit as so directed.

(b)     The Escrow Agent may at any time commence an action in the nature of interpleader or other legal proceedings and may deposit the Escrow Deposit with the clerk of a court of competent jurisdiction.

(c)     Upon any delivery or deposit of the Escrow Deposit as provided in this Section 3, the Escrow Agent shall be released and discharged from any further obligation under this Escrow Agreement.

(d)     If, at the time a party becomes entitled to the Escrow Deposit, the Escrow Agent holds, as part of the Escrow Deposit, an investment that has not matured, that party shall have the option (exercisable by notice to the Escrow Agent) to either (i) compel delivery of the investment (if assignable) and bear the risk of loss of interest on the investment or the cost of arranging for the sale or repurchase of the investment or (ii) permit the Escrow Agent to retain the investment until it matures and to deliver such portion of the Escrow Deposit so retained to the party entitled to the Escrow Deposit upon maturity of such investment.

4.     Concerning the Escrow Agent.

(a)     The Escrow Agent shall not have any liability to any of the parties to this Escrow Agreement or to any third party arising out of its services as Escrow Agent under this Escrow Agreement, except for damages directly resulting from the Escrow Agent's gross negligence or willful misconduct. Without limiting the generality of the preceding sentence, in

no event shall the Escrow Agent have any liability arising out of losses resulting from its investment or reinvestment of the Escrow Deposit in accordance with the terms of this Escrow Agreement, including, but not limited to, any loss of principal or failure to earn interest on the Escrow Deposit, any claim that a higher rate of return could have been obtained, or any loss of principal or interest resulting from any delay in the investment or reinvestment of the Escrow Deposit or the repurchase or sale of any certificate of deposit or other investment.

(b)     Seller and Purchaser jointly and severally shall indemnify the Escrow Agent and hold it harmless against any loss, liability, damage or expense (including reasonable attorneys' fees) that the Escrow Agent may incur as a result of acting as escrow agent under this Escrow Agreement, except for any loss, liability, damage or expense arising solely from its own gross negligence or willful misconduct, as determined by a final and non-appealable judgment of a court of competent jurisdiction. For this purpose, the term "attorneys' fees" includes fees payable to any counsel retained by the Escrow Agent in connection with its services under this Escrow Agreement and, with respect to any matter arising under this Escrow Agreement as to which the Escrow Agent performs legal services, its standard hourly rates and charges then in effect.

(c)     The Escrow Agent shall be entitled to rely upon any judgment, notice, instrument or other writing delivered to it under this Escrow Agreement without being required to determine the authenticity of, or the correctness of any fact stated in, that document and irrespective of any facts the Escrow Agent may know or be deemed to know in any other capacity. The Escrow Agent may act in reliance upon any instrument or signature believed by it to be genuine and may assume that any person purporting to give any notice or receipt or advice or make any statement or execute any document in connection with this Escrow Agreement has been duly authorized to do so.

(d)     The Escrow Agent shall have no duties or responsibilities except those expressly set forth in this Escrow Agreement. The Escrow Agent shall not have any obligations arising out of or be bound by the provisions of any other agreement, written or oral, including, but not limited to, the Agreement.

(e)     Purchaser acknowledges that it knows that the Escrow Agent has represented Seller and its affiliates in connection with the Agreement and this Escrow Agreement and that it may continue to represent Seller and its affiliates in that connection and in connection with the transactions contemplated by those agreements, including, but not limited to, in connection with any disputes that may arise under either of those agreements. The Escrow Agent shall not be precluded from or restricted from representing Seller and/or any of its affiliates or otherwise acting as attorneys for Seller and/or any of its affiliates in any matter, including, but not limited to, any court proceeding or other matter related to the Agreement or the transactions contemplated by the Agreement, or this Escrow Agreement or the Escrow Deposit, whether or not there is a dispute between Seller and Purchaser with respect to any such matter; Purchaser irrevocably consents to any such representation and waives any conflict or appearance of conflict with respect to any such representation.

(f)     Seller shall report as taxable income any taxable income resulting from the investment of the Escrow Deposit, except to the extent that interest earned on the Escrow Deposit is delivered to Purchaser pursuant to the terms of the Agreement, in which event Purchaser shall report as taxable income any taxable income resulting from such interest.  At the option of the Escrow Agent, the account in which the Escrow Deposit is held may indicate Seller's name and/or its Federal I.D. number.  The Escrow Agent may deduct or withhold from the Escrow Deposit or any payment under this Escrow Agreement any amount that it in good faith estimates is owed to the Internal Revenue Service or to any other taxing authority by any party with an interest in the Escrow Deposit, and the Escrow Agent may in its discretion pay over to the Internal Revenue Service or such other taxing authority all or part of the amount so deducted or withheld.

(g)     All of the Escrow Agent's rights of indemnification provided for in this Escrow Agreement shall survive the resignation of the Escrow Agent, its replacement by a successor Escrow Agent, its delivery or deposit of the Escrow Deposit in accordance with this Escrow Agreement, the termination of this Escrow Agreement, and any other event that occurs after the date hereof.

(h)     The Escrow Agent shall have no responsibility with respect to the sufficiency of the arrangements contemplated by this Escrow Agreement to accomplish the intentions of the parties.

5.     <u>Representations</u>.

Seller and Purchaser each represents and warrants to the Escrow Agent that it has full power and authority to enter into and perform this Escrow Agreement; that the execution and delivery of this Escrow Agreement was duly authorized by all necessary corporate action; and that this Escrow Agreement is enforceable against it in accordance with its terms.

6.     <u>Resignation; Successor Escrow Agent</u>.

The Escrow Agent (and any successor escrow agent) may at any time resign as such upon 60 days prior notice to each of the other parties.  Upon receipt of a notice of resignation, each of the other parties shall use their best efforts to select a successor agent within 30 days, but if within that 30 day period the Escrow Agent has not received a notice signed by both of them appointing a successor escrow agent and setting forth its name and address, the Escrow Agent may (but shall not be obligated to) select on their behalf a bank or trust company to act as successor escrow agent, for such compensation as that bank or trust company customarily charges and on such terms and conditions not inconsistent with this Escrow Agreement as that bank or trust company reasonably requires.  The fees and charges of any successor escrow agent shall be payable out of the Escrow Deposit.  A successor escrow agent selected by the resigning Escrow Agent may become the Escrow Agent by confirming in writing its acceptance of the position.  Seller and Purchaser shall sign such other documents as the successor escrow agent reasonably requests in connection with its appointment, and each of them hereby irrevocably appoints the Escrow Agent as its attorney-in-fact to sign all such documents in its name and place.  The Escrow Agent may deliver the Escrow Deposit to the successor escrow agent selected

pursuant to this provision and, upon such delivery, the successor escrow agent shall become the Escrow Agent for all purposes under this Escrow Agreement and shall have all of the rights and obligations of the Escrow Agent under this Escrow Agreement and the resigning Escrow Agent shall have no further responsibilities or obligations under this Escrow Agreement.

7.      Notices.

All notices, instructions, objections or other communications under this Escrow Agreement shall be in writing and shall be deemed to have been duly given if (i) personally delivered with proof of delivery (or attempted delivery) thereof to the individual or individuals specified below (any notice or communications so delivered being deemed to have been given, served and received at the time delivered (or at the time delivery is rejected)), or (ii) sent by either United States Postal Service or nationally recognized commercial overnight or next business day (as defined in the Agreement) courier, with proof of delivery (or attempted delivery) thereof (any notice or communication so delivered being deemed to have been given, served and received on the next business day after the date on which sent) or (iii) sent by United States registered or certified mail, return receipt requested, postage prepaid (any notice or communication so sent being deemed to have been given, served and received when delivered (or delivery is rejected)), or (iv) by telecopier (with answerback acknowledged), provided that such telecopied notice must also be delivered by one of the means set forth in clauses (i), (ii) or (iii) above (any notice or communication so delivered being deemed to have been given, served and received on the receipt of answerback confirmation, provided such notice is also delivered by one of the means set forth in clauses (i), (ii) or (iii) above), addressed to the respective parties as follows (or at such other address as a party may specify by notice given in accordance with this paragraph):

If to Seller, to it at:

Caritas Health Care, Inc.
16-10 Dekalb Avenue
Brooklyn, New York  11237
Attention:      Mr. Jerry Castoria,
                Chief Financial Officer
Telecopier: (718) 558-2425

with a copy to:

Proskauer Rose LLP
1585 Broadway
New York, New York  10036
Attention:  Jeffrey Levitan, Esq.
Telecopier:  (212) 969-2900

If to Purchaser, to it at:

>Stessa Corp.
>55 West 37[th] Street, Suite 370
>New York, New York 10018
>Attention: Mr. Avi Matatov
>Telecopier: (___) ____-_____

with a copy to:

>Goldberg Weprin Finkel Goldstein LLP
>1501 Broadway, 22[nd] Floor
>New York, New York 10036
>Attention: Andrew W. Albstein, Esq.
>Telecopier: (212) 730-4518

If to the Escrow Agent, to it at:

>Proskauer Rose LLP
>1585 Broadway
>New York, New York 10036
>Attention: Jeffrey Levitan, Esq.
>Telecopier: (212) 969-2900

8.    <u>Miscellaneous</u>.

(a)    The Escrow Agent shall serve under this Escrow Agreement without fee, but Seller and Purchaser jointly and severally shall pay to the Escrow Agent on demand all reasonable costs and expenses incurred by the Escrow Agent in performing its services under this Escrow Agreement.

(b)    If any provision of this Escrow Agreement is determined by any court of competent jurisdiction to be invalid or unenforceable in any jurisdiction the remaining provisions of this Escrow Agreement shall not be affected thereby, and the invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable that provision in any other jurisdiction. It is understood, however, that the parties intend each provision of this Escrow Agreement to be valid and enforceable and each of them waives all rights to object to any provision of this Escrow Agreement.

(c)    This Escrow Agreement shall be binding upon and inure solely to the benefit of the parties and their respective successors and permitted assigns, and shall not be enforceable by or inure to the benefit of any third party. No party may assign its rights or obligations under this Escrow Agreement or any interest in the Escrow Deposit without the written consent of the other parties (except as otherwise provided in the Agreement in connection with a transfer by Purchaser of its interest in the Agreement in accordance with the terms of the Agreement), and any other purported assignment shall be void. In no event shall the Escrow Agent be required to act upon, or be bound by, any notice, instruction, objection or other

communication given by a person other than, nor shall the Escrow Agent be required to deliver the Escrow Deposit to any person other than, Seller or Purchaser.

(d)     This Escrow Agreement shall be governed by, interpreted under and construed and enforced in accordance with, the laws of the State of New York, without regard to conflict of laws principles. The United States Bankruptcy Court for the Eastern District of New York shall retain exclusive jurisdiction to enforce the terms of this Escrow Agreement and to resolve any and all disputes relating to the interpretation and implementation of this Escrow Agreement.

(e)     A summons or complaint or other process in any such action or proceeding served by mail in accordance with Section 7 of this Escrow Agreement or in such other manner as may be permitted by law shall be valid and sufficient service.

(f)     This Escrow Agreement contains a complete statement of all of the arrangements among the parties with respect to its subject matter and cannot be changed or terminated orally. Any waiver must be in writing.

(g)     This Escrow Agreement is being entered into in order to implement certain provisions of the Agreement and shall not amend, modify or supersede the Agreement (or any other agreement entered into in connection therewith) or act as a waiver of any rights, obligations or remedies set forth therein; provided, however, Escrow Agent may rely solely on upon the terms of this Escrow Agreement in performing its duties hereunder.

(h)     This Escrow Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

(i)     The section headings used herein are for convenience of reference only and shall not affect the construction or interpretation of this Escrow Agreement.

[END OF TEXT – SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement on the date first set forth above.

SELLER:

CARITAS HEALTH CARE, INC.

By: _____
Name: JOHN LAVAN
Title: CRO

PURCHASER:

STESSA CORP.

By: _____
Name:
Title:

ESCROW AGENT:

PROSKAUER ROSE LLP

By: _____
Member of the Firm
Date: _____, 2009

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement on the date first set forth above.

SELLER:

CARITAS HEALTH CARE, INC.

By: _____
        Name:
        Title:


PURCHASER:

STESSA CORP.

By: _____
        Name:
        Title: V. P.


ESCROW AGENT:

PROSKAUER ROSE LLP

By: _____
        _____
        Member of the Firm
        Date: _____, 2009

Exhibit "C"

Deed
(FORM)


Bargain and Sale Deed

Without Covenants Against Grantor's Acts


CARITAS HEALTH CARE, INC.

As Grantor

to

_____

As Grantee


Address:

_____

New York, New York

Block:          _____
Lots:           _____
County:         Queens


Recorded at Request of and
Return by Mail to:

_____
_____
_____
Attention: _____

THIS INDENTURE, made the ___ day of _____ 2009 between CARITAS HEALTH CARE, INC., a New York not-for-profit corporation, having an address at 16-10 Dekalb Avenue, Brooklyn, New York 11237, party of the first part, and _____, a _____ _____, having an address _____, party of the second part.

WITNESSETH, that the party of the first part, in consideration of ten dollars and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the City of New York, County of Queens and State of New York, being more particularly described on <u>Schedule A</u> attached hereto and made a part hereof;

TOGETHER with all right, title and interest, if any, of the party of the first part, in and to any streets and roads abutting the above described premise to the center lines thereof;

TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises;

TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND this conveyance is made pursuant to Order of the United States Bankruptcy Court for the Eastern District of New York dated _____, 2009, Case Nos. 09-40901 (CEC) through 09-40909 (CEC), titled United States Bankruptcy Court for the Eastern District of New York In Re: Caritas Health Care, Inc. et al., Debtors. Order pursuant to Sections 105(a), 363(b), 365 and 1146(c) of the Bankruptcy Code approving sale of Debtors' real property in Queens, New York and related assets.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

[Remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the party of the first part has duly executed this deed the day and year first above written.

CARITAS HEALTH CARE, INC.

By: _____
        Name:
        Title:


ACKNOWLEDGEMENT

STATE OF _____  )
                         )
COUNTY OF _____  )

       On the ____ day of _____ in the year 2009, before me, the undersigned, a Notary Public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is (are) subscribed to the within instrument and acknowledge to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the person(s),or the entity upon behalf of which the person(s) acted, executed the instrument.


_____
Notary Public

Schedule A

LEGAL DESCRIPTION

# Exhibit "D"

## Insurance Coverage

| | | | | | | |
|---|---|---|---|---|---|---|
| NAMED INSURED: | | | CARITAS HEALTH CARE , INC. | | | |
| MAILING ADDRESS: | | | 152-11 89th Avenue, Jamaica, NY 11432 | | | AS OF |
| | | | | | | 6/1/2009 |

| POLICY NUMBER | INSURANCE COMPANY | TERM | EFFECTIVE DATES | TYPE OF COVERAGE | AMOUNT | NOTATION |
|---|---|---|---|---|---|---|
| ZMD914075900 . . . . . . . | **AMERICAN GUAR. & LIABILITY** **(ZURICH)** . . . . . . | 1 YEAR . | 6/1/2009- 6/1/2010 . . . . . . | **SPECIAL MULTI-PERIL POLICY** **PROPERTY SECTION:** PERILS PROVIDED: ALL RISK INCLUDING EARTHQUAKE , FLOOD, TERRORISM, EQUIPMENT BREAKDOWN AGREED AMOUNT, REPLACEMENT COST LIMITS PROVIDED: LOSS LIMIT PER OCCURRENCE DEDUCTIBLES: REAL PROPERTY SUBLIMITS: FLOOD ANNUAL AGGREGATE EARTHQUAKE ANNUAL AGGREGATE | $445,000,000 $25,000 $25,000,000 $25,000,000 | Includes Taxes & Fees Coverage is written on the same policy with Wyckoff - Total Annual Premium - $365,000 $50,000 DEDUCTIBLE $50,000 DEDUCTIBLE |

## Exhibit "E"

### Certain Fixtures Not a Part of the Excluded Property

1. Five (5) TCO Chillers (air conditioners) located in the mechanical room in the basement.

2. Two (2) air-conditioning units for E.R. Train Units located on (and bolted to) the Emergency Department roof.

3. Two (2) air-conditioning units for Dentistry Train Units located on (and mounted to) the roof outside the Chapel.

4. One (1) air-conditioning unit for Cancer Department Train Units located on (and bolted to) the Cancer Center roof.

5. Four (4) Bryen Boilers located on the C level below the basement.

6. One (1) Claver Brooks boiler located on the C level below the basement.

## Exhibit C

**Form of Sale-Purchase Agreement for the St. John's Campus**

SALE-PURCHASE AGREEMENT

between

CARITAS HEALTH CARE, INC.

as seller,

and

[                    ]

as purchaser.

Premises:


90-02 Queens Boulevard, Elmhurst, New York (Block 2857, Lot 36)
87-28 58th Avenue, Elmhurst, New York (Block 2860, Lot 16)
57-28-32 Hoffman Drive, Elmhurst, New York (Block 2858, Lots 20, 21 & 22)



As of _____, 2009

# TABLE OF CONTENTS

1. Purchase and Sale. ...................................................................................................... 1
2. Purchase Price. ......................................................................................................... 2
3. The Closing; Closing Date. ........................................................................................ 3
4. Apportionments. ....................................................................................................... 3
5. Closing Documents and Deliverables. ........................................................................ 5
6. Return of Downpayment. ........................................................................................... 8
7. Purchaser's Representations. ..................................................................................... 8
8. Limited Seller Representations, No Implied Representations. ........................................ 9
9. Casualty and Condemnation. .................................................................................... 12
10. Bankruptcy Court Approval. .................................................................................... 13
11. Limitation on Personal Liability. ............................................................................... 13
12. Seller's Default. ...................................................................................................... 13
13. Purchaser's Default. ............................................................................................... 13
14. Conditions Precedent. ............................................................................................ 14
15. Notices. ................................................................................................................. 15
16. Assignment of Agreement. ...................................................................................... 16
17. Broker. .................................................................................................................. 17
18. Entire Agreement. .................................................................................................. 17
19. Amendments. ......................................................................................................... 17
20. No Waiver. ............................................................................................................. 18
21. Successors and Assigns. ......................................................................................... 18
22. Partial Invalidity. .................................................................................................... 18
23. Section Headings. .................................................................................................. 18
24. Governing Law. ...................................................................................................... 18
25. No Recording or Notice of Pendency. ...................................................................... 19
26. Calculation of Time Periods; Business Days. ............................................................. 19
27. Counterparts. ......................................................................................................... 19

# SALE-PURCHASE AGREEMENT

THIS SALE-PURCHASE AGREEMENT (this "<u>Agreement</u>") is made as of the ____ day of _____, 2009 (the "<u>Effective Date</u>"), between CARITAS HEALTH CARE, INC., a New York not-for-profit corporation, as debtor and debtor-in-possession pursuant to Case Nos. 09-40901 (CEC) through 09-40909 (CEC) in the United States Bankruptcy Court for the Eastern District of New York, having an address at 16-10 Dekalb Avenue, Brooklyn, New York 11237 ("<u>Seller</u>"), and _____, a _____ _____, having an address at _____ ("<u>Purchaser</u>").

W <u>I T N E S S E T H</u> :

WHEREAS, on February 6, 2009, Seller and certain of its affiliates filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 <u>et seq</u>. (as amended, the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Eastern District of New York (the "<u>Bankruptcy Court</u>"), which are being jointly administered under Case Nos. 09-40901 (CEC) through 09-40909 (CEC) in the Bankruptcy Court.

WHEREAS, Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, Seller's right, title and interest in and to the Asset (hereinafter defined), in accordance with Section 363 and other applicable sections of the Bankruptcy Code, on the terms and subject to the conditions set forth herein.

WHEREAS, Seller's right, title and interest in and to the Asset will be sold pursuant to a Sale Order (hereinafter defined) of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code and the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the mutual receipt and legal sufficiency of which the parties hereto hereby acknowledge, Seller and Purchaser hereby agree as follows:

1.    <u>Purchase and Sale.</u>

(a)    Subject to the terms and conditions set forth in this Agreement, Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase and acquire from Seller, the following (collectively, the "<u>Asset</u>"):

(i)    *Land*. All of Seller's right, title and interest in and to that certain plot, piece and parcel of land located in Queens County, State of New York, more particularly described on <u>Exhibit "A"</u> attached hereto and made a part hereof (the "<u>Land</u>"), together with all of Seller's right, title and interest, if any, in and to any land lying in the bed of any street, road or avenue, opened or proposed, public or private, in front of or adjoining the Land, to the center line thereof, and all right, title and interest, if any, of Seller in and to any award made or to be made in lieu thereof and in and to any unpaid award for damage to the Land by reason of change of grade of any street, subject, however, to the Permitted Exceptions (hereinafter defined);

(ii)     *Improvements.*  All of Seller's right, title, and interest in and to the buildings and other improvements built on or attached to the Land (collectively, the "Improvements"), subject, however, to the Permitted Exceptions (the Land and the Improvements being referred to herein as, collectively, the "Real Estate");

(iii)    *Fixtures.*  Subject to the terms of Section 1(b), all of Seller's right, title and interest in and to the fixtures built on or attached to the Real Estate (the "Fixtures"), subject, however, to the Permitted Exceptions; and

(iv)     *Appurtenant Rights.*  All of Seller's right, title and interest, if any, in and to all easements, rights of way, privileges, servitudes, appurtenances and other rights, if any, running with Seller's interest in the Real Estate, subject, however, to the Permitted Exceptions.

(b)     Notwithstanding anything to the contrary contained herein, it is expressly agreed by the parties hereto that (i) any movable fixtures, furniture, furnishings, equipment or other personal property (including, without limitation, trade fixtures and equipment, medical or otherwise, in, on, around or affixed to the Real Estate) owned by Seller or any affiliate of Seller (collectively, "Excluded Property"), are not intended, and shall not be, included in the Asset to be sold to Purchaser hereunder; provided, however, (i) Seller shall have no obligation to remove the Excluded Property from the Real Estate at any time, (ii) the removal of the Excluded Property from the Real Estate shall not be a condition precedent to Purchaser's obligations hereunder to consummate the Closing, and (iii) if and to the extent that any Excluded Property is not removed from the Real Estate prior to the Closing, such Excluded Property shall be deemed abandoned by Seller upon Closing, Seller shall have no obligation after the Closing to remove same and Purchaser shall accept the Asset with such Excluded Property in, on, around or affixed to the Real Estate without any abatement of the Purchase Price.

2.     Purchase Price.

Subject to the apportionments described in Section 4 hereof, the purchase price to be paid by Purchaser to Seller for Seller's right, title and interest in the Asset is *[no less than $13,500,000.00]* Dollars ($_____), legal currency of the United States of America (the "Purchase Price"), which shall be payable as follows:

(a)     *Downpayment.*  On the date hereof, Purchaser shall pay to Proskauer Rose LLP, as escrow agent ("Escrow Agent"), *[an amount equal to ten percent (10%) of the Purchase Price]* Dollars ($_____), legal currency of the United States of America (the "Downpayment"), by wire transfer of immediately available federal funds to the trust account designated by Escrow Agent, to be held by Escrow Agent pursuant to and in accordance with the provisions of an escrow agreement among Seller, Purchaser and Escrow Agent, dated as of the date hereof, a copy of which is attached hereto as Exhibit "B".

(b)     *Balance of the Purchase Price.*  The balance of the Purchase Price shall be paid by Purchaser to Seller on the Closing Date (hereinafter defined) by wire transfer of immediately available federal funds to the account or accounts designated by Seller or, at Seller's option (if requested at least three (3) business days prior to Closing (hereinafter

2

defined)), by unendorsed certified or cashier's check(s) payable to the order of, or at the direction of, Seller and drawn on a commercial bank which is a member of the New York Clearinghouse Association (i.e., upon Closing, (i) the Downpayment (together with any interest earned thereon) shall be paid by Escrow Agent to, or as directed by, Seller and (ii) Purchaser shall receive a credit against the total Purchase Price in the amount of the Downpayment (but not any interest earned thereon)).

3.      The Closing; Closing Date.

The consummation of the purchase and sale transaction contemplated hereby (the "Closing") shall take place at 10:00 A.M. (New York City time) on the tenth (10th) business day after the notice of the entry of the Sale Order (the date on which the Closing occurs being referred to herein as the "Closing Date"). TIME SHALL BE OF THE ESSENCE as to Purchaser's obligations hereunder to consummate the Closing on such date. Seller shall have the right to adjourn the Closing for a period not to exceed ten (10) business days by giving notice thereof to Purchaser not later than the business day on which the Closing is otherwise scheduled to occur, which extension shall be without prejudice to further extensions at Seller's sole discretion, and TIME SHALL BE OF THE ESSENCE as to Purchaser's obligations hereunder to consummate the Closing on such adjourned date. Seller may, in its sole and absolute discretion, but is in no way required to, agree in writing to adjourn the Closing at the written request of Purchaser, in which event TIME SHALL BE OF THE ESSENCE as to Purchaser's obligations hereunder to consummate the Closing on such adjourned date. The Closing shall take place at the offices of Proskauer Rose LLP, 1585 Broadway, New York, New York 10036, or, at Purchaser's option, at the offices of (x) the lending institution providing Purchaser's financing for Purchaser's purchase of Seller's right, title and interest in the Asset, or (y) such lending institution's attorneys, provided that in either case such offices are located in the Borough of Manhattan, New York City. Nothing contained in this Section 3 shall be construed to condition Purchaser's obligations hereunder on Purchaser arranging financing for all or any portion of the Purchase Price.

4.      Apportionments.

(a)     *Generally.* Subject to the terms of this Section 4, the following items, without duplication, are to be apportioned between Seller and Purchaser with respect to the Asset as of 11:59 p.m., New York City time, on the date immediately prior to the Closing Date, and at the Closing the net amount thereof shall either be (x) paid by Purchaser to Seller by wire transfer to a bank account designated by Seller or, at Seller's option, by unendorsed certified or cashier's check(s) payable to the order of, or at the direction of, Seller and drawn on a commercial bank which is a member of the New York Clearinghouse Association, or (y) credited by Seller against the Purchase Price:

(i)      real property taxes and assessments;

(ii)     water rates and charges;

(iii)    sewer taxes and rents;

(iv)    electricity, steam, gas, fuel and all other utilities, including, without limitation, taxes thereon;

(v)    deposits on account with any utility company servicing the Asset, to the extent transferred to Purchaser;

(vi)    deposits on account with any municipality having jurisdiction over the Asset, to the extent transferred to Purchaser; and

(vii)    annual permit, license and inspection fees, if any, on the basis of the fiscal year for which levied, if the rights with respect thereto are transferred to Purchaser.

(b)    *Governmental Charges*.  Apportionment of real property taxes, water rates and charges, sewer taxes and rents and other similar items shall be made on the basis of the fiscal year for which assessed.  If the Closing Date occurs before the real property taxes, water rates and charges, sewer taxes and rents or similar items with respect to the Asset are finally fixed for the fiscal year in which the Closing occurs, then the apportionments thereof made at the Closing shall be made on the basis of the real property taxes, water rates and charges, sewer taxes and rents or other similar items, as the case may be, for the preceding fiscal year applied to the latest assessed valuation.

(c)    *Water Meters*.  If there are any meters measuring water consumption at the Real Estate, then Seller shall attempt to obtain meter readings to a date that is no more than thirty (30) days before the Closing, and, if such readings are obtained, the unfixed water rates and charges and sewer taxes and rents, if any, based thereon for the intervening time shall be apportioned on the basis of such readings, or if such readings are not obtained, then the unfixed water rates and charges and sewer taxes and rents, if any, shall be apportioned upon the last meter readings.

(d)    *Payment of Certain Items*.  The amount of any unpaid taxes, assessments, water rates and charges, sewer taxes and rents and any other similar items which Seller is obligated to pay and discharge with respect to the Real Estate, with interest and penalties thereon to the Closing Date, may, at the option of Seller, be allocated to Purchaser out of the Purchase Price, provided that official bills therefor, with interest and penalties thereon, are furnished by Seller at the Closing.  Purchaser, if request is made at least two (2) business days prior to the Closing, shall provide Seller at the Closing with separate wire transfers of immediately available federal funds and/or certified and/or official bank check(s) drawn on, or by, a commercial bank that is a member of the New York Clearinghouse Association, payable as directed by Seller, in an aggregate amount not exceeding the balance of the Purchase Price due to Seller at the Closing, to facilitate the satisfaction of any of the aforesaid taxes, assessments, water rates and charges, sewer taxes and rents and other similar items and any interest and penalties thereon to the Closing Date.  Without limiting the foregoing, Seller is solely obligated to pay and discharge any of the aforesaid taxes, assessments, water rates and charges, sewer taxes and rents and other similar items affecting the Real Estate and any interest or late payment charges with respect thereto that are delinquent as of the Closing Date, subject to apportionment as herein provided.

3740/21521-011 Current/14497264v5

(e)     *Fuel Oil; Utilities.*  Fuel oil, if any, owned by Seller and located at the Real Estate on the Closing Date shall be adjusted at the cost thereof to Seller on a first in-first out basis.  Seller shall arrange for the amount of fuel oil to be determined in writing by the fuel company presently supplying fuel to the Real Estate as of a date that is not more than five (5) business days prior to the Closing Date.  With respect to the other utilities described in clause (iv) of Section 4(a), where possible, Seller shall secure cutoff readings for all utilities as of a date that is not more than five (5) business days prior to the Closing Date.  To the extent that such cutoff readings are not available, at Closing the cost of such utilities shall be apportioned between the parties on the basis of the most recent actual (not estimated) bill for such service.  Purchaser shall be responsible for causing such utilities and services to be changed to its name as of the Closing Date, and shall be liable for and shall pay all utility bills for services rendered on and after the Closing Date.  With respect to deposits on account with any utility company servicing the Asset, to the extent same are transferred to Purchaser at Closing, Seller shall receive an adjustment equal to (i.e., Purchaser shall be pay to Seller at Closing) the full amount of such deposits transferred to Purchaser.  To the extent that any such deposits are not transferred to Purchaser, Seller shall have the right to a return of such deposits and Purchaser shall be responsible for posting any deposits required from and after the Closing.

(f)     *Assessments.*  If, on the Closing Date, the Real Estate, or any part thereof, is affected by any real property tax assessments, then Seller shall pay such assessments; provided, however, that if such assessments are payable in installments, then Seller shall pay such installments due prior to the Closing Date, and Purchaser shall pay such installments due after the Closing Date.

(g)     *Violations.*  Purchaser shall accept title to the Asset subject to all violations of law, rules, regulations, statutes and ordinances, orders or requirements noted in or issued by the departments of buildings, fire, labor, health or other federal, state, county, city or other departments and governmental agencies having jurisdiction against or affecting the Asset (collectively, the "Violations"), whether noted or issued prior to, on or after the date hereof, without any abatement of or adjustment to the Purchase Price, and all such Violations shall be the sole responsibility of Purchaser from and after the Closing.  Seller shall not be responsible for (i) remedying any Violations that have been noted against the Real Estate or that arise prior to the Closing Date, (ii) removing the notation thereof from the public records, or (iii) making payment of any fines or penalties imposed prior to the Closing Date in connection with any such Violations.

5.     Closing Documents and Deliverables.

(a)     *Seller Deliveries.*  At the Closing, Seller, at Seller's sole cost and expense, shall deliver to Purchaser the following:

(i)     possession of the Real Estate vacant and free of any tenancies and rights of occupancy (other than any tenancies or rights of occupancy created by Purchaser) and subject to the Permitted Exceptions;

(ii)     a copy of the Sale Order;

(iii)    a bargain and sale deed without covenants against grantor's acts, containing the covenant required by Section 13 of the Lien Law of the State of New York (the "<u>Deed</u>"), in the form of <u>Exhibit "C"</u> attached hereto and made a part hereof, in proper form for recording, duly executed and acknowledged by Seller, so as to convey to Purchaser all of Seller's right, title and interest in and to the Real Estate, subject only to the Permitted Exceptions;

(iv)    tax returns in respect of the New York State Real Estate Transfer Tax (the "<u>TP-584</u>") and the New York City Real Property Tax (the "<u>NYC-RPT</u>"), to the extent required by applicable law in connection with the consummation of the transaction contemplated hereby, both duly executed (and, to the extent required by law, notarized) by Seller;

(v)    a Real Property Transfer Tax Report (the "<u>RP-5217NYC</u>"), to the extent required by applicable law in connection with the consummation of the transaction contemplated hereby, duly executed by Seller;

(vi)    a "non-foreign person affidavit" that meets the requirements of Section 1445(b)(2) of the Internal Revenue Code of 1986, as amended, and the treasury regulations promulgated thereunder (the "<u>Tax Code</u>"), containing Seller's taxpayer identification number, duly executed by Seller;

(vii)    a direction letter to Escrow Agent authorizing and directing Escrow Agent to release the Downpayment (together with any interest earned thereon) to, or as directed, by Seller upon the Closing, duly executed by Seller (the "<u>Escrow Agent Direction Letter</u>");

(viii)    a closing and apportionment statement showing all adjustments in respect of the Purchase Price to be made at the Closing in accordance with Section 4 (the "<u>Closing Statement</u>"); and

(ix)    access to all non-privileged files in Seller's possession pertaining to the Asset.

(b)    *Purchaser Deliveries.*  At the Closing, Purchaser, at Purchaser's sole cost and expense, shall deliver to Seller the following:

(i)    in accordance with and subject to adjustment as provided in this Agreement, the balance of the Purchase Price;

(ii)    Purchaser's organizational documents, resolutions and consents, as applicable, certified by a general partner, managing member or officer, as the case may be, of Purchaser as true, correct and complete, which evidence and certify that the execution and delivery by Purchaser of this Agreement and the documents set forth herein have been duly authorized by all necessary actions of Purchaser and that this Agreement and such documents have been duly executed and delivered by Purchaser;

(iii)    The TP-584, the NYC-RPT and the RP-5217NYC, to the extent required in connection with the consummation of the transaction contemplated hereby, each duly executed (and, if required by applicable law, notarized) by Purchaser;

6

(iv)     a certificate, from and duly executed by Purchaser, restating on and as of the Closing Date the accuracy of the representations made by Purchaser in Section 7 hereof;

(v)     the Escrow Agent Direction Letter, duly executed by Purchaser

(vi)     the Closing Statement showing all adjustments in respect of the Purchase Price to be made at the Closing, duly executed by Purchaser; and

(vii)     any other documentation reasonably required to consummate the transactions contemplated by this Agreement.

(c)     *Payments at the Closing.*  At the Closing, Purchaser shall pay the following:

(i)     the Purchase Price, less the Downpayment paid pursuant to Section 2(a) hereof, subject to apportionment as provided in Section 4 hereof;

(ii)     all title insurance premiums and other costs for which Purchaser is responsible hereunder charged by the title insurance company (the "Title Company") that Purchaser designates in connection with Purchaser's acquisition of Seller's right, title and interest in and to the Asset;

(iii)     all survey fees, if any, charged in connection with Purchaser's acquisition of Seller's right, title and interest in and to the Asset; and

(iv)     all recordation fees in connection with recording any documents required to be recorded in connection with Purchaser's acquisition of Seller's right, title and interest in and to the Asset (including, without limitation, the Deed).

The terms of this Section 5(c) shall survive the Closing.

(d)     *Transfer Taxes.*  Seller and Purchaser acknowledge that the conveyance of the Asset by Seller to Purchaser may be exempt from New York State real estate transfer tax pursuant to Section 1405(b)(8) of the Real Estate Transfer Tax Law of the State of New York and from New York City real property transfer tax (due to the conveyance being made by a tax exempt organization); provided, however, in the event that any transfer, conveyance or similar tax is imposed in connection with the conveyance of the Asset by Seller to Purchaser, whether due to a change in applicable law or otherwise, then Purchaser shall be responsible for, and shall pay in full as and when due, any such tax (including, without limitation, any additional amount imposed due to any "gross up" of consideration paid as the result of the grantee paying such tax in lieu of the grantor), regardless or whether such tax is imposed by law on the grantor or grantee.  The terms of this Section 5(d) shall survive the Closing.

(e)     *Condition of Title at the Closing.*  At the Closing, Seller shall convey its right, title and interest in and to the Asset free and clear of all liens, claims, interests, or encumbrances, other than Permitted Exceptions, with any such liens, interests, claims, or encumbrances attaching to the net proceeds of the transaction with the same force, effect and priority that currently exists, subject to further order of the Bankruptcy Court.  Purchaser's

obligation to consummate the transaction contemplated hereby shall not be impaired by the existence of any Permitted Exceptions and Purchaser shall accept title to the Asset subject to Permitted Exceptions. As used herein, the term "Permitted Exceptions" means, collectively, the following items: (i) real property taxes, supplemental taxes and assessments, water rates and charges and sewer taxes and rents for the tax year in which Closing occurs (and subsequent tax years), together with any interest and penalties thereon, subject to apportionment of such items to the extent provided in Section 4 of this Agreement; (ii) any state of facts an accurate, current survey of the Real Estate or a physical inspection of the Real Estate would show; (iii) all easements, rights of way, covenants, conditions and restrictions and other encumbrances (including, without limitation, any matters shown on any subdivision or parcel map affecting the Real Estate) affecting the Real Estate as shown in the public records (other than liens securing monetary debts or judgments), and all easements and rights of way that affect any land in the bed of any street, road, or avenue in front of or adjoining the Real Estate; (iv) all covenants, restrictions and utility company rights, easements and franchises relating to electricity, water, steam, gas, telephone, cable, sewer or other service or the right to use and maintain poles, lines, wires, cables, pipes, boxes and other fixtures and facilities in, over, under and upon the Real Estate; (v) any laws, rules, regulations, statutes, ordinances, orders or other legal requirements affecting the Real Estate, including, without limitation, all zoning, land use, building, development and environmental laws, rules, regulations, statutes, ordinances, orders or other legal requirements, including landmark designations and all zoning variance and special exceptions, if any, whether presently existing or enacted prior to or after the Closing; (vi) any variations between the tax diagram or tax map and the record description of the Land; (vii) the standard printed exclusions from coverage contained in the ALTA form of owner's title policy currently in use in New York; and (viii) all Violations.

6.      Return of Downpayment.

If Seller is unable to convey Seller's right, title and interest in and to the Asset in accordance with the terms of this Agreement, for reasons other than breach of this Agreement by Purchaser, then Seller shall cause Escrow Agent to return the Downpayment (together with any interest earned thereon) to Purchaser, whereupon this Agreement shall terminate and thereupon Seller shall not have any further liability or obligation to Purchaser hereunder.

7.      Purchaser's Representations.

Purchaser hereby represents and warrants to Seller that as of the date hereof:

(i)      Purchaser is a _____, duly organized, validly existing and in good standing under the laws of the State of _____, was formed on _____, and is qualified to do business in the State of New York;

(ii)      Purchaser's tax identification number is _____;

(iii)      Purchaser has the power and authority to conduct its business and to execute and deliver, and perform Purchaser's obligations under, this Agreement;

8

(iv)     Purchaser's execution and delivery of this Agreement, and the performance of Purchaser's obligations hereunder, have been authorized by all necessary action on the part of Purchaser;

(v)     all necessary consents for Purchaser to enter into this Agreement and perform its obligations hereunder have been obtained and there are no pending actions or investigations the outcome of which could adversely affect Purchaser's ability to perform Purchaser's obligations hereunder;

(vi)     the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby by Purchaser do not violate any provision of, or cause a default under, or result in the acceleration of any obligation under, any agreement to which Purchaser is a party or any law, statute, rule, ordinance, regulation or requirement by which Purchaser or the properties, assets, business or operations of Purchaser may be bound or affected; do not require the consent or approval of any court, administrative or governmental authority; and do not result in the creation or imposition of any lien or equity of any kind whatsoever upon, or give to any other person any interest or right (including any right of termination or cancellation) in or with respect to, any agreement to which Purchaser is a party or the business or operations of Purchaser or any of its properties or assets;

(vii)     neither Purchaser, nor any person or entity that controls Purchaser, constitutes a person or entity that the Office of Foreign Assets Control of the United States Department of the Treasury has listed on its list of Specially Designated Nationals and Blocked Persons; and

(viii)     Purchaser, or an authorized representative of Purchaser, has made and/or Purchaser has waived the right to make personal inspection of the Asset and an investigation of all facts and circumstances in connection therewith; Purchaser is entering into this Agreement on the basis of Purchaser's own understanding and, except as expressly set forth in Section 8(a), no representations or warranties have been made by Seller or by any other person on behalf of Seller.

8.     <u>Limited Seller Representations, No Implied Representations.</u>

(a)     *Seller's Representations.*  Seller hereby represents and warrants to Purchaser that as of the date hereof:

(i)     there are no leases, licenses or other agreements for the present or future use or occupancy of any space at or in the Real Estate to which Seller is a party affecting the Real Estate that will survive the Closing (unless otherwise agreed by Purchaser in writing);

(ii)     there are no service, maintenance, union, employment, supply or management contracts or agreements to which Seller is a party affecting the Real Estate that will survive the Closing and for which Purchaser shall be liable (unless otherwise agreed by Purchaser in writing);

(iii)     there are no employees of Seller whose employment Purchaser shall be obligated to retain from and after the Closing or with respect to whom Purchaser shall be liable for severance or other payments (unless otherwise agreed by Purchaser in writing);

(iv)     no condemnation, eminent domain or similar proceeding of which Seller has received written notice is pending, threatened or contemplated with respect to all or any portion of the Real Estate;

(v)     there are no rights or options to purchase or lease all or any part of the Real Estate that have been created by Seller, except for the rights in favor of Purchaser created hereunder;

(vi)     Seller currently maintains insurance coverage with respect to the Real Estate as described on Exhibit "D" attached hereto and made a part hereof;

(vii)     Seller is not a "foreign person" as defined in Section 1445(f)(3) of the Tax Code; and

(viii)     neither Seller, nor any person or entity that controls Seller, constitutes a person or entity that the Office of Foreign Assets Control of the United States Department of the Treasury has listed on its list of Specially Designated Nationals and Blocked Persons.

(b)     *Asset "As-Is"; No Implied Representations.*  Prior to the execution of this Agreement, Purchaser has either inspected and/or waived any right to inspect the Asset, and has become acquainted with the Asset's present condition.  Purchaser represents, warrants and agrees that, except as specifically set forth in Section 8(a), neither Seller nor its affiliates, or any employees, agents, attorneys, partners, members, officers, directors, advisors or property manager of Seller or its affiliates have made any verbal or written representations, warranties or statements of any nature or kind whatsoever to Purchaser, whether expressed or implied, and, in particular, and without limitation, that no representations or warranties have been made with respect to (I) the physical condition or operation of the Asset (including, without limitation, (x) the absence or presence of hazardous substances at, in or adjacent to the Asset, (y) the compliance of the Asset with applicable legal or insurance requirements regarding hazardous substances or (z) the compliance of the Asset with any other applicable legal requirements), (II) the revenues and expenses of the Asset, (III) the zoning and other laws, regulations and rules applicable to the Asset or the compliance of the Asset therewith, (IV) the occupancy of the Asset or any part thereof, (V) the assignability or validity of any licenses or permits that are currently in effect for the Asset, (VI) the quantity, quality or condition of the Improvements or Fixtures (including, without limitation, regarding any latent or patent defects with respect thereto), or (VII) any other matter or thing affecting or related to the Asset or the transactions contemplated hereby.  Purchaser agrees that Seller shall not be bound in any manner whatsoever by any guarantees, promises, projections, or other information pertaining to the Asset made, furnished or claimed to have been made or furnished by Seller or any affiliates, employees, agents, attorneys, partners, members, officers, directors, advisors or property manager of Seller or any broker, whether verbally or in writing.  Purchaser acknowledges and agrees to take Seller's right, title and interest in and to the Asset on an "as-is, where-is" basis, with all faults, in substantially its

10

present condition, subject to ordinary use, wear and tear and natural deterioration between the date hereof and the Closing and to casualty and condemnation to the extent provided in this Agreement.  Purchaser hereby waives, to the extent permitted by law, any and all implied warranties.  The provisions of this Section 8(b) shall survive the Closing or earlier termination of this Agreement.

   (c) *Waivers.*  Notwithstanding anything to the contrary set forth in this Agreement, Seller makes no warranty with respect to the presence of Hazardous Materials (as hereinafter defined) on, above or beneath the Real Estate (or any parcel in proximity thereto) or in any water on or under the Real Estate.  Purchaser's closing hereunder shall be deemed to constitute an express waiver of Purchaser's right to cause Seller to be joined in any action brought under any Environmental Laws (as hereinafter defined).  Purchaser, for itself and its agents, affiliates, successors and assigns, hereby releases and forever discharges Seller and its affiliates from any and all rights, claims and demands at law or in equity, whether known or unknown at the time of this Agreement, which Purchaser has or may have in the future, arising out of the physical, environmental, economic or legal condition of the Asset, including, without limitation, any claim for indemnification or contribution arising under any Environmental Law. The term "Hazardous Materials" means (i) those substances included within the definitions of any one or more of the terms "hazardous materials," "hazardous wastes," "hazardous substances," "industrial wastes," and "toxic pollutants," as such terms are defined under the Environmental Laws, or any of them, (ii) petroleum and petroleum products, including, without limitation, crude oil and any fractions thereof, (iii) natural gas, synthetic gas and any mixtures thereof, (iv) asbestos and or any material which contains any hydrated mineral silicate, including, without limitation, chrysotile, amosite, crocidolite, tremolite, anthophylite and/or actinolite, whether friable or non-friable (collectively, "Asbestos"), (v) polychlorinated biphenyl ("PCBs") or PCB-containing materials or fluids, (vi) radon, (vii) any other hazardous or radioactive substance, material, pollutant, contaminant or waste, and (viii) any other substance with respect to which any Environmental Law or governmental authority requires environmental investigation, monitoring or remediation.  The term "Environmental Laws" means all federal, state and local laws, statutes, ordinances and regulations, now or hereafter in effect, in each case as amended or supplemented from time to time, including, without limitation, all applicable judicial or administrative orders, applicable consent decrees and binding judgments relating to the regulation and protection of human health, safety, the environment and natural resources (including, without limitation, ambient air, surface, water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.), the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 1801 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 et seq.), the Resource Conservation and Recovery Act, as amended (42 U.S. §§ 6901 et seq.), the Toxic Substance Control Act, as amended (15 U.S.C. §§ 2601 et seq.), the Clean Air Act, as amended (42 U.S.C. §§ 7401 et seq.), the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et seq.), the Occupational Safety and Health Act, as amended (29 U.S.C. §§ 651 et seq.), the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300f et seq.), Environmental Protection Agency regulations pertaining to Asbestos (including, without limitation, 40 C.F.R. Part 61, Subpart M, the United States Environmental Protection Agency Guidelines on Mold Remediation in Schools and Commercial Buildings, the United States Occupational Safety and Health Administration regulations pertaining to Asbestos including,

without limitation, 29 C.F.R. Sections 1910.1001 and 1926.58), applicable New York State and New York City statutes and the rules and regulations promulgated pursuant thereto regulating the storage, use and disposal of Hazardous Materials, the New York City Department of Health Guidelines on Assessment and Remediation of Fungi in Indoor Environments and any state or local counterpart or equivalent of any of the foregoing, and any related federal, state or local transfer of ownership notification or approval statutes.

9.     Casualty and Condemnation.

(a)     *Casualty.* If, prior to the Closing, any portion of the Asset is damaged or destroyed by fire or other casualty, then (i) Seller shall notify Purchaser of the occurrence of such fire or other casualty, (ii) Purchaser shall remain obligated under this Agreement to accept the Asset in its "as-is, where-is" condition and proceed with Closing with no abatement of the Purchase Price (it being understood that this Section 9 shall constitute a "contract that expressly provides otherwise" for purposes of Section 5-1311 of the General Obligations Law), and (iii) at the Closing, Seller shall assign to Purchaser, without recourse, and Purchaser shall have the right to retain, any insurance proceeds to which Seller is entitled by reason of such fire or other casualty, less reasonable costs incurred by Seller, in its sole and absolute discretion, to collect the same and the portion thereof that Seller, in its sole and absolute discretion, uses to make temporary or emergency repairs to the Asset. Between the date hereof and the Closing Date, Seller shall maintain substantially the same insurance coverage with respect to the Asset as it maintains on the date hereof, to the extent that such insurance coverage remains available at commercially reasonable rates (and this obligation of Seller to maintain insurance coverage shall be deemed a material obligation of Seller hereunder).

(b)     *Permanent Taking.* If, prior to the Closing, any portion of the Asset is taken by eminent domain or a condemnation, other than a temporary taking (or is the subject of a pending or contemplated permanent taking which has not been consummated), then (i) if such taking materially adversely affects Purchaser's intended use of the Asset, Purchaser shall have the right to terminate this Agreement upon notice to Seller given not later than ten (10) business days after Purchaser receives notice of such taking, in which event neither party shall thereafter have any further rights or obligations hereunder (other than such rights or such obligations that are expressly stated herein to survive the termination hereof), except that Seller shall cause Escrow Agent to pay the Downpayment (together with interest accrued thereon, if any) to Purchaser, or (ii) if this Agreement is not terminated by Purchaser in accordance with clause (i) of this sentence or Purchaser has no right to terminate this Agreement pursuant thereto, (A) Purchaser shall accept so much of the Asset as remains after such taking in its "as-is, where-is" condition and proceed with Closing with no abatement of the Purchase Price, and (B) at the Closing, Seller shall assign and turn over to Purchaser, without recourse, and Purchaser shall be entitled to receive and keep, all of Seller's interest in and to all awards paid or payable to Seller for such taking by eminent domain, less, in either case, reasonable costs incurred by Seller, in its sole and absolute discretion, to collect the same and the portion thereof that Seller, in its sole and absolute discretion, uses to make temporary or emergency repairs to the Asset.

(c)     *Temporary Taking.* If, prior to the Closing, all or any portion of the Asset is temporarily taken by eminent domain (or is the subject of a pending or contemplated temporary taking that has not yet been consummated), then (i) Purchaser shall accept the Asset in

12

its "as-is" condition and proceed with Closing with no abatement of the Purchase Price, (ii) Seller shall not compromise, settle or adjust any claims to awards for the taking without the prior written consent of Purchaser, which consent shall not be unreasonably withheld, delayed or conditioned, (iii) at the Closing, Seller shall assign and turn over to Purchaser, without recourse, and Purchaser shall be entitled to receive and keep, all of Seller interest in and to any awards, if any, for the taking to the extent relating to or allocable to the period from and after the Closing Date (it being understood and agreed that Seller shall be entitled to receive and retain any such award to the extent that it relates to or is allocable to the period prior to the Closing Date, whether or not the award is received prior to, on or after Closing), in any event less an allocable share of the costs incurred by Seller, in its sole and absolute discretion, to collect same and the portion thereof that Seller, in its sole and absolute discretion, uses to make temporary or emergency repairs to the Asset.

10. <u>Bankruptcy Court Approval.</u>

Seller, in accordance with all applicable requirements of, and procedures under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and subject in all cases to the approval of the Bankruptcy Court, shall use its reasonable efforts to cause an order approving the transactions contemplated by this Agreement and the sale of the Asset to Purchaser in accordance with and subject to the terms of this Agreement (a "<u>Sale Order</u>") to be entered and become a final non-appealable order; it being understood that Seller may not consummate the contemplated transaction without such Bankruptcy Court approval in the form of a Sale Order.

11. <u>Limitation on Personal Liability.</u>

Purchaser agrees that it shall look solely to the Asset, and not to any other assets of Seller to enforce Purchaser's rights hereunder, and that Seller shall not have any personal obligation or liability hereunder. The provisions of this Section 11 shall survive the Closing or the earlier termination of this Agreement.

12. <u>Seller's Default.</u>

If (i) Seller defaults in the performance of Seller's material obligations hereunder, and (ii) such default continues for more than thirty (30) days after the date that Purchaser gives Seller notice thereof, then Purchaser, as Purchaser's sole remedy, except as provided in Section 6 hereof, may terminate this Agreement by giving notice thereof to Seller and upon the giving of such notice this Agreement shall terminate and thereafter neither party shall have any further rights or obligations hereunder at law or in equity, for damages or otherwise (other than any such rights or such obligations that are expressly stated herein to survive the termination hereof), except that if this Agreement is terminated pursuant to this Section 12 on or prior to the Closing Date, then Seller shall cause Escrow Agent to return the Downpayment (and the interest earned thereon) to Purchaser. The terms of this Section 12 shall survive the termination of this Agreement.

13. <u>Purchaser's Default.</u>

If (i) Purchaser defaults in the performance of Purchaser's obligations hereunder, and (ii) such default continues for more than ten (10) days after the date that Seller gives Purchaser

notice thereof (with the understanding, however, that this clause (ii) shall not apply in respect of Purchaser's default in respect of Purchaser's obligation to consummate the Closing on the date that is otherwise required under Section 3 hereof), then Seller's sole remedy shall be to terminate this Agreement by giving notice thereof to Purchaser, and, upon the giving of such notice, this Agreement shall terminate and neither party shall thereafter have any rights or obligations hereunder (other than any such rights or such obligations that are expressly stated in this Agreement to survive the termination thereof), except that if this Agreement is terminated pursuant to this Section 13 on or prior to the Closing Date, then Seller shall receive the Downpayment (and the interest earned thereon) from Escrow Agent, as liquidated damages and as Seller's sole and exclusive remedy; it being agreed that Seller's actual damages would be difficult or impossible to ascertain.  The terms of this Section 13 shall survive the termination of this Agreement.

14.     Conditions Precedent.

(a)     *Conditions Precedent to Purchaser's Obligation to Close.*  Subject to the terms of this Agreement, Purchaser shall have no obligation to consummate the transaction contemplated hereby at the Closing unless:

(i)     the Bankruptcy Court shall have entered the Sale Order;

(ii)     Seller shall have complied with all of the provisions in Section 5(a);

(iii)     Seller is not in default of Seller's material obligations hereunder; and

(iv)     all of Seller's representations as set forth in Section 8(a), other than those set forth in clauses (iv) and (vi) of Section 8(a), are true and correct in all material respects on the Closing Date.

(b)     *Purchaser's Knowledge; Satisfaction of Conditions Upon Closing.*  If Purchaser elects to proceed to the Closing with knowledge of (i) a default in any of the covenants, agreements or obligations to be performed by Seller under this Agreement, and/or (ii) an inaccuracy in or untruthfulness of any representation or warranty of Seller made in this Agreement, then, upon the consummation of the Closing, Purchaser shall be deemed to have waived any such default and/or inaccuracy and shall have no claim against Seller on account thereof.  Purchaser's acceptance of the Deed at Closing shall be deemed to be Purchaser's acknowledgement and agreement that all conditions precedent to Purchaser's obligation to consummate the Closing have been fully satisfied by Seller, or irrevocably waived by Purchaser, and that Seller shall have no liability or obligation hereunder after the Closing, except with respect to any liability or obligation that expressly survives the Closing under the terms of this Agreement.  The terms of this Section 14(b) shall survive the Closing.

(c)     *Conditions Precedent to Seller's Obligation to Close.*  Subject to the terms of this Agreement, Seller shall have no obligation to consummate the transaction contemplated hereby at the Closing unless:

(i)      the Bankruptcy Court shall have entered the Sale Order;

(ii)     Purchaser shall have complied with all of the provisions in Section 5(b);

(iii)    Purchaser has performed in all respects the obligations on Purchaser's part to be performed hereunder on or prior to the Closing Date (and Purchaser is not in default hereunder in any respect);

(iv)     all of Purchaser's representations as set forth in Section 7 hereof are true and correct in all respects on the Closing Date; and

(v)     any other conditions precedent set forth herein to Seller's obligation to consummate the transaction contemplated hereby have been satisfied in all respects (it being understood that Seller shall have the right to waive any such conditions precedent to Seller's obligation to consummate the transaction contemplated hereby).

(d)    *Seller's Knowledge.* If Seller elects to proceed to the Closing with actual knowledge of (i) a default in any of the covenants, agreements or obligations to be performed by Purchaser under this Agreement, and/or (ii) an inaccuracy in or untruthfulness of any representation or warranty of Purchaser made in this Agreement, then, upon the consummation of the Closing, Seller shall be deemed to have waived any such default and/or inaccuracy and shall have no claim against Purchaser on account thereof. The terms of this Section 14(d) shall survive the Closing.

15.    <u>Notices.</u>

All notices, demands or requests made pursuant to, under or by virtue of this Agreement (in each case, a "<u>Notice</u>") must be in writing and sent to the party to which the Notice is being made by commercial overnight delivery service, or delivered by hand with receipt acknowledged in writing as follows:

To Seller:

Caritas Health Care, Inc.
16-10 Dekalb Avenue
Brooklyn, New York  11237
Attention:    Mr. Jerry Castoria,
               Chief Financial Officer

15

with a copy to:

        Proskauer Rose LLP
        1585 Broadway
        New York, New York  10036
        Attention:  Jeffrey Levitan, Esq.

To Purchaser:

        _____
        _____
        _____
        Attention:  _____

with a copy to:

        _____
        _____
        _____
        Attention:  _____

All Notices (i) shall be deemed given upon the date of delivery of such Notice or refusal to accept delivery of such Notice and (ii) may be given either by a party hereto or by such party's attorney set forth above.  Either party shall have the right to change its addresses for Notices for purposes of this Section 15 by giving not less than three (3) business days of advance notice thereof to the other party in accordance with this Section 15.  The provisions of this Section 15 shall survive the Closing or the earlier termination of this Agreement.

        16.     <u>Assignment of Agreement.</u>

        Subject to the terms of this Section 16, Purchaser shall not assign its rights under this Agreement or delegate Purchaser's duties hereunder, without the prior written consent of Seller, which consent may be withheld, delayed and conditioned by Seller in its sole and absolute discretion.  For purposes hereof, any transfer of any direct or indirect equity interest in Purchaser shall be deemed and shall constitute an assignment by Purchaser of its rights under this Agreement and shall be subject to the restrictions herein contained.  Notwithstanding the foregoing, Purchaser shall have the right to assign its rights hereunder to an entity that is wholly owned by (a) Purchaser or (b) the direct or indirect owners of Purchaser on the date hereof (a "<u>Permitted Assignee</u>"); provided, however, that Purchaser delivers to Seller, on or before the earlier of (x) the effective date of such assignment (which shall be no later than the Closing Date) and (y) two (2) business days prior to the Closing Date, written notice thereof, together with (i) a written agreement, in form and substance satisfactory to Seller in Seller's reasonable discretion, pursuant to which such assignee assumes and agrees to be bound by the terms and conditions of this Agreement, (ii) evidence reasonably satisfactory to Seller that the proposed assignee is in fact a Permitted Assignee, and (iii) certified copies of duly adopted resolutions of Purchaser and the Permitted Assignee, in form and substance satisfactory to Seller in Seller's reasonable discretion, authorizing the execution, acknowledgment and delivery of said

assignment and assumption agreement and the transactions contemplated therein and herein. Any assignment by Purchaser in contravention of this Section 16 shall be null and void for all purposes. Notwithstanding anything herein to the contrary, no assignment shall release the Purchaser herein named from any obligation or liability under this Agreement and the express terms of any assignment by Purchaser shall reaffirm Purchaser's obligations under this Agreement. Purchaser and the Permitted Assignee shall complete, execute and deliver any transfer tax returns, affidavits or other documents required by applicable law to be filed in connection with such assignment and shall pay any and all transfer taxes due thereon at or prior to the Closing hereunder. Any Permitted Assignee of Purchaser shall be deemed to have made any and all representations and warranties made by Purchaser hereunder, as if the Permitted Assignee were the original signatory hereto.

17. <u>Broker.</u>

(a) *Purchaser's Representation.* Purchaser represents and warrants to Seller that Purchaser dealt with no broker, finder or salesperson in connection with this Agreement other than CB Richard Ellis, Inc. ("<u>Seller's Broker</u>") \*\*\*[and _____ ("<u>Purchaser's Broker</u>"). Purchaser's Broker was retained by Purchaser to act as its broker, and Purchaser shall pay Purchaser's Broker its commission or other fee earned in connection with the transactions contemplated herein pursuant to a separate agreement between Purchaser and Purchaser's Broker.]\*\*\* Purchaser shall indemnify Seller, and hold Seller harmless, from and against, any and all losses, damages, liabilities, costs and expenses (including without limitation, reasonable attorneys' fees and disbursements) incurred by Seller to the extent arising out of a claim for commission or other compensation made by a broker, finder or other person with whom Purchaser dealt in connection herewith (other than Seller's Broker).

(b) *Seller's Representation.* Seller's Broker was retained by Seller to act as its exclusive broker pursuant to an Order of the Bankruptcy Court dated May 11, 2009. Seller shall pay Seller's Broker its commission or other fee earned in connection with the transactions contemplated herein pursuant to a separate agreement between Seller and Seller's Broker.

(c) *Survival.* The provisions of this Section 17 shall survive the Closing or the earlier termination of this Agreement.

18. <u>Entire Agreement.</u>

This Agreement contains all of the terms agreed upon between the parties with respect to the subject matter hereof, and all agreements heretofore had or made between the parties hereto are merged in this Agreement which alone fully and completely expresses the agreement of said parties. The provisions of this Section 18 shall survive the Closing or the earlier termination of this Agreement.

19. <u>Amendments.</u>

This Agreement may not be changed, modified or terminated, except by an instrument executed by all of the parties hereto. The provisions of this Section 19 shall survive the Closing or the earlier termination of this Agreement.

20. <u>No Waiver.</u>

No waiver by either party of any failure or refusal to comply with its obligations under this Agreement shall be deemed a waiver of any other or subsequent failure or refusal to so comply. The provisions of this Section 20 shall survive the Closing or the earlier termination of this Agreement.

21. <u>Successors and Assigns.</u>

Without limiting the terms of Section 16, the stipulations aforesaid shall inure to the benefit of, and shall bind, the heirs, executors, administrators, successors and permitted assigns of the respective parties. Nothing contained herein is intended or shall be construed to confer upon or give any person or entity other than Seller or Purchaser any right, remedy or claim under or by reason of this Agreement or the transactions contemplated hereunder, and this Agreement shall be for the sole and exclusive benefit of the respective parties hereto and the heirs, executors, administrators, successors and permitted assigns of the respective parties. The provisions of this Section 21 shall survive the Closing or the earlier termination of this Agreement.

22. <u>Partial Invalidity.</u>

If any term or provision of this Agreement or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law. The provisions of this Section 22 shall survive the Closing or the earlier termination of this Agreement.

23. <u>Section Headings.</u>

The headings of the various Sections of this Agreement have been inserted only for the purposes of convenience, and are not part of this Agreement and shall not be deemed in any manner to modify, explain or restrict any of the provisions of this Agreement. The provisions of this Section 23 shall survive the Closing or the earlier termination of this Agreement.

24. <u>Governing Law.</u>

This Agreement shall be governed by, interpreted under and construed and enforced in accordance with, the laws of the State of New York. The Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to resolve any and all disputes relating to the interpretation and implementation of this Agreement. The provisions of this Section 24 shall survive the Closing or the earlier termination of this Agreement.

3740/21521-011 Current/14497264v5

25. <u>No Recording or Notice of Pendency.</u>

The parties hereto agree that neither this Agreement nor any memorandum of notice hereof shall be recorded, and Purchaser agrees not to file any notice of pendency or other instrument against the Asset.  The provisions of this Section 25 shall survive the termination of this Agreement.

26. <u>Calculation of Time Periods; Business Days.</u>

Notwithstanding anything herein to the contrary, all periods of time described herein shall be calculated in accordance with the Section 20 of Article 2 of the New York General Construction Law.  As used herein, the term "business day" shall mean a day other than Saturday, Sunday or any day on which banks located in New York City are authorized or obligated to close.  The provisions of this Section 26 shall survive the Closing or earlier termination of this Agreement.

27. <u>Counterparts.</u>

This Agreement may be executed in counterparts, it being understood that all such counterparts, taken together, shall constitute one and the same agreement.  The provisions of this Section 27 shall survive the termination of this Agreement.

3740/21521-011 Current/14497264v5

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the day and year first above written.

SELLER:

CARITAS HEALTH CARE, INC.

By: _____
     Name:
     Title:

PURCHASER:

[                              ]

By: _____
     Name:
     Title:

3740/21521-011 Current/14497264v5

Exhibit "A"

Description of the Land


[see attached]

## SCHEDULE A DESCRIPTION

90-02 QUEENS BOULEVARD, ELMHURST, NEW YORK

ALL THAT CERTAIN PLOT, PIECE, OR PARCEL OF LAND, SITUATE, LYING, AND BEING IN
THE BOROUGH AND COUNTY OF QUEENS, CITY AND STATE OF NEW YORK, BEING MORE
PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHERLY SIDE OF QUEENS BOULEVARD (240 FEET WIDE)
DISTANT 158.59 FEET EASTERLY FROM THE CORNER FORMED BY THE INTERSECTION OF THE
SOUTHERLY SIDE OF QUEENS BOULEVARD WITH THE EASTERLY SIDE OF 57TH AVENUE;

RUNNING THENCE EASTERLY ALONG THE SOUTHERLY SIDE OF QUEENS BOULEVARD, 347.90
FEET TO A POINT;

THENCE SOUTHERLY ON A LINE FORMING AN INTERIOR ANGLE OF 97 DEGREES 32 MINUTES 20
SECONDS WITH THE SOUTHERLY SIDE OF QUEENS BOULEVARD, 122.89 FEET TO THE
NORTHERLY SIDE OF HOFFMAN DRIVE (60 FEET WIDE);

THENCE WESTERLY AND ALONG THE NORTHERLY SIDE OF HOFFMAN DRIVE AND ON A LINE
DRAWN ON AN INTERIOR ANGLE OF 96 DEGREES 43 MINUTES 59.7 SECONDS WITH THE LAST
MENTIONED COURSE, 159.28 FEET TO A POINT;

THENCE STILL WESTERLY AND ALONG THE NORTHERLY SIDE OF HOFFMAN DRIVE AND ON A
LINE FORMING AN INTERIOR ANGLE OF 164 DEGREES 40 MINUTES 56 SECONDS WITH THE
LAST MENTIONED COURSE, 52 FEET TO A POINT;

THENCE STILL WESTERLY AND ALONG THE NORTHERLY SIDE OF HOFFMAN DRIVE AND ON A
LINE FORMING AN INTERIOR ANGLE OF 173 DEGREES 06 MINUTES 16 SECONDS WITH THE
LAST MENTIONED COURSE, 124.23 FEET TO A POINT; AND

THENCE STILL WESTERLY AND ALONG THE NORTHERLY SIDE OF HOFFMAN DRIVE ON A LINE
FORMING AN INTERIOR ANGLE OF 153 DEGREES 49 MINUTES 28.9 SECONDS WITH THE LAST
MENTIONED COURSE, 72.92 FEET TO A POINT DISTANT 167.23 FEET EASTERLY FROM THE
EASTERLY SIDE OF 57TH AVENUE;

THENCE NORTHERLY ON A LINE FORMING AN INTERIOR ANGLE OF 109 DEGREES 57 MINUTES
38.4 SECONDS WITH THE NORTHERLY SIDE OF HOFFMAN DRIVE, 105.27 FEET TO THE
SOUTHERLY SIDE OF QUEENS BOULEVARD AT THE POINT OR PLACE OF BEGINNING.

FOR INFORMATION ONLY:  BLOCK 2857  LOT 36

## SCHEDULE A DESCRIPTION

87-28 58TH AVENUE, ELMHURST, NEW YORK

ALL THAT CERTAIN PLOT, PIECE, OR PARCEL OF LAND, SITUATE, LYING, AND BEING IN THE FORMER TOWN OF NEWTOWN, NOW SECOND WARD, OF THE BOROUGH OF QUEENS, COUNTY OF QUEENS, CITY AND STATE OF NEW YORK KNOWN AND DESIGNATED AS LOTS NUMBERED 106 TO 116, BOTH INCLUSIVE IN BLOCK NUMBERED 4 ON A CERTAIN MAP ENTITLED, "MAP OF 716 LOTS SITUATE AT NEWTOWN HEIGHTS, QUEENS COUNTY, LONG ISLAND, BELONGING TO JAMES V.S. WOOLLEY, JUNE 1892 CORNELIUS HYATT, SURVEYOR" AND FILED IN THE OFFICE OF THE CLERK, NOW NEW YORK CITY REGISTER, IN THE COUNTY OF QUEENS ON SEPTEMBER 17, 1892 AS NEW MAP NO. 2174 AND WHICH LOTS WHEN TAKEN TOGETHER ARE MORE PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT THE CORNER FORMED BY THE INTERSECTION OF THE SOUTHEASTERLY SIDE OF 58TH AVENUE WITH THE SOUTHWESTERLY SIDE OF HOFFMAN DRIVE;

RUNNING THENCE SOUTHEASTERLY ALONG THE SOUTHWESTERLY SIDE OF HOFFMAN DRIVE, 80.12 FEET TO THE COMMON BOUNDARY LINE OF MAP OF 716 LOTS (JAMES V.S. WOOLLEY) AND MAP OF NEWTOWN CENTER, FILED FEBRUARY 24, 1927 AS MAP NO. 5176;

THENCE SOUTHERLY ALONG SAID COMMON BOUNDARY LINE AND ON A COURSE FORMING AND INTERIOR ANGLE OF 95 DEGREES 34 MINUTES 58.3 SECONDS WITH THE SOUTHWESTERLY SIDE OF HOFFMAN DRIVE, 184.37 FEET;

THENCE STILL SOUTHERLY ALONG SAID COMMON BOUNDARY LINE AND ON A COURSE FORMING AN INTERIOR ANGLE OF 177 DEGREES 24 MINUTES 56.8 SECONDS WITH THE LAST DESCRIBED COURSE 46.60 FEET TO THE SOUTHERLY SIDE OF LOT NUMBERED 106 AFOREMENTIONED;

THENCE NORTHWESTERLY ALONG THE SOUTHERLY SIDE OF SAID LOT NUMBERED 106 AND AT RIGHT ANGLES TO 58TH AVENUE 124.01 FEET TO THE SOUTHEASTERLY SIDE OF 58TH AVENUE; AND

THENCE NORTHEASTERLY ALONG THE SOUTHEASTERLY SIDE OF 58TH AVENUE 218.24 FEET TO THE CORNER, THE POINT OR PLACE OF BEGINNING.

FOR INFORMATION ONLY: BLOCK 2860 LOT 16

## SCHEDULE A DESCRIPTION

57-28/58-00 HOFFMAN DRIVE, ELMHURST, NEW YORK

ALL THAT CERTAIN PLOT, PIECE, OR PARCEL OF LAND, SITUATE, LYING, AND BEING IN THE BOROUGH AND COUNTY OF QUEENS, CITY AND STATE OF NEW YORK, BEING MORE PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT THE CORNER FORMED BY THE INTERSECTION OF THE SOUTHERLY SIDE OF HOFFMAN DRIVE (60 FEET WIDE) WITH THE EASTERLY SIDE OF 57TH ROAD (60 FEET WIDE);

RUNNING THENCE EASTERLY ALONG THE SOUTHERLY SIDE OF HOFFMAN DRIVE, 22.59 FEET TO A POINT;

THENCE SOUTHERLY ON A LINE FORMING AN INTERIOR ANGLE OF 90 DEGREES 53 MINUTES 31 SECONDS WITH THE SOUTHERLY SIDE OF HOFFMAN DRIVE, 78.72 FEET TO A POINT;

THENCE WESTERLY AND AT RIGHT ANGLES TO THE LAST MENTIONED COURSE, 37.55 FEET TO A POINT;

THENCE NORTHERLY ON A LINE FORMING AN INTERIOR ANGLE WITH THE LAST MENTIONED COURSE OF 85 DEGREES 32 MINUTES 07 SECONDS, 43.40 FEET TO THE EASTERLY SIDE OF 57TH ROAD;

THENCE NORTHEASTERLY ALONG THE EASTERLY SIDE OF 57TH ROAD, 37.64 FEET TO THE POINT OR PLACE OF BEGINNING.

FOR INFORMATION ONLY: BLOCK 2858 LOT 20

## SCHEDULE A DESCRIPTION

57-30 HOFFMAN DRIVE, ELMHURST, NEW YORK

ALL THAT CERTAIN PLOT, PIECE, OR PARCEL OF LAND, SITUATE, LYING, AND BEING IN
THE BOROUGH AND COUNTY OF QUEENS, CITY AND STATE OF NEW YORK, AT ELMHURST BEING
KNOWN AND DESIGNATED UPON A CERTAIN MAP ENTITLED, "MAP OF 716 LOTS SITUATED AT
NEWTON HEIGHTS QUEENS COUNTY, LONG ISLAND, BELONGING TO JAMES V.S. WOOLEY, JUNE
1892, CORNELIUS HYATT, SURVEYOR" AS AND BY LOT 40 THE WESTERLY HALF OF LOTS # 41
IN BLOCK # 2 AS LAID DOWN ON SAID MAP WHICH WAS FILED IN THE OFFICE OF THE CLERK
(NOW REGISTER) OF COUNTY OF QUEENS, AND MORE PARTICULARLY BOUNDED AND DESCRIBED
AS FOLLOWS:

BEGINNING AT A POINT ON THE SOUTHWESTERLY SIDE OF HOFFMAN DRIVE DISTANT 30 FEET
NORTHWESTERLY FROM THE CORNER FORMED BY THE INTERSECTION OF THE SOUTHWESTERLY
SIDE OF HOFFMAN DRIVE WITH THE NORTHWESTERLY SIDE OF 58TH AVENUE;

RUNNING THENCE SOUTHWESTERLY PARALLEL WITH 58TH AVENUE, 78.25 FEET;

THENCE NORTHWESTERLY AT RIGHT ANGLES TO THE LAST MENTIONED COURSE, 30 FEET;

THENCE NORTHEASTERLY PARALLEL WITH 58TH AVENUE, 78.72 FEET TO THE SOUTHWESTERLY
SIDE OF HOFFMAN DRIVE;

THENCE SOUTHEASTERLY ALONG THE SOUTHWESTERLY SIDE OF HOFFMAN DRIVE 30 FEET TO
THE POINT OR PLACE OF BEGINNING.

FOR INFORMATION ONLY: BLOCK 2858 LOT 21

PLEGAL

# SCHEDULE A DESCRIPTION

57-32 HOFFMAN DRIVE, ELMHURST, NEW YORK

ALL THAT CERTAIN PLOT, PIECE, OR PARCEL OF LAND, SITUATE, LYING, AND BEING IN THE BOROUGH AND COUNTY OF QUEENS, CITY AND STATE OF NEW YORK, KNOWN AND DESIGNATED AS AND BY LOT # 42 AND THE EASTERLY 10 FEET OF LOT # 41 IN BLOCK # 2 ON A CERTAIN MAP ENTITLED, "MAP OF 716 LOTS SITUATE AT NEWTOWN HEIGHTS, QUEENS COUNTY, BELONGING TO JAMES V.S.WOOLEY JUNE 1892, CORNELIUS HYATT SURVEYOR", AND FILED IN THE OFFICE OF THE CLERK OF QUEENS COUNTY ON 9/16/1892, WHICH LOT AND PART OF LOT WHEN TAKEN TOGETHER AS ONE PARCEL ACCORDING TO SAID MAP IS BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE CORNER FORMED BY THE INTERSECTION OF THE SOUTHERLY SIDE OF OLD ROAD (NOW HOFFMAN DRIVE) AND THE WESTERLY SIDE OF BOWNE STREET (NOW 58TH AVENUE);

RUNNING THENCE SOUTHERLY ALONG SAID WESTERLY SIDE OF BOWNE STREET, 77.78 FEET;

THENCE WESTERLY AT RIGHT ANGLES TO BOWNE STREET, 30 FEET;

THENCE NORTHERLY AT RIGHT ANGLES TO OLD ROAD, 78.25 FEET TO THE SOUTHERLY SIDE OF OLD ROAD;

THENCE EASTERLY ALONG THE SOUTHERLY SIDE OF OLD ROAD, 30 FEET TO THE POINT OR PLACE OF BEGINNING.

FOR INFORMATION ONLY: BLOCK 2858 LOT 22

Exhibit "B"

Escrow Agreement


[see attached]

# Escrow Agreement

Dated:  as of _____, 2009

The parties to this agreement (this "Escrow Agreement") are CARITAS HEALTH CARE, INC., a New York not-for-profit corporation, as debtor and debtor-in-possession pursuant to Case Nos. 09-40901 (CEC) through 09-40909 (CEC) in the United States Bankruptcy Court for the Eastern District of New York ("Seller"), _____, a _____ ("Purchaser"), and PROSKAUER ROSE LLP (the "Escrow Agent").

Seller and Purchaser have entered into a Sale-Purchase Agreement dated as of _____, 2009 (the "Agreement"), which provides for the sale to Purchaser of Seller's interest in and to certain land located in New York, New York and other interests related thereto. Pursuant to Section 2 (a) of the Agreement, Purchaser is delivering to the Escrow Agent, to be held by it in escrow in accordance with the terms of this Escrow Agreement, the sum of  *[an amount equal to ten percent (10%) of the Purchase Price]*  Dollars ($_____), legal currency of the United States of America, which constitutes the Downpayment (as such term is defined in the Agreement) (such funds, if and to the extent deposited with the Escrow Agent, in whatever form invested and reinvested, together with all interest and other amounts from time to time held by the Escrow Agent under this Escrow Agreement, being referred to below as the "Escrow Deposit").

Accordingly, the parties agree as follows:

1.    Appointment of Escrow Agent.

Seller and Purchaser appoint Proskauer Rose LLP as the Escrow Agent, and Proskauer Rose LLP accepts that appointment and agrees to hold and dispose of the Escrow Deposit in accordance with the terms of this Escrow Agreement.  The Escrow Agent acknowledges receipt, by wire transfer of immediately available funds, of the sum of $_____, on account of the Escrow Deposit.

2.    Investment.

The Escrow Deposit may be deposited by the Escrow Agent with (i) J.P. Morgan Chase, (ii) Citibank, N.A., (iii) The Bank of New York Mellon or (iv) such other bank as the Escrow Agent may select.  The Escrow Agent may (but shall not be required to) invest and reinvest the Escrow Deposit in any of the following forms of investment:  interest bearing accounts or "money market" accounts of banks or trust companies organized in the United States having a minimum net worth of $200 million, in each case with maturity dates not later than thirty (30) days after the date of investment.

3.    Release of Escrow Deposit.

(a)    The Escrow Agent shall deliver the Escrow Deposit as follows:

(i)    If the Escrow Agent receives written instructions signed by both Seller and Purchaser (or a certified copy of a final order of a court of competent jurisdiction) directing delivery of all or part of the Escrow Deposit, the Escrow Agent shall deliver the Escrow Deposit as so directed.

(ii)    If the Escrow Agent receives a written notice signed by either Seller or Purchaser stating that the party who gave the notice is entitled to all or part of the Escrow Deposit, the Escrow Agent shall send a copy of that notice to the other party and, unless the Escrow Agent has received a written objection from the other party within seven (7) business days thereafter, the Escrow Agent shall deliver the Escrow Deposit in accordance with the notice.  If the Escrow Agent receives a written objection from the other party during such 7-day period, the Escrow Agent shall send a copy of the written objection to the party who gave the notice and shall not deliver any portion of the Escrow Deposit until it shall have received written instructions signed by each of Seller and Purchaser or a certified copy of a final order of a court of competent jurisdiction directing delivery of the Escrow Deposit, and the Escrow Agent shall then deliver the Escrow Deposit as so directed.

(iii)    If the Escrow Agent receives conflicting instructions from Seller and Purchaser regarding delivery of the Escrow Deposit, it shall send a copy of the instructions from each party to the other and shall not deliver any portion of the Escrow Deposit until it shall have received written instructions signed by each of Seller and Purchaser or a certified copy of a final order of a court of competent jurisdiction directing delivery of the Escrow Deposit, and the Escrow Agent shall then deliver the Escrow Deposit as so directed.

(b)    The Escrow Agent may at any time commence an action in the nature of interpleader or other legal proceedings and may deposit the Escrow Deposit with the clerk of a court of competent jurisdiction.

(c)    Upon any delivery or deposit of the Escrow Deposit as provided in this Section 3, the Escrow Agent shall be released and discharged from any further obligation under this Escrow Agreement.

(d)    If, at the time a party becomes entitled to the Escrow Deposit, the Escrow Agent holds, as part of the Escrow Deposit, an investment that has not matured, that party shall have the option (exercisable by notice to the Escrow Agent) to either (i) compel delivery of the investment (if assignable) and bear the risk of loss of interest on the investment or the cost of arranging for the sale or repurchase of the investment or (ii) permit the Escrow Agent to retain the investment until it matures and to deliver such portion of the Escrow Deposit so retained to the party entitled to the Escrow Deposit upon maturity of such investment.

4.     <u>Concerning the Escrow Agent</u>.

(a)     The Escrow Agent shall not have any liability to any of the parties to this Escrow Agreement or to any third party arising out of its services as Escrow Agent under this Escrow Agreement, except for damages directly resulting from the Escrow Agent's gross negligence or willful misconduct.  Without limiting the generality of the preceding sentence, in no event shall the Escrow Agent have any liability arising out of losses resulting from its investment or reinvestment of the Escrow Deposit in accordance with the terms of this Escrow Agreement, including, but not limited to, any loss of principal or failure to earn interest on the Escrow Deposit, any claim that a higher rate of return could have been obtained, or any loss of principal or interest resulting from any delay in the investment or reinvestment of the Escrow Deposit or the repurchase or sale of any certificate of deposit or other investment.

(b)     Seller and Purchaser jointly and severally shall indemnify the Escrow Agent and hold it harmless against any loss, liability, damage or expense (including reasonable attorneys' fees) that the Escrow Agent may incur as a result of acting as escrow agent under this Escrow Agreement, except for any loss, liability, damage or expense arising solely from its own gross negligence or willful misconduct, as determined by a final and non-appealable judgment of a court of competent jurisdiction.  For this purpose, the term "attorneys' fees" includes fees payable to any counsel retained by the Escrow Agent in connection with its services under this Escrow Agreement and, with respect to any matter arising under this Escrow Agreement as to which the Escrow Agent performs legal services, its standard hourly rates and charges then in effect.

(c)     The Escrow Agent shall be entitled to rely upon any judgment, notice, instrument or other writing delivered to it under this Escrow Agreement without being required to determine the authenticity of, or the correctness of any fact stated in, that document and irrespective of any facts the Escrow Agent may know or be deemed to know in any other capacity.  The Escrow Agent may act in reliance upon any instrument or signature believed by it to be genuine and may assume that any person purporting to give any notice or receipt or advice or make any statement or execute any document in connection with this Escrow Agreement has been duly authorized to do so.

(d)     The Escrow Agent shall have no duties or responsibilities except those expressly set forth in this Escrow Agreement.  The Escrow Agent shall not have any obligations arising out of or be bound by the provisions of any other agreement, written or oral, including, but not limited to, the Agreement.

(e)     Purchaser acknowledges that it knows that the Escrow Agent has represented Seller and its affiliates in connection with the Agreement and this Escrow Agreement and that it may continue to represent Seller and its affiliates in that connection and in connection with the transactions contemplated by those agreements, including, but not limited to, in connection with any disputes that may arise under either of those agreements.  The Escrow Agent shall not be precluded from or restricted from representing Seller and/or any of its affiliates or otherwise acting as attorneys for Seller and/or any of its affiliates in any matter, including, but not limited to, any court proceeding or other matter related to the Agreement or

the transactions contemplated by the Agreement, or this Escrow Agreement or the Escrow Deposit, whether or not there is a dispute between Seller and Purchaser with respect to any such matter;  Purchaser irrevocably consents to any such representation and waives any conflict or appearance of conflict with respect to any such representation.

(f)     Seller shall report as taxable income any taxable income resulting from the investment of the Escrow Deposit, except to the extent that interest earned on the Escrow Deposit is delivered to Purchaser pursuant to the terms of the Agreement, in which event Purchaser shall report as taxable income any taxable income resulting from such interest.  At the option of the Escrow Agent, the account in which the Escrow Deposit is held may indicate Seller's name and/or its Federal I.D. number.  The Escrow Agent may deduct or withhold from the Escrow Deposit or any payment under this Escrow Agreement any amount that it in good faith estimates is owed to the Internal Revenue Service or to any other taxing authority by any party with an interest in the Escrow Deposit, and the Escrow Agent may in its discretion pay over to the Internal Revenue Service or such other taxing authority all or part of the amount so deducted or withheld.

(g)     All of the Escrow Agent's rights of indemnification provided for in this Escrow Agreement shall survive the resignation of the Escrow Agent, its replacement by a successor Escrow Agent, its delivery or deposit of the Escrow Deposit in accordance with this Escrow Agreement, the termination of this Escrow Agreement, and any other event that occurs after the date hereof.

(h)     The Escrow Agent shall have no responsibility with respect to the sufficiency of the arrangements contemplated by this Escrow Agreement to accomplish the intentions of the parties.

5.     Representations.

Seller and Purchaser each represents and warrants to the Escrow Agent that it has full power and authority to enter into and perform this Escrow Agreement; that the execution and delivery of this Escrow Agreement was duly authorized by all necessary corporate action; and that this Escrow Agreement is enforceable against it in accordance with its terms.

6.     Resignation; Successor Escrow Agent.

The Escrow Agent (and any successor escrow agent) may at any time resign as such upon 60 days prior notice to each of the other parties.  Upon receipt of a notice of resignation, each of the other parties shall use their best efforts to select a successor agent within 30 days, but if within that 30 day period the Escrow Agent has not received a notice signed by both of them appointing a successor escrow agent and setting forth its name and address, the Escrow Agent may (but shall not be obligated to) select on their behalf a bank or trust company to act as successor escrow agent, for such compensation as that bank or trust company customarily charges and on such terms and conditions not inconsistent with this Escrow Agreement as that bank or trust company reasonably requires.  The fees and charges of any successor escrow agent shall be payable out of the Escrow Deposit.  A successor escrow agent selected by the resigning

Escrow Agent may become the Escrow Agent by confirming in writing its acceptance of the position.  Seller and Purchaser shall sign such other documents as the successor escrow agent reasonably requests in connection with its appointment, and each of them hereby irrevocably appoints the Escrow Agent as its attorney-in-fact to sign all such documents in its name and place.  The Escrow Agent may deliver the Escrow Deposit to the successor escrow agent selected pursuant to this provision and, upon such delivery, the successor escrow agent shall become the Escrow Agent for all purposes under this Escrow Agreement and shall have all of the rights and obligations of the Escrow Agent under this Escrow Agreement and the resigning Escrow Agent shall have no further responsibilities or obligations under this Escrow Agreement.

      7.     <u>Notices</u>.

All notices, instructions, objections or other communications under this Escrow Agreement shall be in writing and shall be deemed to have been duly given if (i) personally delivered with proof of delivery (or attempted delivery) thereof to the individual or individuals specified below (any notice or communications so delivered being deemed to have been given, served and received at the time delivered (or at the time delivery is rejected)), or (ii) sent by either United States Postal Service or nationally recognized commercial overnight or next business day (as defined in the Agreement) courier, with proof of delivery (or attempted delivery) thereof (any notice or communication so delivered being deemed to have been given, served and received on the next business day after the date on which sent) or (iii) sent by United States registered or certified mail, return receipt requested, postage prepaid (any notice or communication so sent being deemed to have been given, served and received when delivered (or delivery is rejected)), or (iv) by telecopier (with answerback acknowledged), provided that such telecopied notice must also be delivered by one of the means set forth in clauses (i), (ii) or (iii) above (any notice or communication so delivered being deemed to have been given, served and received on the receipt of answerback confirmation, provided such notice is also delivered by one of the means set forth in clauses (i), (ii) or (iii) above), addressed to the respective parties as follows (or at such other address as a party may specify by notice given in accordance with this paragraph):

      If to Seller, to it at:

          Caritas Health Care, Inc.
          16-10 Dekalb Avenue
          Brooklyn, New York  11237
          Attention:     Mr. Jerry Castoria,
                         Chief Financial Officer
          Telecopier: (718) 558-2425

          with a copy to:

          Proskauer Rose LLP
          1585 Broadway
          New York, New York  10036
          Attention:  Jeffrey Levitan, Esq.

Telecopier:  (212) 969-2900

If to Purchaser, to it at:

_____
_____
_____
Attention:  _____
Telecopier: (___) ___-_____

with a copy to:

_____
_____
_____
Attention:  _____
Telecopier: (___) ___-_____

If to the Escrow Agent, to it at:

Proskauer Rose LLP
1585 Broadway
New York, New York 10036
Attention:  Jeffrey Levitan, Esq.
Telecopier:  (212) 969-2900

8.      Miscellaneous.

(a)      The Escrow Agent shall serve under this Escrow Agreement without fee, but Seller and Purchaser jointly and severally shall pay to the Escrow Agent on demand all reasonable costs and expenses incurred by the Escrow Agent in performing its services under this Escrow Agreement.

(b)      If any provision of this Escrow Agreement is determined by any court of competent jurisdiction to be invalid or unenforceable in any jurisdiction the remaining provisions of this Escrow Agreement shall not be affected thereby, and the invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable that provision in any other jurisdiction.  It is understood, however, that the parties intend each provision of this Escrow Agreement to be valid and enforceable and each of them waives all rights to object to any provision of this Escrow Agreement.

(c)      This Escrow Agreement shall be binding upon and inure solely to the benefit of the parties and their respective successors and permitted assigns, and shall not be enforceable by or inure to the benefit of any third party.  No party may assign its rights or obligations under this Escrow Agreement or any interest in the Escrow Deposit without the written consent of the other parties (except as otherwise provided in the Agreement in connection

with a transfer by Purchaser of its interest in the Agreement in accordance with the terms of the Agreement), and any other purported assignment shall be void. In no event shall the Escrow Agent be required to act upon, or be bound by, any notice, instruction, objection or other communication given by a person other than, nor shall the Escrow Agent be required to deliver the Escrow Deposit to any person other than, Seller or Purchaser.

(d)     This Escrow Agreement shall be governed by, interpreted under and construed and enforced in accordance with, the laws of the State of New York, without regard to conflict of laws principles. The United States Bankruptcy Court for the Eastern District of New York shall retain exclusive jurisdiction to enforce the terms of this Escrow Agreement and to resolve any and all disputes relating to the interpretation and implementation of this Escrow Agreement.

(e)     A summons or complaint or other process in any such action or proceeding served by mail in accordance with Section 7 of this Escrow Agreement or in such other manner as may be permitted by law shall be valid and sufficient service.

(f)     This Escrow Agreement contains a complete statement of all of the arrangements among the parties with respect to its subject matter and cannot be changed or terminated orally. Any waiver must be in writing.

(g)     This Escrow Agreement is being entered into in order to implement certain provisions of the Agreement and shall not amend, modify or supersede the Agreement (or any other agreement entered into in connection therewith) or act as a waiver of any rights, obligations or remedies set forth therein; provided, however, Escrow Agent may rely solely on upon the terms of this Escrow Agreement in performing its duties hereunder.

(h)     This Escrow Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

(i)     The section headings used herein are for convenience of reference only and shall not affect the construction or interpretation of this Escrow Agreement.

**[END OF TEXT – SIGNATURES ON NEXT PAGE]**

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement on the date first set forth above.

SELLER:

CARITAS HEALTH CARE, INC.

By: _____
      Name:
      Title:


PURCHASER:

[                               ]

By: _____
      Name:
      Title:


ESCROW AGENT:

PROSKAUER ROSE LLP

By: _____
_____
      Member of the Firm
      Date: _____, 2009

Deed
(FORM)

Bargain and Sale Deed

Without Covenants Against Grantor's Acts

CARITAS HEALTH CARE, INC.

As Grantor

to

_____

As Grantee

Address:

_____
New York, New York

Block:             \_\_\_\_\_
Lots:              \_\_\_\_\_
County:          Queens

Recorded at Request of and
Return by Mail to:

_____
_____
_____

Attention:  _____

THIS INDENTURE, made the ___ day of _____ 2009 between CARITAS HEALTH CARE, INC., a New York not-for-profit corporation, having an address at 16-10 Dekalb Avenue, Brooklyn, New York 11237, party of the first part, and _____, a _____ _____, having an address _____, party of the second part.

WITNESSETH, that the party of the first part, in consideration of ten dollars and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the City of New York, County of Queens and State of New York, being more particularly described on Schedule A attached hereto and made a part hereof;

TOGETHER with all right, title and interest, if any, of the party of the first part, in and to any streets and roads abutting the above described premise to the center lines thereof;

TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises;

TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND this conveyance is made pursuant to Order of the United States Bankruptcy Court for the Eastern District of New York dated _____, 2009, Case Nos. 09-40901 (CEC) through 09-40909 (CEC), titled United States Bankruptcy Court for the Eastern District of New York In Re: Caritas Health Care, Inc. et al., Debtors. Order pursuant to Sections 105(a), 363(b), 365 and 1146(c) of the Bankruptcy Code approving sale of Debtors' real property in Queens, New York and related assets.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

[Remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the party of the first part has duly executed this deed the day and year first above written.

CARITAS HEALTH CARE, INC.

By: _____

Name:

Title:

ACKNOWLEDGEMENT

STATE OF _____          )
                                                        )
COUNTY OF _____          )

On the _____ day of _____ in the year 2009, before me, the undersigned, a Notary Public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is (are) subscribed to the within instrument and acknowledge to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the person(s),or the entity upon behalf of which the person(s) acted, executed the instrument.

_____
Notary Public

Schedule A

LEGAL DESCRIPTION

Exhibit "D"

Insurance Coverage

| NAMED INSURED: | CARITAS HEALTH CARE , INC. | | |
|---|---|---|---|
| MAILING ADDRESS: | 152-11 89th Avenue, Jamaica, NY 11432 | | AS OF |
| | | | 6/1/2009 |

| POLICY NUMBER | INSURANCE COMPANY | TERM | EFFECTIVE DATES | TYPE OF COVERAGE | AMOUNT | NOTATION |
|---|---|---|---|---|---|---|
| **ZMD914075900** | **AMERICAN GUAR. & LIABILITY** | **1 YEAR** | **6/1/2009- 6/1/2010** | **SPECIAL MULTI-PERIL POLICY** | | **Includes Taxes & Fees** |
| - | **(ZURICH)** | | | | | |
| - | - | - | - | **PROPERTY SECTION:** PERILS PROVIDED: ALL RISK INCLUDING EARTHQUAKE , FLOOD, TERRORISM, EQUIPMENT BREAKDOWN AGREED AMOUNT, REPLACEMENT COST | | **Coverage is written on** |
| - | - | - | - | | | **the same policy with** |
| - | - | - | - | | | **Wyckoff - Total Annual** |
| - | - | - | - | | | **Premium - $365,000** |
| - | - | - | - | LIMITS PROVIDED: | | |
| - | - | - | - | LOSS LIMIT PER OCCURRENCE | $445,000,000 | |
| | | | | DEDUCTIBLES: | | |
| | | | | REAL PROPERTY | $25,000 | |
| | | | | SUBLIMITS: | | |
| | | | | FLOOD ANNUAL AGGREGATE | $25,000,000 | $50,000 DEDUCTIBLE |
| | | | | EARTHQUAKE ANNUAL AGGREGATE | $25,000,000 | $50,000 DEDUCTIBLE |

**Exhibit D**

**Auction Procedures**

# AUCTION PROCEDURES[1]

The following procedures (the "Auction Procedures" or these "Auction Procedures") shall govern the auction (the "Auction") to be conducted with respect to the sale of the real property (the "Real Estate") of Caritas Health Care, Inc. and the other affiliated debtors and debtors in possession (each, a "Debtor," and collectively, the "Debtors"). These Auction Procedures have been approved and authorized by order dated _____, 2009 (the "Bidding Procedures Order") of the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") in the Debtors' Chapter 11 cases, which order was entered upon the Debtors' motion (the "Motion") dated _____, 2009 for entry of orders of the Court: (I) approving these Auction Procedures and certain bidder protections in connection herewith and, (II) subsequent to any Auction conducted pursuant hereto, authorizing sales of the Real Estate (the "Sales") free and clear of liens, claims, encumbrances and interests.

### 1.  Proposed Auction

The Debtors shall consider bids for the purchase of either the St. John's or Mary Immaculate Campuses or both (each, a "Bid"). Those who bid on the Real Estate (each, a "Bidder") may simultaneously submit Bids for (i) both the St. John's and Mary Immaculate Campuses, as well as (ii) either the St. John's or Mary Immaculate Campus, individually (e.g. a Bidder may submit one Bid for the St. John's and Mary Immaculate Campuses together, and also a separate Bid for the Mary Immaculate Campus alone). The proposed Sales shall in all respects be subject to approval by the Bankruptcy Court and in compliance with the applicable Sale Agreement.

### 2.  No Seller Representations or Warranties

The sale of the Real Estate shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents or their estates except to the extent set forth in a Sale Agreement with a Successful Bidder (as defined below).

### 3.  Due Diligence Requests

Upon execution and delivery of a confidentiality agreement, in form and substance satisfactory to the Debtors and their counsel, a Bidder shall be afforded the opportunity to conduct due diligence on the Real Estate until the Bid Deadline (as defined below). To obtain a copy of a confidentiality agreement, contact CB Richard Ellis, Inc. (the "Broker"), 88 Froehlich Farm Boulevard, Suite 100, Woodbury, NY 11797, Attn: David Zelinski, Tel: 516-677-1735, E-mail: David.Zelinski@cbre.com. Further due diligence inquiries and requests should also be directed to the Broker. To the extent not previously provided, due diligence access may include, at the Debtors' discretion, management presentations as may be scheduled by the Debtors, access to data rooms, on-site inspections of the Real Estate and such other matters as a Bidder may request

---

[1]  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

and as to which the Debtors, in their reasonable discretion, may agree. The Debtors may, in their discretion, coordinate diligence efforts so that multiple Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections.

       4.      <u>Form and Content of Bids</u>

      All bids must satisfy the following requirements:

      (a)     All Bids shall be accompanied by appropriate evidence, satisfactory to the Debtors in their sole discretion, as to the Bidder's financial and other required abilities to consummate a transaction.

      (b)     All Bids shall be unconditional and not contingent upon any event, including, without limitation, any additional due diligence investigation or financing contingency of any kind.

      (c)     No Bid shall be shared among Bidders (for example, without limitation, by way of a joint venture or a partnership) without the Debtors' prior written consent given after consultation with counsel to their secured lenders and the Committee.

      (d)     All Bids shall be irrevocable until a Closing has occurred with respect to the Real Estate which was bid upon and all Bidders shall be deemed to have agreed to serve as a Next Highest Bidder (as defined herein) and shall be obligated to close the Sales in such capacity if so elected by the Debtors.

      (e)     All Bids shall include an earnest money refundable deposit equal to 10% of the value of the Bid (a "<u>Deposit</u>") in the form of a certified check or wire transfer payable to Proskauer Rose LLP, as escrow agent. Each Deposit shall be held in an interest-bearing account. Deposits shall be returned promptly to the appropriate Bidder after the Closing of the sale of the related Real Estate, except for Deposits given by the purchaser(s) with respect to such Real Estate. If a Successful Bidder fails to consummate a sale as approved at the Sale Hearing because of a breach or failure to perform on the part of such Successful Bidder, the Debtors will not have any obligation to return the Successful Bidder's Deposit, and such Deposit shall irrevocably become property of the Debtors.

      (f)     All Bids shall state that such Bidder is prepared to enter into a legally binding Sale Agreement and shall be in the form of a mark-up of (i) the Sale Agreement(s) annexed to the Motion as <u>Exhibits B</u> and/or <u>C</u>, as applicable, (each such mark-up, a "<u>Modified Sale Agreement</u>") and (ii) the Form of Sale Order annexed to the Motion as <u>Exhibit F</u>, in each case unless otherwise agreed by the Debtors and a Bidder, and shall not request or entitle the Bidder to any transaction or break-up fee, expense reimbursement or similar type of payment. Moreover, all Bids shall be accompanied by a clean and duly executed Modified Sale Agreement.

(g)  A Bid for the purchase of the St. John's Campus shall provide for a purchase price of no less than $13,500,000, and a Bid for the purchase of the Mary Immaculate Campus shall provide for a purchase price of no less than $4,351,000.

(i)  Bids for both the St. John's and Mary Immaculate Campuses as a package shall allocate a value to each Campus individually, and such allocation shall provide consideration equal to or greater than the minimum required purchase price with respect to each such Campus.

(h)  All Bids shall fully identify the Bidder and the officer(s) or authorized Purchaser(s) who will appear on behalf of such Bidder.

(j)  All Bids shall include evidence of authorization and approval from the Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery of the Modified Sale Agreement and the closing of the transaction contemplated therein.

5.  <u>Time for Submission of Bids</u>

Any Bidder that desires to make a Bid shall deliver a copy of its proposal, in writing, including an executed Modified Sale Agreement, so that it is actually received by 12:00 p.m. (New York City time) on October 6, 2009 (the "<u>Bid Deadline</u>").  Bids should be submitted to: (1) counsel for the Debtors, Proskauer Rose LLP, 1585 Broadway, New York, NY 10036, (Attn: Jeffrey W. Levitan, E-mail: jlevitan@proskauer.com, and Adam T. Berkowitz, E-mail aberkowitz@proskauer.com), Fax: 212-969-2900; (2) counsel to DASNY, Winston & Strawn LLP, 200 Park Avenue, New York, New York 10166-4193 (Attn: David Neier, E-mail dneier@winston.com); (3) counsel to SVCMC, Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New York 10281 (Attn: Andrew M. Troop, E-mail andrew.troop@cwt.com, and Christopher R. Mirick, E-Mail christopher.mirick@cwt.com); and (4) counsel to the Committee, Alston & Bird LLP, 90 Park Avenue, New York, New York 10016 (Attn: Craig E. Freeman, Esq., E-mail craig.freeman@alston.com).

By submitting a Bid, each Bidder shall be deemed to acknowledge: (i) that it is bound by these Auction Procedures; (ii) that it had an opportunity to inspect and examine the Real Estate and all other pertinent information with respect to the Real Estate before submitting such Bid and that each such Bid is based solely on that review and upon each Bidder's own investigation and inspection; (iii) that is has consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Auction and the construction and enforcement of any transaction documents relating to the Bidder's Bid; and (iv) in making its Bid, such Bidder is not relying upon any written or oral statements, representations or warranties of the Debtors, their agents or representatives.

6.  <u>Due Diligence From Bidders</u>

Each Bidder shall comply with all reasonable requests for additional information by the Debtors or their advisors regarding such Bidder's financial wherewithal to consummate and perform obligations in connection with a Sale.  Failure by a Bidder to comply with requests for

additional information may be a basis for the Debtors to determine that such Bidder is not a Qualified Bidder (as defined below).

7.    <u>The Auction</u>

Only Bidders that submit Bids in compliance with these Auction Procedures, such compliance to be determined by the Debtors in their sole discretion (each such bid, a "<u>Qualified Bid</u>," and each Bidder submitting a Qualified Bid, a "<u>Qualified Bidder</u>"),[2] may participate in the Auction.  The Auction shall commence at 10:00 a.m. (New York City time), on October 9, 2009 at the offices of Proskauer Rose LLP, 1585 Broadway, New York, New York 10036, at which time counsel for the Debtors will explain the mechanics of the Auction in fuller detail.  Bidding shall commence at the amount of the highest or best bid submitted by a Qualified Bidder or Bidders prior to the Auction with respect to a parcel of Real Estate (a "<u>Baseline Bid</u>").  The determination of which Qualified Bids constitute the Baseline Bids shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to their estates.  All Bids thereafter shall be overbids and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders.  Bids subsequent to the Baseline Bid (i) in respect of the St. John's Campus shall exceed the Baseline Bid therefor by no less than $50,000, and (ii) in respect of the Mary Immaculate Campus shall exceed the Baseline Bid therefor by no less than $25,000, <u>provided however</u>, that the Debtors reserve the right to alter these bid increments at any time, including during the Auction.  Qualified Bidders who appear at the Auction in person, or through a duly authorized representative will be permitted to participate in the Auction.  Each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sales.  The Auction may be adjourned from time to time without further notice except by announcement of the adjourned date or dates at the Auction or any adjournment thereof.  If there are no Qualified Bidders, the Debtors may cancel the Auction without further notice.  The Debtors shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all overbids, the Successful Bidders' Bids and the Next Highest Bidders' Bids.  The Debtors reserve the right to conduct the auction in the manner designed to maximize value based upon the nature and extent of the Qualified Bids received.

8.    <u>Selection of Successful Bidder</u>

Prior to the completion of the Auction, the Debtors shall review and consider each of the Bids.  The Debtors may, after consultation with counsel to their Secured Lenders and the Committee, reject any Bid that, in the Debtors' sole discretion, is (a) inadequate or insufficient; (b) contrary to the best interests of the Debtors, their estates and their creditors, or (c) not in conformity with the requirements of these Bidding Procedures or the Bankruptcy Code.  The Debtors shall determine, in the exercise of their reasonable business judgment and in consultation with counsel to their Secured Lenders and the Committee, which of the Bids constitutes the highest or best Bid(s) and the runner(s)-up.  A Bidder making a Bid that is selected by the Debtors

---

[2]    The Stalking Horse Bidder shall be deemed to be a Qualified Bidder, and the Stalking Horse Bidder's Bid, as embodied in the Mary Immaculate Agreement, is deemed to be a Qualified Bid.

as the highest or best, with respect to the St. John's or Mary Immaculate Campus, shall be considered a "Successful Bidder." Before the conclusion of the Auction, the Debtors shall inform each of the Bidders of the decision regarding designation of the Successful Bidder(s) and the Next Highest Bidder(s) and the Successful Bidder(s) shall be required to execute a definitive asset purchase agreement at such time. In addition, the Successful Bidder shall be required, within 24 hours of the conclusion of the Auction, to increase its Deposit to an amount equal to 10% of the aggregate amount of the Successful Bidder's final Bid. Bidders should note that each parcel or combination of parcels of Real Estate may have a different Successful Bidder and Next Highest Bidder.

9.       Auction Results

Subject to the reservation of rights set forth below, the Debtors will submit proposed order(s) approving the sale to the Successful Bidders, together with agreements executed with the Successful Bidders, at or prior to the Sale Hearing (as defined below).

10.      Failure to Consummate Agreements

The Next Highest Bidders shall be obligated to keep their Bids open until the transaction with the Successful Bidders are closed. If for any reason a Successful Bidder fails to consummate the transaction contemplated by its winning Bid, the offeror of the second highest or best Bid (the "Next Highest Bidder") will automatically be deemed to be a Successful Bidder and will be obligated to consummate the transaction proposed in its runner-up Bid, without further order of the Bankruptcy Court.

11.      Bankruptcy Court Approval of a Successful Bidder

An evidentiary hearing (the "Sale Hearing") on all of the relief requested in the Motion and to approve transactions with Successful Bidders shall be held before the Honorable Carla E. Craig, United States Bankruptcy Judge at 271 Cadman Plaza East, Suite 3529, Brooklyn, New York on _____, 2009 at _____m.. The execution and implementation of the Sale Agreements or any other similar agreements are subject to approval of the Bankruptcy Court. The Sale Hearing may be adjourned from time to time without further notice except by announcement of the adjourned date or dates at the Sale Hearing or any adjournment thereof. The Debtors will be deemed to have accepted a Bid only when a sale in respect of such Bid has closed.

12.      Business Judgment of the Debtors – Reservation of Rights

The Debtors reserve the right (a) to determine in the reasonable exercise of their business judgment whether the amendments and changes contained in each Bid are acceptable; (b) to determine, in the reasonable exercise of their business judgment, which Bid, or any combination of Bids, is/are the highest or otherwise best offer(s), and to seek court approval of separate purchase agreements with separate purchasers with respect to such Bids; (c) to reject at any time prior to entry of an of the Bankruptcy Court approving a Successful Bidder, any bid that the Debtors, in the reasonable exercise of their business judgment, deem to be (i) inadequate or

insufficient or (ii) not to conform with the requirements of the Bankruptcy Code or the Auction Procedures; (d) to withdraw some or all of the assets from the Auction or sale at any time prior to entry of an order approving such sale, or (e) to alter, amend or otherwise not comply with these Auction Procedures at any time and without notice.

<u>**Exhibit E**</u>

**Auction and Sale Hearing Notice**

**UNITED STATES BANKRUPTCY COURT,
EASTERN DISTRICT OF NEW YORK**

```
-------------------------------------------------- x
```
**In re:**             :

            :        Chapter 11

            :

**CARITAS HEALTH CARE, INC., <u>et al.</u>,**    :        Case Nos. 09-40901 (CEC)

            :        through 09-40909 (CEC)

            :

          **Debtors.**    :        (Jointly Administered)

```
-------------------------------------------------- x
```

## NOTICE ESTABLISHING THE DATES, TIMES
## AND PLACES OF THE AUCTION AND THE SALE
## HEARING RESPECTING THE DISPOSITION OF
## <u>THE REAL PROPERTY OF CARITAS HEALTH CARE, INC.</u>

       **PLEASE TAKE NOTICE THAT**, on _____, 2009, pursuant to a motion filed by Caritas Health Care, Inc. ("<u>Caritas</u>") and the other above-captioned debtors and debtors-in-possession (each, a "<u>Debtor</u>," and collectively, the "<u>Debtors</u>") dated April 30, 2009 (the "<u>Motion</u>")[1], the United States Bankruptcy Court for the Eastern District of New York (the "<u>Bankruptcy Court</u>") entered an Order (the "<u>Bidding Procedures Order</u>") approving the Auction Procedures annexed hereto as <u>Exhibit 1</u> in connection with the sale of the real estate assets of Caritas (the "<u>Real Estate</u>") at an auction.

       **PLEASE TAKE FURTHER NOTICE** that the parcels comprising the Real Estate are as follows:

            (a)       the Mary Immaculate Hospital Campus and the attached on-site parking facility, located at 152-01 89th Avenue (aka 152-11 89th Avenue), Jamaica, New York, Block 9695, Lot 14;

            (b)       the St. John's Queens Hospital Campus, located at 90-02 Queens Boulevard, Elmhurst, New York, Block 2857, Lot 36;

            (c)       the St. John's Queens Hospital Parking Facility, located at 87-28 58th Avenue, Elmhurst, New York, Block 2860, Lot 16;

            (d)       three contiguous unimproved parcels located at 57-28, 57-30 and 57-32 Hoffman Drive, Elmhurst, New York, Block 2858, Lots 20, 21 and 22;

---

[1]      Capitalized terms used in this Notice but not defined shall have the meanings given to them in the Motion.

(e)        a vacant lot located on 88th Avenue in Jamaica, New York, Block 9695, Lot 6; and

(f)        a parking lot located at 152-09 88th Avenue (aka 152-03 88th Avenue), Jamaica, New York, Block 9697, Lot 52.

**PLEASE TAKE FURTHER NOTICE** that upon written request to the undersigned counsel, the Debtors will provide interested parties with access to the Real Estate in order to examine it. Closings with respect to the Real Estate shall take place on the 10th business day after notice of entry of a Sale Order approving an agreement for the purchase of such Real Estate, subject to Caritas' right to adjourn such Closing for a period not to exceed ten (10) business days, which extension shall be without prejudice to further extensions at Caritas' sole discretion, and time shall be of the essence as to the Stalking Horse Bidder's obligations to consummate such Closing on such adjourned date. The Closings shall take place at the offices of Proskauer Rose LLP, located at 1585 Broadway, New York, New York 10036 (or at such other place as Caritas and a purchaser may designate in writing).

**PLEASE TAKE FURTHER NOTICE** that, in accordance with the Auction Procedures (a) interested parties will have the opportunity to make competing offers to purchase the Real Estate and (b) the Debtors will select the highest or best bid and seek approval from the Bankruptcy Court of the entity submitting such bid. **The auction procedures contain detailed requirements for the submission of all bids and should be reviewed carefully**.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Auction Procedures, the Auction will be conducted at the offices of Proskauer Rose LLP, 1585 Broadway, New York, New York, on _____, 2009 at _____.m. (New York City time). **The Auction may be adjourned from time to time or may be cancelled without further notice except by announcement of the adjourned date or dates at the Auction or any adjournment thereof**.

**PLEASE TAKE FURTHER NOTICE**, that objections to any relief requested in the Motion, other than that granted in the Bidding Procedures Order, must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court for the Eastern District of New York, and shall be filed with the Bankruptcy Court electronically, by utilizing the Court's electronic case filing system at www.nyeb.uscourts.gov, or if the same cannot be filed electronically, by manually filing the same with the Clerk of the Court together with a 3.5 inch diskette containing the same in Portable Document Format, with a hard copy provided to the Clerk's Office at the Bankruptcy Court for delivery to the Chambers of the Honorable Carla E. Craig, and shall be served upon (1) counsel for the Debtors, Proskauer Rose LLP, 1585 Broadway, New York, NY 10036, (Attn: Jeffrey W. Levitan, E-mail: jlevitan@proskauer.com, and Adam T. Berkowitz, E-mail aberkowitz@proskauer.com), Fax: 212-969-2900; (2) the Office of the United States Trustee, 271 Cadman Plaza East, Suite 4529, Brooklyn, New York 11201 (Attn: William E. Curtin, E-mail william.e.curtin@usdoj.gov, and Valerie Millman, E-mail valerie.millman@usdoj.gov), (3) counsel to DASNY, Winston & Strawn LLP, 200 Park Avenue, New York, New York 10166-4193 (Attn: David Neier, E-mail dneier@winston.com); (4) counsel to SVCMC, Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New York 10281 (Attn: Andrew M. Troop, E-mail andrew.troop@cwt.com, and Christopher R. Mirick, E-Mail christopher.mirick@cwt.com); (5)

counsel to the Committee, Alston & Bird LLP, 90 Park Avenue, New York, New York 10016 (Attn: Craig E. Freeman, Esq., E-mail craig.freeman@alston.com); and (6) any other party entitled to service under applicable rules, so as to be received by all such parties no later than **_____, 2009 at _____.m. (New York City time)**.  Only those objections which have been timely filed and served may be considered by the Court at the Hearing.

       **PLEASE TAKE FURTHER NOTICE** that the Bankruptcy Court will hold a hearing on **_____, 2009 at _____.m. (New York City time)** to consider and approve the transaction or transactions contemplated by the Bid selected by the Debtors at the Auction.  **<u>The hearing may be adjourned from time to time without further notice except by announcement of the adjourned date or dates at the hearing or any adjournment thereof</u>**.


Dated: _____, 2009
      New York, New York


               **PROSKAUER ROSE LLP**

               By: _____
                  Jeffrey W. Levitan (JL-6155)
                  Adam T. Berkowitz (AB-3714)
                  1585 Broadway
                  New York, NY  10036-8299
                  Tel:  (212) 969-3000
                  Fax:  (212) 969-2900

               Counsel for the Debtors and
               Debtors-In-Possession

**Exhibit 1**

**Auction Procedures**

**Exhibit F**

**Form of Sale Order**

**UNITED STATES BANKRUPTCY COURT,
EASTERN DISTRICT OF NEW YORK**

```
----------------------------------------------------- x
```
**In re:**                                     :
                                               :                Chapter 11
                                               :
**CARITAS HEALTH CARE, INC., et al.,**         :                Case Nos. 09-40901 (CEC)
                                               :                through 09-40909 (CEC)
                                               :
                          **Debtors.**         :                (Jointly Administered)
```
----------------------------------------------------- x
```

**ORDER PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a)
AND 363 AND RULES 2002, 6004 AND 9014 OF THE FEDERAL
RULES OF BANKRUPTCY PROCEDURE (I) AUTHORIZING AND
APPROVING THE SALE OF CERTAIN OF THE DEBTORS' REAL ESTATE ASSETS
FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, (II)
AUTHORIZING AND APPROVING THE SALE-PURCHASE AGREEMENT
WITH RESPECT THERETO AND (III) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion")[1] of Caritas Health Care, Inc. and the

other above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), pursuant

to Sections 105(a) and 363 of Title 11 of the United States Code (the "Bankruptcy Code") and

Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), for entry of an order (i) authorizing and approving the sale, free and clear of liens,

claims and interests, of certain real estate assets (the "Real Estate") of Caritas, as more

specifically described in the Sale-Purchase Agreement (the "Agreement")[2] entered into by and

among Caritas and [_____] (the "Purchaser"), (ii) authorizing and approving such

Agreement and (iii) granting related relief; and a hearing to consider, among other things,

approval of the Auction Procedures having been held before this Court on [_____], 2009

---

[1] Capitalized terms used and not otherwise defined herein shall have the meaning ascribed to them in the Motion.

[2] The transactions contemplated by the Agreement, including the sale of the Real Estate to the Purchaser (as defined below) are herein referred to as the "Sale."

(the "Auction Procedures Hearing"); and the Court having entered the Bidding Procedures Order on [_____], 2009; and the Court having conducted the Sale Hearing on [_____], 2009 to consider the approval of the Sale and related transactions pursuant to the terms of the Agreement; and all parties in interest having been heard, or having had the opportunity to be heard, regarding the approval of the Agreement and the transactions contemplated thereby; and the Court having reviewed and considered the Motion and any objections thereto, and the arguments of counsel and evidence adduced related thereto; and upon the record of the Auction Procedures Hearing and the Sale Hearing and the full record of these cases; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their creditors and estates and other parties in interest; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.      This Court has jurisdiction over the Motion and the transactions contemplated by the Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue in this District is proper under 28 U.S.C. §§ 1408 and 1409.

C.      Good and sufficient notice of the Motion and the relief sought therein has been given to all interested persons and entities, including, without limitation, (a) the U.S. Trustee; (b) DASNY; (c) HFG; (d) SVCMC; (e) the Committee; (f) all those who have entered an appearance in these cases pursuant to Bankruptcy Rule 2002; (g) all parties who have expressed interest in

making a Bid and for which the Debtors were provided contact information; (h) all known entities holding or asserting a lien on the Real Estate; (i) the Office of the Attorney General of the State of New York; and (j) any taxing authorities having jurisdiction over the Debtors, and no other or further notice is required.

D. A sound business purpose justifies the transactions contemplated by the Agreement outside of the ordinary course of business.

E. The consideration to be provided by the Purchaser pursuant to the Agreement: (i) is fair and reasonable; (ii) is the highest and otherwise best offer in respect of the Sale; and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and the Uniform Fraudulent Conveyance Act (7A part II, U.L.A. 2 (1999)) or the Uniform Fraudulent Transfer Act (7A part II, U.L.A. 66 (1999)) or any similar laws of any state or other jurisdiction whose law is applicable to the contemplated transactions.

F. The auction process set forth in the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Real Estate. Consummation of the Sale contemplated in the Agreement will provide the highest or otherwise best value for the Real Estate and is in the best interests of the Debtors, their creditors and estates.

G. [_____] (the "Next Highest Bidder") is the Next Highest Bidder (as defined in the Auction Procedures) for the Real Estate.

H. Entry into the Agreement and consummation of the transactions contemplated thereby constitute the exercise of the Debtors' sound business judgment and fiduciary duties by the Debtors and such acts are in the best interests of the Debtors, their creditors and estates.

3

I.     The transactions contemplated by the Agreement are undertaken by the Debtors and the Purchaser at arms' length, without collusion and in good faith within the meaning of section 363(m) of the Bankruptcy Code.  The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and as such, is entitled to all of the protections afforded thereby and otherwise has proceeded in good faith in all respects in connection with this proceeding in that: (a) the Purchaser recognized that the Debtors were free to deal with any other party interested in a transaction regarding the Sale; (b) the Purchaser agreed to provisions in the Agreement that would enable the Debtors to accept a higher and better offer in respect of the Sale; (c) the Purchaser in no way induced or caused the Chapter 11 filing of the Debtors; (d) the Purchaser made the highest and best bid in respect of the Sale; (e) all payments to be made to Purchaser and other agreements or arrangements entered into by Purchaser in connection with the transactions have been disclosed; and (f) the negotiation and execution of the Agreement and any other agreements or instruments related thereto was in good faith and an arm's-length transaction between the Purchaser and the Debtors.

J.     The Debtors and the Purchaser have not engaged in any conduct that would permit the Agreement or the Sale to be avoided under Section 363(n) of the Bankruptcy Code.

K.     The Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia.

L.     The Debtors are the sole and lawful owners of the Real Estate, and hold good title thereto (subject to the Permitted Exceptions), immediately prior to the Closing.  Except as permitted under the express terms of the Agreement, the consummation of the Sale pursuant to the Agreement will be a legal, valid and effective sale of the Real Estate and will vest (a) the

4

Purchaser (and its designees or assignees, as applicable) with all right, title and interest of the Debtors and their bankruptcy estates in and to the Real Estate and (b) any Purchaser of the Real Estate (and their designees or assignees, as applicable) with all right, title and interest of the Debtors and their bankruptcy estates in and to the Real Estate, in each case, free and clear of all liens, claims and interests, including any such liens, claims and interests (i) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Debtors', the Debtors' estates' or the Purchaser's interest in the Real Estate, or any similar rights, or (ii) relating to taxes or any other liabilities, arising under or out of, in connection with, or in any way relating to, the Real Estate, the Debtors, the Debtors' estates, or their respective operations or activities prior to the Closing Date, subject, however, to the Permitted Exceptions.

M.     Sale of the Real Estate other than free and clear of liens, claims and interests other than the Permitted Exceptions would be of substantially less benefit to and would adversely affect the Debtors' bankruptcy estates.

N.     With respect to all parties asserting liens, claims and interests in, to, or against the Real Estate, except with respect to the Permitted Exceptions, the Sale complies with all the requirements of section 363(f) of the Bankruptcy Code.  With respect to each interest in the Real Estate, except with respect to the Permitted Exceptions: (a) applicable non-bankruptcy law permits the sale free and clear of such interest; (b) the holder of such interest consents to the Sale; (c) the price at which such property is to be sold is greater than the aggregate value of all liens on the Real Estate; (d) such interest is in bona fide dispute; or (e) the holder of such interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

5

O.	Except with respect to the Permitted Exceptions, all parties with liens, claims or interests against the Real Estate identified to be sold under the Agreement, if any, who did not object to the Motion and the relief requested therein, or who withdrew their objections to the Motion, are deemed to have consented pursuant to Section 363(f)(2) of the Bankruptcy Code; and all parties with liens, claims or interests against the Real Estate who objected to the Motion, but who did not withdraw any such objection, can be compelled to accept a monetary satisfaction of their liens, claims or interests within the meaning of Section 363(f)(5) of the Bankruptcy Code, and in each case, are enjoined from taking any action against the Purchaser or any purchaser of the Real Estate, their affiliates or any agent of the foregoing to recover any claim which such person or entity has solely against the Debtors, or any of their respective affiliates.

P.	By virtue of the Agreement or otherwise, the Purchaser will not acquire any liabilities of the Debtors except for the Permitted Exceptions.  The Purchaser is not a mere continuation of any of the Debtors or any of their estates, there is no continuity of enterprise between the Purchaser and any of the Debtors and the Purchaser is not holding itself out to the public or otherwise as a continuation of any of the Debtors.  The Purchaser is not a successor to any of the Debtors or any of their estates, and the Sale does not amount to a consolidation, merger or de facto merger of Purchaser and any of the Debtors.

Q.	Without limiting the generality of the foregoing, the Purchaser would not have entered into the Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates and their creditors, if the Sale were not free and clear of all liens, claims and interests of any kind or nature whatsoever, except for the Permitted Exceptions, or if the Purchaser would or in the future could, be liable for any liens, claims and interests.

R. The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

S. Upon entry of this order (the "Sale Order"), the Debtors shall have full power and authority to consummate the Sale contemplated by the Agreement. The Agreement and the Sale have been duly and validly authorized by all necessary action of the Debtors and no shareholder vote, board resolution or other corporate action is required of the Debtors for the Debtors to consummate such Sale or the other transactions contemplated in the Agreement.

T. Cause has been shown as to why this Sale Order should not be subject to the stay provided by Bankruptcy Rule 6004.

U. The entry of this Sale Order is in the best interests of the Debtors, their creditors and estates, and other parties in interest.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. The Motion, the Agreement and the transactions contemplated thereby shall be, and hereby are, granted and approved in all respects.

2. The Debtors are authorized and directed to close, consummate and comply with the Agreement and all other agreements and documents related to and contemplated thereby (collectively, the "Sale Documents"), which Sale Documents hereby are authorized and approved in all respects and to execute such other documents and take such other actions as are necessary or appropriate to effectuate the Agreement.

3. All objections and responses to the Motion are hereby resolved in accordance with the terms of this Order and as set forth in the record at the Sale Hearing. To the extent such objections or responses were not otherwise overruled, withdrawn, waived, settled or resolved, they, and all reservations of rights included therein, are hereby overruled and denied.

7

4. The Purchaser's offer in respect of the Sale, as embodied in the Agreement, is the highest and best offer therefor and is hereby approved.

5. Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, (i) the sale of the Real Estate by the Debtors to the Purchaser, (ii) the sale of the Real Estate as set forth in the Agreement and (iii) the transactions related thereto, upon closing under the Sale Documents, are authorized and approved in all respects.

6. Subject to the payment by the Purchaser to the Debtors of the consideration provided for in the Agreement pursuant to Section 363 of the Bankruptcy Code, (i) the sale of the Real Estate by the Debtors to the Purchaser shall constitute a legal, valid, and effective transfer of the Real Estate and shall vest the Purchaser with all right, title and interest of the Debtors in and to the Real Estate free and clear of all liens, claims and interests (except for the Permitted Exceptions) pursuant to section 363(f) of the Bankruptcy Code, effective as of the Closing.

7. Pursuant to Section 363(f) of the Bankruptcy Code, and except for the Permitted Exceptions, the Sale of the Real Estate shall be free and clear of all liens, claims and interests and all liabilities of the Debtors whether known or unknown, including, but not limited to, liens, claims or interests asserted by any of the Debtors' creditors, vendors, suppliers, employees, executory contract counterparties, mortgagees, lenders or lessors, with such valid and/or perfected liens, claims and interests to attach to the proceeds that the Debtors realize from the Sale in the order of priority, with the same validity force and effect that they now have as against the Real Estate, subject to any rights, claims, defenses and objections the Debtors may possess with respect thereto.

8. The Purchaser have not assumed or otherwise become obligated for any of the Debtors' liabilities except for the Permitted Exceptions.

8

9. Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and except for the Permitted Exceptions, all persons and entities, including, without limitation, the Debtors, all debt security holders, equity security holders, the Debtors' employees or former employees, governmental, tax, and regulatory authorities, lenders, parties to or beneficiaries under any benefit plan, trade and other creditors asserting or holding any liens, claims and interests, in or with respect to the Real Estate (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising prior to the closing date under the Agreement or the transfer of the Real Estate to the Purchaser, shall be forever barred, estopped, and permanently enjoined from asserting, prosecuting or otherwise pursuing such liens, claims and interests against the Purchaser or the Real Estate. To avoid doubt, the foregoing shall not prevent the Debtors, their estates, successors, or permitted assigns from pursuing claims, if any, against the Purchaser and/or their successors and assigns in accordance with the terms of the Agreement.

10. If any person or entity that has filed any financing statement, mortgage, mechanic's lien, *lis pendens* or other document or instrument evidencing liens with respect to any of the Real Estate shall have failed to deliver to the Debtors and Purchaser prior to the Closing of the Agreement, in proper form for filing and executed by the appropriate entity or entities, termination statements, instruments of satisfaction and releases of all interests which such person or entity has with respect to the Real Estate, then (a) the Debtors are authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity and (b) the Purchaser is authorized to file, register, or otherwise record a copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive

9

evidence of the release of all liens, claims, encumbrances, and interests in the Real Estate as of the Closing of the Agreement.

11.     The provisions of this Order authorizing the sale of the Real Estate free and clear of Liens (other than Permitted Exceptions) shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate and implement the provisions of this Order.  However, the Debtors and the Purchaser, and each of their respective officers, employees, and agents, are authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtors or the Purchaser deem necessary or appropriate to implement and effectuate the terms of the Agreement and this Sale Order.

12.     After the date of Closing of the Agreement, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect liens or a security interest against any of the Real Estate on account of, or (b) collect or attempt to collect from the Purchaser or any of its affiliates, any tax (or other amount alleged to be owing by the Debtors) (i) for any period concluding prior to the date of Closing or (ii) assessed prior to and payable after the date of Closing.

13.     This Sale Order shall be binding upon and govern the acts of all entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons or entities who may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report to or insure title or state of title in or to any of the Real Estate.

CURRENT 15007088v21

14.     Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement and this Sale Order.

15.     This Order (a) is and shall be effective as a determination that, upon Closing, liens existing as to the Real Estate conveyed to the Purchaser, except for the Permitted Exceptions, have been and hereby are adjudged and declared to be unconditionally released, discharged and terminated, subject to paragraph 7 hereof, and (b) is and shall be binding upon and govern the acts of all entities, including, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Real Estate conveyed to the Purchaser.

16.     With respect to the transactions consummated pursuant to this Sale Order, this Sale Order shall be sole and sufficient evidence of the transfer of title to the Purchaser, and the Sale consummated pursuant to this Sale Order shall be binding upon and shall govern the acts of all persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the property sold pursuant to this Sale Order, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, administrative agencies, governmental departments, secretaries of state, and federal, state, and local officials, and each of

11

such persons and entities is hereby directed to accept this Sale Order as sole and sufficient evidence of such transfer of title and shall rely upon this Sale Order in consummating the transactions contemplated hereby.

17.     Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, all "persons" (as that term is defined in section 101(41) of the Bankruptcy Code) are hereby enjoined from taking any action against the Purchaser or its affiliates (as they existed immediately prior to the Closing) to recover any claim which such "person" has solely against the Debtors (as they exist immediately following the Closing).

18.     All persons or entities who are presently, or at the Closing of the Agreement will be, in possession of any of the Real Estate conveyed to the Purchaser hereunder are hereby directed to surrender possession of such Real Estate to the Purchaser at the Closing.

19.     From and after the date of the entry of this Sale Order, the Debtors or any creditor or other party in interest shall not take or cause to be taken any action that would interfere with the transfer of the Real Estate to the Purchaser in accordance with the terms of this Sale Order.

20.     The Purchaser is a good faith purchaser entitled to the benefits and protections afforded by Section 363(m) of the Bankruptcy Code; accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the sale of the Real Estate by the Debtors to the Purchaser.

21.     The consideration provided by the Purchaser for the Real Estate pursuant to the Agreement is fair and reasonable, and the Sale may not be avoided under Section 363(n) of the Bankruptcy Code.

22.     CB Richard Ellis, Inc. is the Court-appointed broker involved in consummating the Sale and its commission in the amount of $[_____] [(1.5% of $_____)], as calculated

12

in accordance with the retention letter agreement dated April 24, 2009, may be paid by the Debtors upon the Closing and approval of the Broker's final fee application.

23. This Court shall retain exclusive jurisdiction to interpret and enforce the provisions of the Agreement, the Bidding Procedures Order, and this Sale Order in all respects and further to hear and determine any and all disputes between the Debtors and/or the Purchaser, as the case may be; provided, however, that in the event the Court abstains from exercising or declines to exercise such jurisdiction or is without jurisdiction with respect to the Agreement, the Bidding Procedures Order, and this Sale Order, such abstention, refusal, or lack of jurisdiction shall have no effect upon, and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

24. The Agreement and any related agreements, documents or other instruments may be further modified, amended or supplemented by the parties thereto, in a writing signed by such parties, in accordance with the terms thereof without further order of the Court, provided, however, that any material modifications shall be subject to the prior review and approval of the U.S. Trustee and the Committee.

25. From and after the date hereof, each Debtor shall act in accordance with the terms of the Agreement and each Debtor, to the extent it already has not done so, shall execute any Sale Document at or prior to Closing.

26. To the extent of any inconsistency between the provisions of this Sale Order and the Agreement, or any documents executed in connection therewith, the provisions contained in this Sale Order shall govern.

27. The provisions of this Sale Order are nonseverable and mutually dependent.

13

28.     This Sale Order shall inure to the benefit of the Purchaser, the Debtors, and their respective successors and assigns, including but not limited to any Chapter 11 or Chapter 7 trustee that may be appointed in the Debtors' cases and shall be binding upon any trustee, party, entity or fiduciary that may be appointed in connection with these cases or any other or further case involving the Debtors, whether under Chapter 7 or Chapter 11 of the Bankruptcy Code.

29.     Because time is of the essence, this Sale Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing, and the stay of (i) orders authorizing the sale, use, or lease of property of the estate, as set forth in Bankruptcy Rule 6004(h) and (ii) proceedings to enforce a judgment, as set forth in Bankruptcy Rule 7062, or otherwise shall not apply to this Sale Order.

30.     In the event of the default of the Purchaser and failure to close in accordance with the Agreement and this Sale Order, the Debtors are hereby authorized to close with the Next Highest Bidder pursuant to the sale agreement executed by such bidder.  In such case, this Sale Order and all of the terms and provisions herein shall apply to the Next Highest Bidder, the sale agreement executed by such bidder and such bidder's Bid to the same extent they are to apply to the Purchaser, the Agreement and the Purchaser's winning Bid.

31.     The Debtors are authorized to close the Agreement immediately upon entry of this Sale Order.


Dated: _____, 2009
        Brooklyn, New York


                                    _____
                                    United States Bankruptcy Judge